## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INDIANAPOLIS DOWNS, LLC, *et al.*,[1] | Case No. 11-_____ ( ) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF GREGORY F. RAYBURN
## IN SUPPORT OF THE DEBTORS' CHAPTER 11
## PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

**GREGORY F. RAYBURN** hereby declares, under penalty of perjury, as follows:

1.      I am the Chief Restructuring Officer[2] of Indianapolis Downs, LLC (d/b/a Indiana Downs and Indiana Live! Casino) ("**Indianapolis Downs**") and its wholly-owned subsidiary Indiana Downs Capital Corp. ("**IDCC**" and, together with Indianapolis Downs, the "**Debtors**" or the "**Company**"). I perform my duties out of the Debtors' headquarters located at 4300 North Michigan Road, in Shelbyville, Indiana. I submit this declaration (the "**Declaration**") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "**First Day Motions**").

2.      I have more than twenty eight years of experience working with troubled businesses, and creating and maximizing value for stakeholders of companies facing economic,

---

[1]  The Debtors in these chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Indianapolis Downs, LLC (5457) and Indiana Downs Capital Corp. (3803). The Debtors' address is 4300 N. Michigan Road, Shelbyville, IN 46176.

[2]  On February 24, 2011, I submitted an application for licensure with the Indiana Gaming Commission. Thereafter, following various correspondence with the Indiana Gaming Commission, on March 24, 2011, I submitted a job description detailing the chief restructuring role. By letter dated March 29, 2011, my application was approved and I became licensed by the Indiana Gaming Commission to serve as chief restructuring officer of Indianapolis Downs, LLC.

strategic and competitive challenges. I have experience in a wide range of industries, including gaming, thoroughbred horse racing, hospitality, manufacturing, freight, telecommunications, retail, home building, pharmaceutical, health care and outsourced services. Specifically, I have served as chief restructuring officer, chief executive officer or chief operating officer in several high profile distressed and restructuring situations including New York City Off Track Betting Association, Magna Entertainment Corporation, aaiPharma, WorldCom and Sunterra Corporation. During my time as chief executive officer of Magna Entertainment Corporation from May 2009 to May 2010, I led a successful reorganization and exit from bankruptcy for North America's largest owner of thoroughbred horse tracks and casinos (including Gulfstream Park, Remington, Santa Anita and Pimlico), by improving the operating performance of each of the assets and leading bankruptcy and restructuring efforts. I hold a Bachelor of Science in business and marketing, and a Master of Arts in accounting, both from the University of Alabama. I am a certified fraud examiner and licensed as a non-practicing certified public accountant. I have testified and have been qualified as an expert witness in federal and state courts on issues including business viability, valuation, strategic plan assessment, fraud, damages, bankruptcy and reorganization.

3.    As the Chief Restructuring Officer of the Debtors, I am authorized to submit this Declaration on behalf of the Debtors. Except as indicated otherwise, all statements in this Declaration are based upon my personal knowledge or my review of the Debtors' books and records, other relevant documents and information prepared or collected by the Debtors' employees. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein. In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

4.     Part I of this Declaration provides a brief overview of the Debtors and a summary of these Cases (as defined below). Part II of this Declaration describes in more detail the Debtors' business, the developments which led to the Debtors' chapter 11 filing and their goals in these Cases (as defined below). Part III sets forth the relevant details of the various First Day Motions.

# I.
# INTRODUCTION

5.     Indianapolis Downs operates a "racino," which is a combined race track and casino, at a state-of-the-art 283 acre Shelbyville, Indiana site. In addition, the Debtors operate two satellite wagering facilities in Evansville and Clarksville, Indiana (collectively, the "**OTB Facilities**"). The Shelbyville racino is a world class entertainment complex comprised of the Indiana Live! Casino (the "**Casino**") and the Indiana Downs racetrack (the "**Track**"), which collectively employ up to approximately 1,110 individuals during normal operations and 1,300 individuals during the racing season. The Casino is a growing business in its early stages, having opened in June of 2008 in a temporary facility and moved to its permanent site in March of 2009. Customers visit the facility to place wagers at one or more of approximately 2,000 high-tech slot machines and electronic table games including blackjack, roulette and craps, and poker, and to enjoy several branded dining and entertainment options. The Track, which opened in December 2002, offers live racing seven months out of the year (April - November) and a full-card simulcast wagering facility year round featuring thoroughbred, quarter-horse and harness races from across the country. In addition, the Track houses a full-service restaurant and lounge, an arcade, a gift shop, facilities for entertaining, and a family entertainment center, thus providing its customers with a wide array of entertainment options when visiting the Track.

6.     The Debtors' total revenue for calendar year 2010 was approximately $270 million, representing an 8.7% increase in revenue from 2009, after one full year of operations at the permanent facility.   During the twelve-month period ending in December 2010, the Casino captured 53% of the Indianapolis market share.

7.     Despite the success of 2010, the Debtors faced certain operational issues inherent in the early stages of a gaming facility and financial issues, primarily their ability to service the long term debt incurred because of an initial $250 million state-mandated license fee and a high statutory tax rate.  I was hired as part of the Debtors' effort to further provide a complete and stable management team focused on continued growth of revenue and enterprise value, while providing, and improving, a superior entertainment experience with unmatched customer service. Based on my experience, I have and continue to identify revenue enhancement opportunities. Although the Debtors currently operate the Casino and the Track on a cash-positive basis, additional revenue enhancements and operational and marketing efforts are being implemented which will realize increased operating profits during these bankruptcy cases.  Faced with the need to address sizeable long term debt, the Debtors' long term initiatives, which will enable them to implement a business plan and restructure their debt, include three critical, but achievable foundational points:

-     Increase Market Growth/Share

-     Operational Improvements

-     Realization of Legislative Relief

8.     Many of the necessary foundational processes are currently under way.  For instance, recently, management has implemented a number of demonstrable initiatives, including operational improvements across all departments to improve the customer experience, drive

growth and increase efficiency. The Debtors are creating measurable targets to generate consistent customers as part of their efforts to increase market share and market growth. The Debtors believe that, if given an opportunity to realize the benefits of these initiatives, which are already well underway, they will be able to achieve measurable goals in 2011 and the subsequent three to five years.

9. Still in the "start-up" phase of the operations at the permanent facility and under stable management, the Debtors continue to experience positive operating results. The Company has an asset which is far superior to that of its competitors and operates in a relatively underpenetrated market with significant growth opportunities. Presently, the Company is current on its trade payables and experiencing positive cash flow on an operational basis.

10. As a result of these factors and the results of initiatives currently under way, the Debtors anticipate that their enterprise value (and the value of the secured lenders' collateral) will grow during the pendency of these Cases. Simply stated, the Debtors have an operationally profitable, but relatively new business that has not yet achieved its full potential. It has steadily grown its revenue and market share since opening, however, it has not yet reached full maturity. Thus, this case is unlike many bankruptcy cases because the Debtors are demonstrating continual improvement in net operating cash flow at the same time as they filed these Cases. The Debtors simply need time to overcome some of the initial costs and burdens of establishing the business, including a $250 million licensing fee and a high statutory tax rate required by the state of Indiana. Although a consensual and negotiated "standstill" period in which the Debtors could address the financial restructuring required of its long term debt was preferred, the Debtors were not able to negotiate the relief needed with their lenders. As a consequence, the Debtors were required to file these Cases to permit them to continue to improve their operations, benefit from

the value enhancements available to Debtors, and reorganize themselves. The Debtors seek to use the chapter 11 process to restructure their institutional debt. The Debtors believe that a restructuring of this debt, coupled with continued operational improvements, market growth/share and legislative relief, with allow the Company to realize its full potential and generate significantly greater value for its constituents.

11.     To minimize the adverse effects of the commencement of these chapter 11 cases (the "Cases") on their business, the Debtors request various types of relief in the First Day Motions. The First Day Motions are described in greater detail in Part III below. Pursuant to the First Day Motions, the Debtors seek, among other things, to: (a) continue the Debtors' operations with as little disruption as possible; (b) maintain the confidence and loyalty of the Debtors' customers and employees; (c) obtain authority to use cash collateral and/or debtor-in-possession financing; (d) comply with applicable Indiana state statutes and regulations; and (e) retain appropriate professionals.     Gaining and maintaining the support of the Debtors' key constituencies, as well as operating the Debtors' day-to-day business with minimal disruption and erosion, will be crucial to the success of the Debtors' efforts in these Cases to maximize the value of the Debtors' estates as they work through the chapter 11 process.

12.     On the date hereof (the "Petition Date"), the Debtors commenced the Cases by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

## II.
## BACKGROUND

**A.**    **Overview of the Debtors**

13.    The Indianapolis Downs racino is located in Shelbyville, Indiana and is the second largest employer in Shelby County, Indiana and surrounding area. Located approximately twenty-five miles from Indianapolis, it is the closest casino to the downtown Indianapolis area and, as the newest gaming facility in the state of Indiana, prides itself on facilities that are far superior to that of its competitors. With its closest competitor located forty miles north of the property and thirty-nine miles northeast of Indianapolis, the Company is working to expand its marketing efforts to increase its reach in the downtown Indianapolis market segment.

14.    The racino is situated on a spacious 283-acre site, which features the Track, a one-mile race track and, the Casino, with 83,000 square feet of gaming space. Indianapolis Downs' business operations currently generate revenue from pari-mutuel operations at the Track, gaming operations at the Casino, food and beverage sales, and other operations at both facilities.

15.    The Track began conducting live pari-mutuel races and participating in simulcasting in December 2002. The Track is one of only two entities in the state of Indiana that is licensed by the Indiana Horse Racing Commission (the "**IHRC**") to conduct live pari-mutuel races and to participate in simulcasting. The pari-mutuel segment of its operations consists of pari-mutuel wagering on live thoroughbred, standard-bred and quarter horse races from April through November of each year. A full-card simulcast wagering facility at the track features thoroughbred and harness races from across the country and throughout the year. In addition to conducting live wagering during the "peak season," the Track simulcasts the Shelbyville races to

other racetracks. Beginning in 2003 and 2004, respectively, the Track began operating the OTB Facilities in Evansville, Indiana and Clarksville, Indiana.

16.     In June 2008, the Casino began operating a gaming facility featuring slot machines and electronic table games adjacent to the racetrack operation. While the current permanent gaming facility was being developed, on June 9, 2008, the Casino opened its doors in a temporary 70,000 square foot temporary facility which held 1,898 slot machines. Upon completion of the permanent facility, operations ceased at the temporary facility and, on March 13, 2009, the grand opening of the state-of-the-art Casino took place. The Casino offers its customers the optimal entertainment experience, featuring 1,995 electronic gaming machines, including approximately 25 electronic table games (blackjack, roulette and craps), a poker room, several branded dining and entertainment options and a recently opened banquet room. The Casino was awarded top honors in seven categories in 2010 in Southern Gaming & Destination Magazine's "Best of 2010" Readers' Choice Awards, including "Best Overall Casino."

17.     The racino facility hosts a wide array of dining and entertainment options in addition to gaming operations, thus rendering the facility a true destination for customers seeking a comprehensive entertainment experience. The Track offers a full-service restaurant with seating for approximately 375 guests, an arcade, a gift shop, and facilities that can be rented for business entertaining, including a casual event party room and luxury track-side suites. Similarly, at the Casino the gaming floor is encircled by the Live! Market Buffet, an approximately 400 seat market-style buffet and food court, approximately a 200-seat Maker's Mark® themed fine dining restaurant, an approximately 300-seat NASCAR sports bar, a coffee bar, and the Angels Rock Bar themed bar. Additionally, a 4,500 square foot center bar is located

on the gaming floor, and the upper level of the Casino contains two private dining and bar areas, as well as the new banquet facility.

## B. Corporate Structure

18.     Indianapolis Downs is an Indiana limited liability company, founded in 1999 primarily by Oliver Racing LLC, to finance a race track and the OTB Facilities. Oliver Racing LLC is a limited liability company whose membership is comprised of several trusts, with Ross Mangano as its managing member. Indianapolis Downs is 95.39% owned by Oliver Racing LLC,[3] 3.07% owned by John S. Warriner and 1.54% owned by Ross Mangano, who also serves as the Chairman of the Board of Managers. There are also $38,705,000 of non-voting, convertible preferred membership interests outstanding. The preferred membership interests are convertible to common interests at any time after the Senior Notes (defined below) and the Subordinated Notes (defined below) are paid in full. Currently, there is approximately $14,613,000 of accrued interest relating to the outstanding preferred membership interests.

19.     IDCC is a Delaware corporation formed solely to serve as co-issuer and guarantor of the Senior and Subordinated Notes. It has no assets or liabilities other than with respect to the Notes (defined below). Ross Mangano is the sole director of IDCC.

20.     Pursuant to an order of the IHRC dated July 21, 2001, Indianapolis Downs was granted a permit to conduct a horse track operation in Shelbyville, Indiana. Construction commenced, and the Track opened in 2002. In May 2007, the Indiana legislature granted permission  to operate a casino at the racetrack operation in Shelbyville, Indiana. Having determined that adding a casino at the existing racetrack site would create a valuable enterprise in Shelbyville, the group of family trusts that comprise Oliver Racing LLC searched for a

---

[3] Oliver Racing LLC has a preferential undistributed return of capital of $39,800,000.

development and management company that could transform their vision into a reality by building the casino that would become the crown jewel of Shelbyville. In September 2007, the Company entered into a Development, Financing & Management Agreement with Power Plant Entertainment Casino Resorts of Indiana, LLC ("**PPE**"), an affiliate of Gomes + Cordish Gaming Management, LLC ("**Cordish**"), to construct and manage the Casino. PPE managed the Casino from the time that it opened its doors in 2008 until July of 2010.

## C.  Prepetition Capital Structure

### (i)  Secured Loans

21.  On or about October 30, 2007, Indianapolis Downs entered into a Credit Agreement (the "**Original Credit Agreement**") with Jefferies Finance LLC,[4] and the lenders from time to time party thereto (collectively, the "**First Lien Lender**"), which provided for a $75,000,000 term loan (the "**Term Loan**") to fund the second installment of a gaming license payment due by November 2008. The Original Credit Agreement was amended on November 25, 2008 and subsequently amended and restated as of January 15, 2009 (the "**Amended Credit Agreement**") to provide for a revolving loan commitment of $25,000,000 (the "**Revolving Loan**" and, together with the Term Loan, the "**First Lien Debt**"). The First Lien Debt was collateralized by substantially all of the Debtors' assets. IDCC guaranteed the First Lien Debt.

22.  The Amended Credit Agreement was subsequently amended on October 9, 2009 (and thereafter on December 1, 2009, April 13, 2010, August 9, 2010, and March 4, 2011) to extend the maturity date of each of the Term Loan and the Revolving Loan until April 30, 2012 and to lower the interest rate on the First Lien Debt. Following these amendments, interest on the Term Loan was payable at an optional interest rate equal to the base rate (defined as the

---

[4]  Since that time, Wells Fargo Bank N.A. ("**Wells Fargo**") has succeeded to the rights of Jefferies Finance LLC as First Lien Lender.

higher of the prime rate, federal funds rate plus 0.5% or LIBOR plus 1%, or 3.5%) plus 7.25%, or LIBOR (minimum 2.5%) plus 8.25%. Interest on the Revolving Loan was payable monthly at an optional interest rate equal to the base rate (defined as the higher of the prime rate, federal funds rate plus 0.5% or LIBOR plus 1%, or 3.5%) plus 4.25%, or LIBOR (minimum 2.5%) plus 5.25%. On the Petition Date, the outstanding balance on the First Lien Debt was approximately $98,125,000.

23.  Effective as of December 2, 2010, as a result of the defaults under the First Lien Debt, the First Lien Lender began charging interest at the default rate, which is 2% in excess of the previously existing interest rate.

**(ii)    Senior Secured Notes and Senior Subordinated Secured Notes**

24.  On October 30, 2007, pursuant to an Indenture (the "**Senior Note Indenture**") by and among Indianapolis Downs and IDCC, as co-issuers, and The Bank of New York Trust Company, N.A. as trustee and collateral agent (in these capacities, the "**Senior Notes Agent**"), the Debtors issued senior secured notes in an aggregate principal amount of $375,000,000 (the "**Senior Notes**"). The Senior Notes mature on November 1, 2012 and bear interest at an annual rate of 11%, payable in cash. As of December 31, 2010 the outstanding balance on the Senior Notes was approximately $375,000,000 plus accrued and unpaid interest.

25.  Additionally, on October 30, 2007, pursuant to an Indenture (the "**Subordinated Indenture**") by and among Indianapolis Downs and IDCC, as co-issuers, and The Bank of New York Trust Company, N.A. as trustee and collateral agent (in these capacities, the "**Subordinated Notes Agent**")[5], the Debtors originally issued senior subordinated secured notes

---

[5] Pursuant to an Agreement of Resignation, Appointment and Acceptance, dated as of March 14, 2011 by and among Indianapolis Downs, The Bank of New York Mellon Trust Company N.A., and Wilmington Trust Company, The Bank of New York Trust Company, N.A. resigned from its position as indenture trustee and collateral agent under the Subordinated Indenture and Wilmington Trust Company succeeded to the position.

in an aggregate principal amount of $50,000,000 (the "**Initial Subordinated Notes**"). Additional Subordinated Notes were issued following the date of the Subordinated Note Indenture through June 2010 in an amount of $22,649,048 (together with the Initial Subordinated Notes, the "**Subordinated Notes**"). The Subordinated Notes mature on November 1, 2012 and bear interest at an annual rate of 15.5%, payable in cash or through the issuance of additional subordinated notes, provided that the Debtors' consolidated fixed charge coverage ratio is greater than or equal to 1.25. As of December 31, 2010, the outstanding balance on the Subordinated Notes was approximately $72,649,048.

26. The Senior Notes and the Subordinated Notes (collectively, the "**Notes**") are guaranteed by the Debtors and are collateralized by essentially all of the Debtors' assets. The Notes and related guarantees are subordinated to the First Lien Debt and such other indebtedness to the extent of the value of such assets. However, certain collateral in a construction account was pledged to the Senior Notes and/or the Subordinated Notes as security. In addition, pursuant to a related Intercreditor Agreement (described below), the Senior Notes Agent and the Subordinated Notes Agent, the liens securing the Subordinated Notes are contractually subordinated to the liens securing the Senior Notes.

(iii) **Related Party Debt**

27. In addition, on October 20, 2009, Indianapolis Downs issued $2,600,000 in short-term unsecured debt, bearing interest at a rate of 3.0% and due on demand to John Warriner and Susan McClean. These funds were to be used for working capital needs of the horse racing operations. As of September 30, 2010, $1,736,000 remains outstanding.

### (iv) **Demand Promissory Notes**

28.  Throughout the period of time from April through June 2009, Indianapolis Downs entered into unsecured demand promissory notes in the aggregate amount of $25,250,000, bearing interest at a rate of 8.0%, with Troon & Co. ("**Troon**"), a partnership of the trusts that comprise Oliver Racing, LLC.  Indianapolis Downs issued these notes to Troon in exchange for Troon's funding of a trust collateral account pursuant to a separate agreement with the Senior Notes Agent.

29.  Subsequently, on June 29, 2009, Indianapolis Downs entered into a demand promissory note with Troon in an amount of $3,100,000, bearing interest at a rate of 8.0%, to fund working capital needs at the Track.  In May and June 2010, Indianapolis Downs entered into demand promissory notes with Troon in an additional aggregate amount of $9,025,000, bearing interest at a rate of 3.0%, for additional working capital needs at Indiana Downs.  The principal and interest on these notes are not able to be paid until permitted under the Notes and the First Lien Debt.

30.  As of September 30, 2010, $37,575,000 remained outstanding on these demand promissory notes plus $3,599,000 in accrued interest.

### (v) **The Intercreditor Agreement**

31.  On October 30, 2007, Indianapolis Downs, Troon, the First Lien Lender, the Senior Notes Agent and the Subordinated Notes Agent entered into that certain Intercreditor Agreement (the "**Intercreditor Agreement**"), pursuant to which the liens securing the Subordinated Notes are contractually subordinated to the liens securing the Senior Notes.  The First Lien Debt, Senior Notes and Subordinated Notes, along with the Permitted Indebtedness described above, are all governed by the Intercreditor Agreement.  Among other things the

Intercreditor Agreement governs these parties' rights on various issues including priority, enforcement and distributions, including with respect to actions taken in these chapter 11 Cases.

32.     In particular, section 6.01 of the Intercreditor Agreement restricts the right of the holders of the Notes to object to certain actions in a chapter 11 bankruptcy proceeding until the First Lien Debt has been discharged, or unless the First Lien Lender opposes the Debtors' proposed request for relief.  Specifically, section 6.01(a)(i) provides that, unless the First Lien Lender opposes the Debtors' proposed use of its collateral as cash collateral within the meaning of section 363 of the Bankruptcy Code, the holders of Notes will not oppose or object to the use of the First Lien Lender's collateral as cash collateral.  Similarly, the Intercreditor Agreement provides that the holders of the Notes will not oppose or object to any First DIP Financing (as defined therein), whether provided by the First Lien Lender or otherwise, unless the First Lien Lender opposes the proposed post-petition financing.  Moreover, the holders of the Notes agree in section 6.01(a)(iii) of the Intercreditor Agreement to not request adequate protection with respect to any Collateral (as defined therein) in connection with the Debtors' proposed use of cash collateral.

33.     Thus, the holders of the Senior Notes and the Subordinated Notes agreed contractually amongst themselves, and with the Debtors, that they will not object to post-petition debtor-in-possession financing proposed by the First Lien Lender or to the Debtors' use of Collateral to which the First Lien Lender has consented and will not request adequate protection (other than replacement liens) of their respective interests in connection with any such post-petition financing.

D.     **Events Leading to the Chapter 11 Filing**

34.     Because of the efforts of and significant financial commitments made by the current management and ownership, Indianapolis Downs operates a world class racino with

facilities that are superior to all of its competitors and produces cash positive results on an operational basis. Although certain state gaming and horsemen provisions require significant payment for the benefit of the state and its citizens, Indianapolis Downs generates revenues sufficient to pay its operating expenses. However, Indianapolis Downs has been over-leveraged since its inception and is just now beginning to realize its full potential.

35.     On December 9, 2010, as a result of the Debtors' failure to pay interest due on November 1, 2010 to the holders of the Senior Notes, as required pursuant to the terms and conditions of the Senior Notes Indenture, certain holders and beneficial holders of the Senior Notes delivered an acceleration notice to Indianapolis Downs and the Senior Notes Agent. Consequently, on December 9, 2010, the Senior Notes Agent delivered an acceleration notice to Wells Fargo, as administrative agent and collateral agent for the Amended Credit Facility, triggering a ninety-day standstill period established pursuant to the Intercreditor Agreement. Additional defaults under the First Lien Debt and the Subordinated Notes have been triggered as a result of the acceleration of the Senior Notes. The standstill period contemplated under the Intercreditor Agreement expired on March 9, 2011. On March 7, 2011, Indianapolis Downs entered into separate forbearance agreements with the First Lien Lender and the Senior Notes Agent which extended the standstill period through April 7, 2011.

E.     **Rightsizing the Capital Structure and Enhancement of the Value-A Path to a Successful Restructuring**

36.     Prior to and following the delivery of the notice of acceleration, Indianapolis Downs engaged in discussions with its First Lien Lenders and certain holders of the Senior Notes and Subordinated Notes with respect to these defaults. However, at this time the Company has determined that its constituents would be best served if it were able to take advantage of the protections of the Bankruptcy Code to afford the Company an opportunity to restructure its

institutional debt and significantly improve enterprise value. This case is not simply about an over-leveraged company that is unable to meet its debt service. Rather, this case is an example of a relatively new business that is just beginning to see the fruits of its labor. This company is: (a) a valued employer in Shelby County and the Indianapolis metro area; (b) a member of the local Shelbyville community; (c) a business which operates on a cash positive basis; and (d) a business with a clear vision of its path to rightsizing its balance sheet based on identified initiatives with measurable near term goals. The Company has spent significant time, money and effort to overcome the initial deficiencies that surfaced from the burdensome state licensure and statutory tax rate requirements. It has developed a specific plan to complete its rightsizing through a combination of: (e) additional planned operational improvements, increase market growth and market share, new marketing consultants, new machines on the gaming floor, and a new customer service program; (f) legislative relief, and (g) the infusion of capital at favorable rates which will relieve the current debt stress on the Company's balance sheet.

37.     In addition, the Company is in the final stages of its initial self-managed operational launch, having  improved operations following the termination of its prior management contract and survived normal ramp-up hurdles. The Casino is a world class facility with vast potential for additional growth, as demonstrated by the operational initiatives described above. Over the course of the past several weeks, the Company has become focused on increasing its capture rate and improving market awareness. Recently, the Company has hired new marketing consultants that will focus on further increasing the Company's market share. In addition to my retention and the retention of my firm, Kobi Partners, LLC, the Company has also retained Lazard Freres & Co., LLC ("**Lazard**") to assist with further operational improvements and to evaluate whether there may be additional outside investors wishing to acquire an interest

in this Company. Accordingly, the Company has hired Lazard to, among other things, explore the marketplace and evaluate whether there are potential synergies with strategic partners interested in going-forward expansion.

38. The Company believes that there is significant value that can be achieved by its rightsizing initiatives. In the exercise of their fiduciary duties to their various constituencies, the management of the Company is obligated to pursue these strategies which, if successful, would significantly increase value and allow the Company to continue operations with little disruption. Prior to filing these Cases, the Company was current with payments to its vendors and more than capable of continuing to make current payment of its operational liabilities in the ordinary course of business. The value of the Company is increasing, not decreasing. The Company seeks to effectuate a financial restructuring and, therefore, the Company has sought the protections of the Bankruptcy Code. It desires to use the chapter 11 process to its advantage to emerge in an even stronger operational posture and with a more manageable debt load.

## III.
## FIRST DAY MOTIONS [6]

39. Concurrently with the filing of the voluntary petitions to commence these Cases, the Debtors will be filing a number of First Day Motions. The Debtors anticipate that the Bankruptcy Court will conduct a hearing within a business day or two after the commencement of the Cases (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

40. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the Cases; (b) continuing the

---

[6] Capitalized terms used in Part III and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

Debtors' operations during these Cases with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtors' other key constituencies. I have reviewed each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve success in these Cases.

41.     The First Day Motions are summarized below.

**A.     Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only**

42.     By this motion, the Debtors request entry of an order authorizing and directing the joint administration of the Debtors' related chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for the Debtors' Cases under the Indianapolis Downs, LLC case and also request that the caption of their Cases be modified to reflect the joint administration of the Cases.

43.     Indiana Downs Capital Corp. is the wholly-owned subsidiary of Indianapolis Downs, LLC such that the Debtors constitute "affiliates" of one another within the meaning of 11 U.S.C. § 101(2).[7] Joint administration of these Cases (a) is warranted because the Debtors' financial affairs and business operations are closely related, and (b) will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Cases.

44.     Joint administration will permit the Clerk to use a single general docket for the Debtors' Cases and to combine notices to creditors and other parties-in-interest of the Debtors'

---

[7]  Section 101(2) of the Bankruptcy Code defines "affiliate" to include, in relevant part, a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor…" 11 U.S.C. § 101(2).

respective estates. Joint administration also will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Cases will be apprised of the various matters before the Court in both of these Cases.

45. I understand that if the Court approves joint administration of the Debtors' Cases, the Debtors will be able to reduce fees and costs resulting from the administration of these Cases and ease the onerous administrative burden of having to file multiple documents. I have also been advised that joint administration will ease the administrative burden for the Court and all parties to these Cases and obviate the need for duplicative notices, motions, applications and orders, and thereby save time and expense for the Debtors and their estates.

46. Based on the foregoing, the Debtors believe that joint administration of the Cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**B. Motion of the Debtors for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management System, and (C) <u>Waiving Certain Investment and Deposit Guidelines on an Interim Basis</u>**

47. By this motion (the "**Cash Management Motion**"), the Debtors seek entry of an order (a) authorizing the maintenance of Bank Accounts and continued use of existing business forms and checks; (b) authorizing continued use of existing Cash Management System; (c) waiving certain of the investment and deposit Guidelines established by the United States Trustee for the District of Delaware on an interim basis; and (d) providing any additional relief required in order to effectuate the foregoing.

48. As described in the Cash Management Motion, the Debtors' cash management system is necessary not only for the efficient functioning of the Debtors' business, but also to comply with the strict regulations imposed by the gaming and racing authorities. For an

enterprise like the Debtors, whose operations are so highly dependent on their ability to manage the high volume of cash receipts and cash disbursements received and made on a daily basis, maintaining their existing cash management system is crucial.

49.     In the ordinary course of their business, the Debtors collect large sums of cash in the "house banks" located at the Casino, the Track and the OTB Facilities. At the Casino, these "house banks" are called "cages." At the Track and OTB Facilities, the Debtors collect cash in secure vaults that serve the same purpose as the Casino's cage. These on-site cash-collecting locations represent a significant source of the Debtors' revenue.

50.     In addition, prior to the commencement of their Cases, and in the ordinary course of their business, the Debtors maintained fifteen (15) bank accounts (collectively, the "**Bank Accounts**") that they desire to continue to use. Six (6) of the Bank Accounts relate primarily to operations at the Casino (the "**Casino Bank Accounts**"), eight (8) of the Bank Accounts relate primarily to operations at the Track (the "**Track Bank Accounts**"), and one (1) Bank Account is used by both the Casino and the Track. A list of all Bank Accounts used by the Debtors is as **Exhibit "A"** to the Cash Management Motion.

51.     The cash in the various cages and vaults, together with the funds flowing through the Bank Accounts, comprise the Debtors' carefully constructed cash management system (the "**Cash Management System**"). The Cash Management System ensures the Debtors' ability to efficiently monitor and control their cash position and comply with applicable gaming statutes and regulations, as is more fully described below and as set forth in the account flow chart attached as **Exhibit "B"** to the Cash Management Motion.

(i)     *The Cages and Vaults*

52.    Most of the Debtors' revenue is in the form of cash receipts from patrons on the gaming floors and at the wagering stations. This revenue is initially collected on a daily basis at the locations within the Casino and the Track where winning tickets are redeemed for cash.

53.    The Casino operates a multi-segmented cage system which is comprised of a main cage area, a main vault area, an employee service window and various satellite cages. All transactions on the casino floor flow through these areas of the cage and are recorded in an accountability and inventory log. Specifically, the main and satellite cages are primarily used to handle customer transactions, including the receipt of credit markers for Casino patrons who use the Casino's credit services.[8] The employee service window is used for various kinds of transactions with Casino employees. The main vault area is where all cash, deposits, credit instruments, and amounts received from the ATM kiosks are held. At the close of each shift, the satellite cages exchange the cash held in their respective banks and all tickets received at the main vault. At that time, the main vault issues a new set of funds to the cashiers for each of the satellite vaults. Pursuant to Indiana state law, the cage is required to hold, on a daily basis, monies equal to three times the average daily payout during the preceding quarter. *See* 68 IND. ADMIN. CODE 15-3-3. On an average daily basis, approximately $10.6 million is maintained in the Casino cage. Funds in excess of the statutorily required reserves and operational costs are deposited into its main depository account on a daily basis

---

[8] The Casino offers credit services to all casino patrons through a standardized application, review and approval process. *See* 68 IND. ADMIN. CODE 16-1-3. Each patron that is granted credit at Casino is assigned a pre-determined time period after which unclaimed markers will be deposited into the Casino Main Account (as defined herein). *See* 68 IND. ADMIN. CODE 16-1-8. These time periods are based on the individual's credit limit and generally range from seven (7) to twenty-one (21) days in the ordinary course of business, although state law authorizes the casino to maintain the markers for a thirty (30) day period prior to deposit. *See* 68 IND. ADMIN. CODE 16-1-13. All credit files are maintained within the Casino cage system. As of the Petition Date, the Casino has approximately one-hundred forty (148) active credit files with a total of $603,406 in credit issued and $80,620 in credit outstanding. The Casino handles all collection efforts related to this credit, however it utilizes the services of a collection agency on an as-needed basis. For the thirty (30) day period ending February 28, 2011, approximately $22,620 was returned from collection efforts and approximately $57,920 remained outstanding in credit markers.

54. The Track maintains secure vaults and money rooms, both on-site and at the OTB Facilities, that serve the same function as a cage. The vaults are secured behind double-locked doors that have limited key access. On a daily basis, monies from the vault are used to fund the OTB tellers and the cashiers' drawers at the various Track food and beverage outlets. Periodically throughout the day, the funds in these drawers are collected, identified by source, counted, and reconciled by vault management personnel in preparation for twice weekly pick-up by an armored car service. At the OTB Facilities, bettors may present tickets or vouchers for redemption. On a strictly limited basis, tellers are authorized to cash checks for Horsemen (as defined herein). During the off season, the Shelbyville vault carries a balance of $99,900 and each of the OTB Facilities carry a balance of $80,000. During the live racing season, the Shelbyville vault carries a $200,000 balance to account for increases in OTB volume. On a daily basis, funds in excess of the Track's operational costs are deposited into its main operating account.

### (ii) The Bank Accounts

55. The Debtors' Cash Management System consists of two subsystems centralized around the casino operations at the Casino and the racetrack operations at the Track, each of which are summarized as follows:

a) Casino Main Depository Account: The Casino segment of the Debtors' operations maintains one main depository account with Fifth Third Bank (the "**Casino Main Account**")[9] to which deposits are made on a daily basis. The Casino Main Account serves as the ultimate collection point for the majority of funds moved into the Casino Bank Accounts. Deposits made into the Casino

---

[9] Unless otherwise noted, all of the Casino bank accounts are maintained at Fifth Third Bank in Shelbyville, Indiana. Fifth Third Bank is a member of the FDIC. All of the Debtors' accounts held at Fifth Third are FDIC insured up to the FDIC limit amount.

Main Account include daily deposits from the cage, casino operations, food and beverage outlets, credit markers,[10] and monthly deposits of ATM commissions.

The Casino Main Account holds cash and transfers cash into four (4) checking accounts (collectively, the "**Casino Checking Accounts**") that are used in the Casino's operations to make payments related to payroll, accounts payable, the casino cage, and various types of gaming taxes. These accounts allow funds to be transferred in and out of the Casino Checking Accounts as needed to satisfy the Debtors' obligations. In addition, credit markers are withdrawn from the Casino Main Account on a daily basis. Any balance left at the end of each week is swept into the General Account (defined below).

b)      Casino Secondary Account: In addition, funds received in a secondary depository account (the "**Casino Secondary Account**") from ATM kiosks, credit card advances, credit card deposits and check cashing fees are transferred into the Casino Main Account on a daily basis. Disbursements are made from the Casino Secondary Account solely for the purpose of paying merchant credit card fees, which fees are withdrawn monthly before the fifth (5th) day of each month.

c)      Casino Checking Accounts: The Casino Checking Accounts are funded through daily transfers from the Casino Main Account. The Casino Checking Accounts disburse funds as follows:

   i)      Payroll Account: Funds from the payroll account are used to make payment of the Casino payroll through direct deposit into each individual employee's account every two weeks on Monday. In addition, the funds in the payroll account are used to satisfy state and local payroll taxes every two weeks, coinciding with the Casino's payroll.

   ii)      A/P Account: Funds from the accounts payable account are used to satisfy various categories of accounts payable expenses incurred by the Casino in the ordinary course of business, including gaming-related fees, consulting costs, certain types of payroll taxes, and 401(k) plan deposits. This account is a zero-balance account.

   iii)      Cage Account: Funds from the cage account are used on a daily basis to satisfy casino jackpots, promotions and various other payouts from gambling operations at the casino in the form of checks written against this account. This account is a zero-balance account.

---

[10] As set forth above, within seven (7) to thirty (30) days from the date of the original credit marker, depending on the individual patron's credit line, unclaimed markers are deposited into the Casino Main Account.

iv) <u>Gaming Account</u>: Funds from the gaming taxes account are used to pay daily gaming taxes, horsemen taxes and state withholding taxes. These taxes are paid two days after the applicable gaming day. This account is a zero-balance account.

d) <u>General Account</u>: On a weekly basis, the Casino Main Account is swept for excess cash. This cash is then deposited into a general account (the "**General Account**") at Bank of America. Although the General Account is treated as being a part of the Track segment, primarily because it was in existence before the Casino opened, both the Casino and the Track deposit excess cash in the General Account. However, the General Account is used primarily to manage cash in the Track segment. Funds are disbursed from the General Account to make the following categories of expenditures: (i) operating expenses (excluding payroll, payroll taxes, pari-mutuel taxes, sales taxes and use taxes), (ii) debt payments, (iii) certain legal and professional fees, (iv) the fee for certain management services.

e) <u>Track Operating Account</u>: The Track segment of the Debtors' operations maintains one main operating account (the "**Track Operating Account**") at Fifth Third Bank. The Track Operating Account is a checking control account that serves as the primary collection and disbursement point for funds moving through the Track segment. Deposits made into the Track Operating Account include daily transfers from the OTB Facilities and transfers from the payroll account. In addition, after daily balancing and audit procedures are completed at the race track, cash is collected on a daily basis. Twice weekly, a cash deposit is made into the Track Operating Account by an armored car service.

The funds in the Track Operating Account are transferred to various checking accounts (the "**Track Checking Accounts**"), including the OTB Facilities' accounts, the payroll checking account, a purse account, certain trust accounts that are used to pay future purses, and the General Account.

f) <u>Track Checking Accounts</u>: The Track Checking Accounts are funded through various sources and disburse funds as follows:

i) <u>Clarksville OTB Account</u>: The Clarksville OTB Facility maintains a checking account at U.S. Bank, N.A. which holds cash that originates from the facility's cage and is comprised of horse racing revenues. On a weekly basis, monies from the Clarksville checking account are manually transferred into the Track Operating Account.

ii) <u>Evansville OTB Account</u>: The Evansville OTB Facility maintains a checking account at Fifth Third Bank which holds cash that originates from the facility's cage and is comprised of horse racing revenues. Funds are transferred from the Track Operating Account

to the Evansville OTB Account to create a zero balance in the account. This account is a zero-balance account.

iii) Payroll Account: A checking account at Fifth Third Bank holds monies that are used to fund payroll at the Track. Funds are transferred from the Track Operating Account into the payroll account to be used to make payment of the Track payroll every two weeks on Friday.

iv) Horsemen's Purse Account: This account collects 15% of the Casino's adjusted gross receipts, on a daily basis, from the Casino's Gaming Taxes Account.[11] Approximately 50% of that amount is transferred into the Horse Industry Purse Trust Accounts on the fifteenth (15th) day of the subsequent month to fund the payment of live racing purses. The remaining approximately 50% is transferred to various state-held Horsemen's funds, including the breed development fund established for each breed. IND. CODE § 4-35-7-12. To the extent that 15% of the Casino's adjusted gross receipts for any given month exceeds the statutory maximum of $85,000,000, that excess cash is paid to the Indiana Horse Racing Commission (the "IHRC"), which then deposits such excess cash into the state general fund. See IND. CODE §§ 4-35-7-12(j); 4-33-12-7.

v) Horse Industry Purse Trust Accounts: Three checking accounts at Wells Fargo Bank, N.A., hold funds required to pay future purses owed on account of thoroughbred races, standard-bred races, and quarter-horse races. See 71 IND. ADMIN. CODE 4-2-7 (b). These accounts are funded by the Track Operating Account and the Horsemen's Purse Account.

On the fourteenth (14th) day of each month, funds are transferred from the Track Operating Account into the three Horse Industry Purse Trust Accounts. 71 IND. ADMIN. CODE 4-2-8 (requiring establishment of breed trust accounts and payment before the fifteenth (15th) day of each month). Each account receives a proportional amount of the race day total handle, with the Thoroughbred Purse Account receiving 49% of the simulcast handle, the Standard-bred Purse Account receiving 49% of the simulcast handle, and the Quarter-horse Purse Account receiving 2% of the simulcast handle. 71 IND. ADMIN. CODE 12-2-15. In addition, various purse-related cash receipts are transferred from

---

[11] The Debtors are required by statute and regulation to allocate certain portions of their revenue to pay purses in future races. In particular, pursuant to section 4-35-7-12 of the Indiana Code, fifteen percent (15%) of Casino's adjusted gross receipts are collected on a daily basis to fund the purses for Horsemen that win live races held at the Track. See IND. CODE § 4-35-7-12.

the Track Operating Account into the Horse Industry Purse Trust Accounts in proportional amounts established by statute, as follows: (i) 8% of the breed live handle for races conducted at the Track pursuant to IND. CODE. § 4-31-9-2, (ii) 5% of the total bet at each of the OTB Facilities on races conducted at the Track pursuant to IND. CODE. § 4-31-9-2, (iii) 50% of export fees paid to the Track from other tracks that carry the Track signal, (iv) entry fees paid by owners of the horses (the "**Horsemen**") that enter live races at the Track pursuant to IND. CODE. § 4-35-7-12; and (v) 5% of the gross handle for wagers placed at Hoosier Park on races conducted at the Track pursuant to 71 IND. ADMIN. CODE 9-3-1; IND. CODE. § 4-31-9-2.

Of the funds in the Horsemen's Purse Account, 25.97% is transferred to the Thoroughbred Purse Account, 21.53% is transferred to the Standard-bred Purse Account, and 5.16% is transferred to the Quarter-horse Purse Account. Further, a portion of the funds that are transferred from the Horsemens' Purse Account to the Breed Development Fund are transferred back into the Horse Industry Purse Account in an amount specified by the IHRC.[12]

g) <u>Lockboxes</u>: The Debtors do not have any lockbox accounts.

56. The Debtors' Cash Management System constitutes an ordinary course and essential business practice providing significant benefits to the Debtors, including the ability to control funds, ensure the maximum availability of funds when and where necessary, and satisfy regulatory requirements and obligations. The Debtors submit that the cost and expense of changing the Bank Accounts and implementing new cash management processes would not only force the Debtors to incur significant costs and expenses, but would impair the operation of the Debtors' business, cause confusion, diminish prospects for a successful reorganization, and place a strain on the Debtors' relationships with customers, vendors and regulators. The Debtors

---

[12] Pursuant to Indiana state regulation, the Breed Development Fund pays a portion of the purse for live races conducted at the Track and its competitor racino, Hoosier Park. 71 IND. ADMIN. CODE 9-3-1. Depending on the breed and the race, the IHRC specifies an amount of the overall purse to be satisfied out of the Breed Development Fund. For races conducted at Track, the applicable Horse Industry Purse Trust Account will pay the overall purse, and a portion will be reimbursed by the Breed Development Fund. Accordingly, of the 2.5% that is paid from the Horsemens' Purse Account into the Breed Development Fund, a portion is ultimately paid back into the Horse Industry Purse Trust Accounts.

intend to continue to maintain strict accounting records, including with respect to receipts and disbursements, so that the Office of the United States Trustee and parties-in-interest may readily monitor the Debtors' financial activities.

57.     The Debtors further request authority to deposit funds in and withdraw funds from all such accounts by all usual means including, but not limited to, checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

58.     The Debtors also seek, on an interim basis, for a period of forty-five (45) days from the date of an Order on this Motion, a waiver of section 345(b) of the Bankruptcy Code permitting the Debtors to maintain their Bank Accounts without the need to post a bond or other security to the extent that, at any given time, funds are deposited in their Bank Accounts in excess of the limits of section 345.

59.     The Debtors do not maintain any investment accounts.  Moreover, in light of the amount of funds that will flow through their estates, the regular deposits and sweeps, and the minimal or zero balances of certain of the Bank Accounts, it would be unnecessary and wasteful for the Debtors to be forced to incur the expense of obtaining a bond given the safeguards embedded in the Debtors' Cash Management System for the preservation of the funds therein. The Debtors submit that their current practices provide sufficient protection for their cash and that it would be in the estates' best interest for the Debtors to continue to follow these practices. Moreover, the where the Debtors maintain their Bank Accounts are well-known and fiscally strong institutions, which provide services critical to the Debtors' operations.

60.     To minimize administrative expense and delay, the Debtors request authority to continue to use their pre-printed checks, correspondence, and business forms, including, but not

limited to, letterhead, envelopes, promotional materials, and other business forms, substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' "Debtor-in-Possession" status.

61. Each form of relief requested in the Cash Management Motion will help ensure the Debtors' smooth transition into chapter 11 and prevent the possible disruptions and distractions that could otherwise divert the Debtors' attention from more pressing matters during the initial days of these Cases.

**C.    Motion of the Debtors for Entry of an Order (A) Authorizing But Not Directing the Debtors to Pay (I) Certain Prepetition Employee Obligations, and (B) Prepetition Withholding Obligations, and (B) Directing Banks to Honor Related Prepetition Transfers**

62. One vital First Day Motion is the Debtors' Motion for Entry of an Order (i) Authorizing But Not Directing the Debtors to Pay (a) Certain Prepetition Employee Obligations, and (b) Prepetition Withholding Obligations and (b) Directing Banks to Honor Related Prepetition Transfers (the "**Employee Wage Motion**").

63. By the Employee Wage Motion, the Debtors seek authority, in their discretion to: (a) pay the accrued unpaid prepetition Employee Compensation; (b) remit the prepetition Payroll Taxes owing to the Taxing Authorities; (c) continue the Paid Time Off policies and allow any Paid Time Off accrued prepetition to be used or paid according to the prepetition policies; (d) pay any Business Expenses accrued prepetition; (e) continue to fund and pay any prepetition amounts due under any Employee Benefit Plans; and (f) pay any outstanding amounts owed by the Debtors for Withholding Obligations, including those incurred prepetition.

64. Honoring the Debtors' prepetition employee obligations will minimize the hardship that employees will certainly endure if payroll is interrupted. Honoring such obligations will also prevent a loss of employees that may ensue as a result of the collective

employees' loss of a reasonable expectation that they will be compensated for services rendered. As such, the Debtors seek to continue paying the prepetition employee obligations in the ordinary course and request that the Court enter an order directing all banks to honor the Debtors' prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

### A.     <u>Employee Compensation</u>

#### (i)     **Wages or Salaries**

65.     As of the Petition Date, the Debtors' aggregate workforce consisted of approximately 1088 Employees and two (2) Independent Contractors (as defined below). The Debtors employ approximately 908 Employees on an hourly basis, and the remaining Employees on a salary basis.

66.     The Debtors' two-week gross payroll obligation is approximately $878,092.45. As of the Petition Date, outstanding amounts for these Employees may be as high as approximately $646,590.07 in the aggregate, or on average approximately $597.00 per Employee.

67.     The vast majority of Debtors' Employees are paid through electronic fund transfers (*i.e.*, direct deposit), and only nineteen (19) Employees are paid by check. The Debtors estimate that, as of the Petition Date, Employees' accrued unpaid wages or salaries (the "**Wages or Salaries**") may be as high as approximately $646,590.07 in the aggregate.

#### (ii)     **Independent Contractor Obligations.**

68.     In the ordinary course of business, the Debtors also utilize the services of approximately two (2) independent contractors who provide services necessary for the operation

of the Debtors' business (collectively, the **"Independent Contractors"**). Included among the Independent Contractors is a caterer, who provides low-cost meals to certain of Debtors' Employees during live racing events, and an on-site architect, who assists with ongoing casino renovations and improvements. Because the services provided by the Independent Contractors are necessary for the Debtors' operations, the Debtors request authority to pay accrued and unpaid prepetition obligations to the Independent Contractors. The Debtors estimate that the prepetition accrued and unpaid amounts owed to their Independent Contractor (the "Independent Contractor Obligations") are approximately $10,000.00.

### (iii) Payroll Taxes

69.     In connection with its payroll, the Debtors, as employers, are required by law to withhold federal, state and local taxes from Wages or Salaries for remittance to appropriate tax authorities (the **"Employee Taxes"**). In addition, the Debtors are required to match, from their own funds, the social security and Medicare taxes and pay, based on a percentage of gross payroll, and subject to state-imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the **"Payroll Taxes"**) and remit the same to the appropriate authorities (collectively, the **"Taxing Authorities"**). The Debtors pay these Payroll Taxes to various Taxing Authorities in accordance with the Internal Revenue Code and applicable state law.

70.     Although it is difficult to assess precisely the amount of the Payroll Taxes, the Debtors' average two-week total obligation for Payroll Taxes relating to Wages or Salaries is approximately $69,369.30. At the time the Debtors pay Wages or Salaries in the ordinary course, the Debtors will submit any prepetition Payroll Taxes to the relevant Taxing Authorities.

As of the Petition Date, to the best of the Debtors' knowledge, the Debtors estimate that the aggregate amount of accrued and unpaid Payroll Taxes is approximately $50,419.23.

### (iv) Paid Time Off

71. Eligible Employees generally earn paid time off for vacation, illness, or other personal requirements based on their length of service. Pursuant to the Debtors' policies, the Debtors' salaried and full-time hourly Employees are eligible to accrue paid time off ("**Paid Time Off**"). Salaried and full-time hourly Employees accrue ten (10) days of Paid Time Off for the first year of continuous service. Employees' Paid Time Off increases to fifteen (15) days after the end of the second year of service and increases to nineteen (19) days after the end of the third year of service. Employees earn an additional one (1) day of Paid Time Off beginning in their fourth year of service and for every year thereafter.

72. There is no limit to the amount of Paid Time Off that an Employee can accrue or roll over. Each December, the Debtors automatically pay forty (40) hours of Paid Time Off to those Employees who have accrued at least 120 hours of Paid Time Off through December 1 of that calendar year. Eligible Employees who have accrued less than 120 hours of Paid Time Off may opt to cash out up to 40 available hours of Paid Time Off. Additionally, the Debtors pay eligible Employees, who are voluntarily terminated, up to 160 hours of accrued Paid Time Off at the time of the Employee's termination.

73. The Debtors estimate that the prepetition accrued and unpaid amount owed to their Employees in the form of Paid Time Off is approximately $620,000.00, in the aggregate. The Debtors intend to allow Employees to use accrued unused Paid Time Off in the ordinary course and will pay cash in lieu of such accrued vacation time only to the extent required by applicable law. By the Employee Wage Motion, the Debtors request authority to continue to

honor their Paid Time Off policies in the ordinary course of business and to honor all prepetition obligations related thereto.

**B.** **Expenses**

**(i)** **Business Expenses.**

74. The Debtors have a formal policy whereby their Employees seek reimbursement of business-related expenses. The Debtors routinely reimburse Employees for certain ordinary course expenses incurred within the scope of their employment, including travel, lodging, ground transportation, meals, and other miscellaneous expenses (collectively, the "**Business Expenses**"). Casino Employees submit requests for reimbursement of Business Expenses to the Casino accounts payable department, and Track Employees submit their requests to the Employee's manager or supervisor. The expense reimbursement requests are processed promptly and reimbursed by check. For all Debtors' Employees, the aggregate average monthly expense reimbursements are approximately $11,000.00

75. Although the Debtors encouraged the submission of reimbursement requests prior to the Petition Date, it is possible that not all such requests were submitted or paid prepetition. As of the Petition Date, to the best of the Debtors' knowledge, the Debtors estimate that the aggregate amount of accrued and unpaid Business Expenses is approximately $6,000.00.

**C.** **Employee Benefit Plans**

76. In the ordinary course of business, and as is customary for companies of their size, the Debtors maintain various employee benefits and policies that provide their Employees with medical, dental, workers' compensation, and other benefits which are described in more detail below (collectively, the "**Employee Benefit Plans**"). Some of the Employee Benefit Plans

are funded either partially or fully through contributions made by the Debtors. The Debtors seek authority to continue funding the Employee Benefit Plans.

### (i) Employee Health Plan

77. The Debtors' Employees may chose to participate in the Debtors' Employee Health Plan, which includes medical, dental, and vision coverage (the "**Employee Health Plan**"). Full time Employees may enroll in the Employee Health Plan after ninety (90) days of full-time hire. Casino Employees are eligible for medical, dental, and vision coverage, and Track Employees are eligible for medical and dental coverage. The Employee Health Plan is funded partly by the Debtors and partly by the participating Employees themselves. In the aggregate, the Employee Health Plan has a monthly cost of approximately $406,000.00. The Debtors fund approximately $329,000.00, and the Employees fund the balance of approximately $77,000.00.

78. In the Employee Wage Motion, the Debtors seek authority to (a) continue to provide the Employee Health Plan for their Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees, and (c) pay all such amounts owed under the Employee Health Plan to the extent that they remain unpaid on the Petition Date. As of the Petition Date, the Debtors estimate that the accrued and unpaid costs for the Employee Health Plan is $25,875.01.

### (ii) Workers' Compensation Program

79. Under applicable state law, the Debtors are required to maintain workers' compensation insurance programs to provide their Employees with workers' compensation insurance coverage for claims arising from or related to their employment with the Debtors and to satisfy the Debtors' obligations arising under or related to these programs (collectively, the

**"Workers' Compensation Program"**). The Workers' Compensation Program covers all Employees. It is critical that the Debtors be permitted to continue their workers' compensation insurance and pay their premiums for workers' compensation coverage, as not doing so would almost certainly be more costly. Specifically, in the event the Debtors are not able to maintain workers' compensation insurance, the Debtors would be required to provide proof of their financial ability to pay the workers' compensation benefits direct to the applicable Employee. *See* Ind. Code § 22-3-5-1. In addition, failure to maintain this insurance in Indiana, where the Debtors do business, could result in the institution of administrative or legal proceedings against the Debtors and their officers and directors. *See id.* at § 22-3-5 *et seq*. The average monthly cost for the Workers' Compensation Program for the Debtors is approximately $69,000.00.

80.    In the Employee Wage Motion, the Debtors request authority to pay any and all prepetition amounts due or that may become due with respect to the Workers' Compensation Program. The Debtors further seek authority to maintain and continue their prepetition practices with respect to the Workers' Compensation Program, including, among other things, allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the Workers' Compensation Program. As of the Petition Date, the Debtors estimate that the accrued and unpaid costs for the Workers' Compensation Program is $21,000.00.

### (iii)    Life Insurance Plan

81.    The Debtors provide life insurance benefit their Employees. (the **"Life Insurance Plan"**). Specifically, the Debtors provide: (i) Track Employees with a life insurance benefit of $20,000.00; (ii) Casino Employees with a life insurance benefit of up to $50,000.00; (iii) management Employees with a life insurance benefit at the level of one and a half times the Employee's salary; and (iv) executive Employees with a life insurance benefit at the level of two

times the Employee's salary. The average monthly cost for the Life Insurance Plan is approximately $5,300.00. As of the Petition Date, the Debtors estimate the amount of accrued and unpaid costs for the Life Insurance Plan to be $820.59. By the Employee Wage Motion, the Debtors seek authority to pay all prepetition amounts owed on account of the Life Insurance Plan and to continue their prepetition practices with respect to such benefit.

(iv)    <strong>Tuition Reimbursement Program</strong>

82.    Debtors provide tuition reimbursement assistance to eligible Employees who have completed a minimum of one year of service (the "**Tuition Reimbursement Program**"). The Debtors provide up to $2,500 per rolling twelve (12) month period to eligible Employees for tuition and books for education provided by a locally accredited institution of higher learning. As of the Petition Date one (1) Employee was participating in the Tuition Reimbursement Program. The maximum potential reimbursement to this Employees is $830.00. In the Employee Wage Motion, the Debtors seek authority to pay all prepetition amounts owed on account of the Tuition Reimbursement Program and to continue their prepetition practices with respect to such benefit.

**D.    <u>Prepetition Withholding Obligations</u>**

83.    As part of the foregoing relief, the Debtors also seek authorization to pay all Employee federal and state withholding and payroll-related taxes relating to prepetition periods, including, but not limited to, all withholding taxes, Social Security taxes, unemployment taxes, Medicare taxes, and garnishments, as well as all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions, and charitable contributions, if any (collectively, the "**Withholding Obligations**"). As of the Petition Date, the Debtors estimate the amount of accrued and unpaid costs for the Withholding Obligations to be $112,199.58. The

Debtors seek Court authority to pay all prepetition amounts owed on account of the Withholding Obligations and to continue their prepetition practices with respect to such obligations.

84.     The Debtors routinely withhold from Employees' paychecks the Withholding Obligations, and are required to transmit these amounts to third parties. The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute moneys held in trust and therefore, are not property of the Debtors' bankruptcy estates. Thus, whether or not such funds are prepetition amounts, the Debtors believe that directing such funds to the appropriate parties does not require Court approval.

85.     The Employees and Independent Contractors are indispensable to both the Debtors' operations and the successful resolution of these chapter 11 Cases. The Employees are essential to the continued operation of the Debtors' businesses, and their morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid postpetition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtors' stability, and undoubtedly would have a negative effect on the Debtors, their customers, the value of their assets and business, and their ability to achieve their objectives in chapter 11.

86.     Absent prompt payment of amounts owed in connection with the prepetition Employee obligations, it is likely that Employee morale and support will be impaired. As many of the Debtors' Employees rely on the timely receipt of their paychecks and/or reimbursement

for expenses, any delay in paying amounts owed in respect of the prepetition Employee obligations could cause such Employees serious hardship. Any such deterioration in Employee morale and welfare at this critical time may have a devastating impact on the value of the Debtors' assets and business.

87.    Many Employees rely exclusively on receiving their full compensation to pay their daily living expenses. Furthermore, many Employees rely on their Employee benefits, such as health benefits, without which they would be forced to pay for or go without insurance coverage for themselves and their families. As a result, these Employees will be exposed to significant financial and health related problems if the Debtors are not permitted to honor the unpaid prepetition Employee obligations. If these Employees fail to remain fully motivated as a consequence of not receiving the compensation set forth in the Employee Wage Motion, the Debtors' ability to maintain and preserve the value of the estates may be forever lost.

88.    Amounts withheld by the Debtors from the Employees' paychecks represent, in many cases, Employee earnings specifically designated by Employees or, in the case of garnishments, by judicial authorities, to be deducted from Employee paychecks and paid accordingly. The failure to make these payments will result in hardship to certain Employees or other third parties. The Debtors expect to be inundated with inquiries from garnishors and other designated recipients regarding the Debtors' failure to submit, among other things, taxes, child support and alimony payments which are not the Debtors' property, but rather have been withheld from Employee paychecks. Moreover, if the Debtors are unable to remit certain of these amounts, the Employees could face legal action and/or imprisonment.

89.    The Debtors' Employees are an essential component of a successful reorganization. Any deterioration in Employee morale and welfare at this critical time

undoubtedly would have a devastating impact on the Debtors, the value of their assets and business, and ultimately, the Debtors' ability to reorganize. Accordingly, the relief sought in the Employee Wage Motion is in the best interests of the Debtors' estates and creditors, and will allow the Debtors to continue to operate their businesses with minimal disruption and proceed with the important task of stabilizing their operations.

90.     The Debtors' business operations are heavily dependent upon their Employees. If the Debtors are unable to immediately pay the prepetition Employee obligations and provide benefits to their Employees, the Debtors' ability to run their businesses will be placed in jeopardy. Accordingly, the Debtors submit that the relief requested in the Employee Wage Motion is necessary to avoid immediate and irreparable harm.

**D.      Motion of the Debtors for Entry of an Order Authorizing The Debtor to Perform and Honor Certain Customer Programs in the Ordinary Course of Business**

91.     Prior to the Petition Date, in the ordinary course of business and as is customary in the industries in which the Debtors operate, the Debtors implemented certain customer programs (collectively, the "**Customer Programs**") to develop and sustain a positive reputation in the marketplace, including but not limited to (a) Patron Reward Programs, (b) Outstanding Gaming Obligations, (c) Progressive Gaming Obligations, (d) Promotions, and (e) Gift Cards. By the motion (the "**Customer Programs Motion**"), the Debtors request authority to perform and honor their prepetition obligations related to the Customer Programs, in the ordinary course of business.

92.     The Customer Programs are fundamental to the continued success of the Debtors' business. The Customer Programs, by design, encourage repeat business and ensure customer satisfaction, thereby retaining current customers, attracting new customers and ultimately increasing the Debtors' revenues. If the Debtors were unable to offer the Customer Programs,

they would be at a significant disadvantage compared to their competitors. Therefore, it is integral that the Debtors are able to assure customers of their ability to satisfy prepetition obligations under the Customer Programs following the commencement of these Cases.

93. In the Debtors' industries more than most others, customer loyalty is of critical importance. The Debtors' revenue is entirely driven by customers visiting the Casino and the Track. Absent repeat business, the Debtors would be unable to generate sufficient revenue to fund their operations on a daily basis. Accordingly it is vital that the Debtors not alienate their customer base following the commencement of these Cases. If the Debtors experience diminished customer loyalty subsequent to the filing of these Cases, they will be unable to continue to operate on a cash-flow positive basis and will risk significant harm to their constituents.

94. Any failure to continue the Customer Programs may drive away valuable current customers and potential customers, result in a loss of goodwill among the Debtors' customers and lead to lower revenues that could impede the Debtors' efforts to successfully reorganize and maximize the value of the estates for the benefit of all stakeholders. Moreover, failure to maintain and honor obligations under certain Customer Programs would result in a violation of certain state gaming and racing laws which could potentially impact the Debtors' licenses.

**A.     Patron Reward Programs**

95. The Debtors have instituted various players clubs and complimentary services programs through which patrons are awarded points for money wagered at the Debtors' gaming machines at the Casino and on races at the Track (the "**Patron Reward Programs**"). Such points are redeemable for prizes, food and beverage, services, coupons, merchandise and "free play." The Debtors estimate that, in the aggregate, they may have approximately

$1,310,855.50[13] of outstanding commitments under the Patron Reward Programs as of the Petition Date. These Patron Reward Programs offer a powerful incentive for patrons to return to the Debtors' facilities.

96. By the Customer Programs Motion, the Debtors request authority to honor the prepetition Patron Reward Programs obligations and to continue honoring, in their sole discretion, Patron Reward Programs obligations in the ordinary course of their business. Because the potential harm to the Debtors' business from not honoring the Patron Reward Programs outweighs the costs to their estates, the Debtors believe that such relief is warranted and necessary to promote their reorganization efforts and maximize the value of their estates for the benefit of all creditors in these Cases.

(i)     *Live! Rewards Club*

97. The Casino provides slot machine patrons with rewards and benefits at various levels based on the dollar amount of play on slot machines. The Live! Rewards Club offers "Purple," "Silver," "Gold," and "Platinum" cards based on the points earned at the Debtors' gaming machines and, correspondingly, provides incremental benefits to members of each club, with "Platinum" club members receiving the greatest benefits. These benefits include slot points, "free play" on slot machines (*i.e.*, slot play credited to a player's casino account), bonus entries for promotions and giveaways and access to VIP lounges. In addition, patrons may be awarded complimentary from a discretionary bucket of funds to foster loyalty.

(ii)    *Indiana Downs Players Club*

---

[13] This amount will not be paid out at any one time, and the actual cost to the Debtors is much less than this booked liability because the rewards and benefits available are only "free play" and food, beverages or merchandise. Thus, the actual cost to the Debtors is significantly less than the retail cost of such products to the customers.

98.    The Track provides pari-mutuel patrons, including customers at the OTB Facilities, with rewards and benefits based on the dollar amount wagered on live and simulcast races. The benefits offered to Players Card holders include, among others, free beverages, gift cards and coupons at the various Track dining establishments, branded retail merchandise, programs, and vouchers.

## B.    Outstanding Gaming Obligations

99.    In addition, the Debtors have outstanding obligations as of the Petition Date to customers that placed wagers in the gaming facility or on horse races, either at the Track or at the OTB Facilities. If these customers placed winning wagers and, for a variety of reasons, failed to redeem their winning tickets (the "**Unclaimed Winnings**"), the Debtors are liable if the customers redeem their Unclaimed Winnings at a later date.[14] Additionally, as is customary in the Debtors' industries, the Debtors routinely issue tickets and vouchers (collectively, the "**Gaming Currency**")[15] to customers for use at the slot machines, electronic table games and the race track. The Gaming Currency is not interchangeable between the Track and the Casino. Inevitably, some customers either retain or discard this Gaming Currency (the "**Outstanding Gaming Currency**" and, together with the Unclaimed Winnings, the "**Outstanding Wagering Obligations**") after they leave the properties, whether advertently or inadvertently. Except at a tremendous cost and substantial disruption of their business, the Debtors will be unable to

---

[14] Under Indiana state law, unclaimed winning racing tickets are only redeemable during the calendar year, plus sixty (60) days, in which the wager was made. On or before March 15 of each year, the Debtors must remit the winnings from such racing tickets to the Indiana Horse Racing Commission if unclaimed as of February 28 of that year. *See* IND. CODE § 4-31-9-10. On March 3, 2011, the Debtors remitted approximately $298,536.71 for all uncashed 2010 mutuel tickets, which significantly reduced the outstanding balance owed on account of Unclaimed Winnings.

[15] Vouchers are the balance of a wager made on a race if the customer puts more money into a wagering machine than is used on the wager. The machine issues the customer a voucher which can then be redeemed for cash or used to place further wagers. Vouchers at the Track do not expire. Unclaimed winning casino tickets expire ninety (90) days from the date of issuance.

distinguish between Outstanding Gaming Currency in possession of the customers prepetition, from those subsequently acquired by customers postpetition.

100.    By assuring customers that the Outstanding Wagering Obligations will be paid, the Debtors will provide a powerful incentive for customers to return to their facilities, where they will undoubtedly make future wagers and spend additional funds on food, beverages and other merchandise and services. Ultimately, the Debtors believe that the additional money spent at the Debtors' facilities by returning customers will far exceed the Outstanding Wagering Obligations. The Debtors estimate that approximately $378,466.95 of Outstanding Wagering Obligations exist as of the Petition Date.

###    C.    Progressive Gaming Obligations

101.    In the ordinary course of their business, the Debtors accrue obligations to customers on account of progressive and multi-progressive gaming machines (the "**Progressive Gaming Obligations**"). Progressive gaming machines accrue value over a period of time based upon the amount of customer play at the machine. Multi-progressive gaming machines accrue value in the same manner, but do so at a more rapid rate on account of the fact that multiple progressive machines are "linked" together to form one collective jackpot. The Debtors are required to record these incremental increases in jackpots from customer play as liabilities for future jackpots that will be paid to winning customers.

102.    Given the nature of the progressive gaming machines, it is inevitable that Progressive Gaming Obligations consisting of both prepetition and postpetition amounts will become due and owing to customers postpetition. The Debtors believe that prepetition Progressive Gaming Obligations total approximately $1,336,549.79.

103.    In the Customer Programs Motion, the Debtors seek authority to honor prepetition Progressive Gaming Obligations existing as of the Petition Date and to continue honoring, in their discretion, Progressive Gaming Obligations in the ordinary course of business.

**D.    Promotions**

104.    The Debtors coordinate contests, entertainment events and promotions, and offer group discounts and promotional offers (collectively, the "**Promotions**") to attract customers to the facilities. The Promotions serve to increase customer attendance at the Debtors' facilities, with the expectation that customers will not only participate in the entertainment and promotional events, but also will wager and spend money at the Debtors' facilities, thereby generating revenue for the Debtors. As of the Petition Date, the Debtors held approximately $185,478 in their promotional fund for use towards various rewards and prizes, including giveaways, tee shirts and similar retail items, that are given to patrons in connection with the various Promotions.

105.    The Debtors also extend the Promotions to potential and repeat patrons at their gaming facilities to encourage greater attendance and wagering at their gaming facilities. For instance, the Casino is currently promoting its "Bad Beat Jackpot"[16] to encourage greater attendance and wagering in its poker room. As of the Petition Date, the "Bad Beat Jackpot" held approximately $120,924 in funds that continue to accrue as more patrons place wagers in the poker room.[17]

---

[16] The "Bad Beat Jackpot" rewards the loser at a hand of poker. Once triggered, the loser of the hand will receive 50% of the jackpot total, the winner of the hand will receive 25% of the jackpot total, and each additional player on the winning table that was dealt cards for the winning hand will receive an equal share of the remaining 25%. Any off amount will be carried over to a secondary jackpot.

[17] As of the Petition Date, approximately $63,352 in available cash is held in poker players' accounts for future play. Thus, the "Bad Beat Jackpot" will likely increase in amount as patrons continue to deplete and refresh the funds in their poker player accounts.

106.    In the Customer Programs Motion, the Debtors request authority to honor their obligations for Promotions that are outstanding as of the Petition Date, up to an aggregate amount of $242,000, and to continue providing Promotions, in their sole discretion, in the ordinary course of business.

**E.    Gift Cards**

107.    At the Casino and the Track, the Debtors offer customers gift cards and coupons (collectively, the "**Gift Cards**") that may be redeemed for cash, free play, dining, entertainment and retail merchandise at the Track, and at the food and beverage outlets at the Casino.  The Debtors estimate that as of the Petition Date, their outstanding Gift Card obligations total approximately $25,390.53.  The Debtors request authority to honor the prepetition Gift Cards and to continue honoring, in their sole discretion, Gift Cards issued postpetition in the ordinary course of their business.

108.    The Debtors believe that the continuation of the Customer Programs is essential to the successful reorganization of their business.  The Debtors operate in a highly-regulated and competitive market.  The Customer Programs have created significant goodwill with the Debtors' customers.  Similar customer programs are offered by casinos and race tracks, as applicable, throughout the respective industries and, as such, customers expect the Debtors to provide such programs.  Any inability of the Debtors to promptly honor their obligations under the Customer Programs would result in a rapid erosion of goodwill and a loss of customers.  In addition, the Debtors' failure to honor certain of the Customer Programs would violate various state gaming and other laws and regulations.  Thus, for these reasons, the continuation of the Customer Programs is critical to the Debtors' retention of customers and profitability during the pendency of the Cases.

109.   The Debtors' creditors will also benefit from the relief sought in the Customer Programs Motion.  If the Debtors are prohibited from honoring and maintaining the Customer Programs in a manner consistent with their past business practices, customers will lose confidence in the Debtors and may begin to patronize the Debtors' competitors that do provide such programs, thereby damaging the Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices.  The relief requested in the Customer Programs Motion will protect the Debtors' goodwill and help maintain the value of their estates during this critical time.

**E.     Motion of the Debtors for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures  for <u>Determining Adequate Assurance of Payment</u>**

110.   In connection with the operation of their business and management of their estates, the Debtors obtain electricity, gas, water, sewer services, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Providers**"), including those listed on **<u>Exhibit "A"</u>** attached to the Utilities Motion (the "**Utility Provider List**").  By the motion (the "**Utilities Motion**"), the Debtors seek entry of interim and final orders: (a) prohibiting their Utility Providers from altering, refusing, or discontinuing service; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of payment.  In addition, the Debtors request that the Court set final hearing on the Debtors' proposed adequate assurance procedures.

111.   Historically, the Debtors have paid all amounts owing to the Utility Providers on a timely basis.  To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services, except where the commencement of these

chapter 11 Cases may have interrupted some of these payments. Prior to the Petition Date, the average aggregate monthly cost of Utility Services for all of the Debtors was approximately $300,000.

112.     The Debtors operate the Casino, the Track and two OTB Facilities that each require uninterrupted Utility Services to run successfully. Thus, if any Utility Provider is permitted to terminate the Utility Services, the Debtors' operations will be irreparably harmed and their ability to reorganize jeopardized. Accordingly, to avert a potentially disastrous situation and, ultimately, the demise of their business, the Debtors have sought the relief requested in the Utility Motion.

113.     Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' ability to preserve and maximize the value of their estates could be severely and irreparably harmed. Specifically, the lack of electricity would cause a shut-down of the Debtors' operations and it is therefore critical that Utility Services continue uninterrupted.

114.     The Debtors intend to pay all post-petition obligations and expect that revenues generated from the business operations will be sufficient to pay all undisputed post-petition obligations owed to the Utility Providers in a timely manner. To provide adequate assurance of payment for future services to the Utility Providers as set forth in section 366(c) of the Bankruptcy Code, however, the Debtors propose to deposit an initial sum equal to the Debtors' estimated average cost for two (2) weeks of Utility Services (the "**Adequate Assurance Deposit**"), into a segregated account (the "**Adequate Assurance Account**") within twenty (20) days of the Petition Date, pending further order of this Court. Since the Debtors' average two-week spending on Utility Services over the past twelve (12) month was approximately $150,000.00, the Adequate Assurance Deposit will be approximately $150,000.00.

115.     In addition, by the Utilities Motion, the Debtors seek to establish reasonable procedures by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that the assurance of future payment proposed by the Debtors is insufficient.

116.     The relief requested in the Utilities Motion will allow the Debtors to continue operations and thus preserve the value of the estates for the Debtors' various stakeholders.

**F.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject Certain Executory Contracts and Unexpired Leases *Nunc Pro Tunc* as of the Petition Date**

117.     The Debtors have determined that the Rejected Agreements are no longer necessary to their business operations and have therefore decided to eliminate the unnecessary expenses related to maintaining the agreements.  Therefore, the Debtors filed a motion (the **"Motion to Reject"**) authorizing and approving the Debtors' rejection of certain executory contracts (collectively, the **"Rejected Contracts"**)[18] and an unexpired lease of property (the **"Rejected Lease"** and, together with the Rejected Contracts, the **"Rejected Agreements"**), all *nunc pro tunc* to the Petition Date.

118.     The Debtors have reviewed their revenues, general and administrative costs and have identified certain executory contracts and unexpired leases that are no longer necessary and can therefore be rejected, resulting in a cost savings for the Debtors.  As a part of this review, the Debtors decided to reject the Rejected Agreements for the reasons that follow.

119.     The Debtors have determined to reject that certain Environmental Scent Service Agreement (the **"Scent Service Agreement"**) entered into on or around April 1, 2010 between Indianapolis Downs, LLC and Scent Air Technologies, Inc. (**"Scent Air"**).  The Debtors have

---

[18] The designation of any agreement on the Rejected Contracts list is not a determination or admission that such agreement is executory in nature.

determined that the services provided under the Scent Service Agreement do not provide a significant benefit to the estates. Indeed, the Scent Service Agreement, which carries a twenty-two (22) month term, was entered into at a time when the Debtors were under different management. Since the conclusion of the Debtors' prior management relationship, the Debtors have endeavored to increase operational efficiencies and shed any unnecessary expenses. In connection with this process, the Debtors determined that the Scent Service Agreement was not beneficial to the estates. Therefore, the Debtors request that the Court approve the rejection of the Scent Service Agreement, effective as of the Petition Date.

120.    The Debtors also seek to reject that certain Resignation & Severance Pay Agreement With General Release of Claims (the "**Severance Agreement**"), dated as of October 21, 2010 and entered into between the Debtors and former employee James Carroll ("**Mr. Carroll**") as an undue burden to the Debtors' estates.    Mr. Carroll has resigned from his employment as the Vice President of Food and Beverage pursuant to the terms of the Severance Agreement and, as a result, the Debtors do not realize any benefits from Mr. Carroll's performance.    Instead, the Severance Agreement simply imposes a needless restraint on the Debtors' ability to put its limited funds to their best use during the pendency of the Cases. Because the Severance Agreement does not provide the estates with any benefit, the Debtors request that this Court approve the rejection of the Severance Agreement as of the Petition Date.

121.    Lastly, the Debtors seek to reject a Rental Agreement, entered into on or around December 31, 2008 with Production Resource Group, L.L.C. ("**PRG**"), pursuant to which the Debtors rented certain lighting fixtures and related equipment for use in their temporary gaming facility.    Since the opening of the permanent Casino facility in 2009, the temporary facility which houses the lighting equipment has remained vacant. Thus, presently, the equipment that is

the subject of the Rental Agreement with PRG does not provide any benefit to the estates. The Debtors do not anticipate having any future use for the equipment that they have leased pursuant to the Rejected Lease and seek to eliminate the ongoing costs associated with such equipment for the Debtors' estates. Although the Debtors have marketed the temporary facility for sale, they believe that they can obtain replacement lighting equipment at a lower cost to the extent a buyer was identified at a future time. Accordingly, the Debtors respectfully request that the Court approve the rejection of the Rejected Lease, effective as of the Petition Date.

122. As a result of the Debtors' decision to file for bankruptcy, the Rejected Agreements have become unduly burdensome to the Debtors' estates. As part of these Cases, the Debtors plan to negotiate and file a plan of reorganization pursuant to which the Debtors desire to reorganize their operations in a way that enhances value for all stakeholders. Accordingly, the Debtors are seeking to streamline their operations to the greatest extent possible while still preserving the value of the business to maximize such value for the Debtors' estates.

123. The Debtors believe that continuing to accrue administrative expenses on account of the Rejected Agreements will not offer any additional value to their estates and, hence, the Rejected Agreements are appropriate for immediate rejection in order to relieve the burden on the Debtors' estates. Rather, the Rejected Agreements impose an unnecessary burden at a time when the Debtors are experiencing liquidity restraints resulting from the filing of the chapter 11 Cases and imposition of a stringent budget from their post-petition secured lenders. In this context, the Debtors believe that the Rejected Contracts and Rejected Lease are no longer necessary for the Debtors' business and that their rejection is in the best interests of the Debtors and their creditors. The Debtors submit that they have satisfied the standards for retroactive rejection, effective as of the Petition Date.

**G. Motion of Debtors For Entry of an Order Allowing Administrative Expense Status for Goods Received Within the Twenty-Day Period Before the Petition Date and Authorizing, But Not Directing, the Debtors to Pay Such Obligations**

124.    In the ordinary course of the Debtors' business, numerous vendors and suppliers provide the Debtors with goods, including consumable goods and general merchandise products, which are essential to the operation of the Debtors' businesses.  By this motion (the "**Goods Motion**"), the Debtors request entry of an order granting the claims of certain trade creditors administrative expense priority status for undisputed obligations arising from goods received by the Debtors within the twenty day period before the Petition Date, pursuant to section 503(b)(9) of the Bankruptcy Code, and authorizing the Debtors, in their sole discretion, to satisfy such undisputed obligations to the Vendors in the ordinary course of business under section 363(c) of the Bankruptcy Code.

125.    Prior to the Petition Date, the Debtors have attempted to pay their trade creditors in full.  Nevertheless, the Debtors anticipate that there may be some creditors who delivered goods (the "**Vendors**"), which the Debtors received within twenty (20) days prior to the Petition Date, all of which the Vendors sold to the Debtors in the ordinary course of business, pursuant to sections 363 and 503(b)(9) of the Bankruptcy Code (the "**Goods Claims**").

126.    If the Debtors do not receive authorization to pay the Goods Claims timely and in the Debtors' sole discretion, certain of the Vendors may be entitled to reclaim goods sold to the Debtors.  The Debtors seek authorization to pay the Goods Claims now to induce the Vendors to continue to do business with the Debtors, and also to mitigate the likelihood that the Vendors will seek to reclaim goods on which the  Debtors depend to maintain their business operations and to reorganize successfully.

127.    For instance, it is unlawful in Indiana for a licensed alcohol retailer to sell, offer to sell, purchase, or receive alcohol for anything other than cash.  *See id.* at § 7.1-5-10-12 (credit

purchases and credit sales of alcohol prohibited). Accordingly, to maintain their liquor license the Debtors must be able to make cash payments to their alcohol vendors upon delivery.

128.    The relief requested by the Debtors helps ensure the Vendors will continue to supply the Debtors with goods (including liquor), which is indispensable to the Debtors' continuing operations and integral to their successful reorganization. Absent such relief, however, the Debtors may be required to expend significant time and effort to provide the Vendors with the assurance of administrative expense priority and to respond to and potentially to litigate motions for allowance of section 503(b)(9) claims in the Court. Such a disruption to the continuous and timely flow of goods used in the Debtors' businesses may cause the Debtors to receive fewer supplies and materials than the Debtors require to conduct their operations, thereby impeding, at this critical stage, the Debtors' efforts to achieve successful reorganization.

129.    Based on the foregoing, the Debtors submit that the relief requested in the Goods Motion is essential, appropriate and in the best interest of the Debtors, their creditors, and all parties in interest.

**H.      Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Property, Sales, Gaming, and Similar Taxes and Regulatory Fees in the Ordinary Course of Business and Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

130.    In connection with the normal operation of their business, the Debtors pay an assortment of property, sales, gaming, and similar taxes and fees (collectively, the "**Taxes and Fees**") to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**"), including, but not limited to, those Taxing Authorities listed on **Exhibit "A"** to the motion (the "**Taxes and Fees Motion**").[19]

---

[19] Inclusion of a Taxing Authority on **Exhibit "A"** does not constitute an acknowledgement by the Debtors that the Debtors owe any obligation to such authority or that such authority will be paid pursuant to any order entered on this Motion.

131.    By the Taxes and Fees Motion, the Debtors request authority to pay, in the Debtors' sole discretion, prepetition Taxes and Fees owed to the Taxing Authorities, including, without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date, in an approximate aggregate amount of $7,380,000.00  (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date), which is the aggregate maximum sum that the Debtors currently believe will be due on account of prepetition Taxes and Fees.

132.    In addition, prior to the Petition Date, certain Taxing Authorities were sent checks or received wires in respect of the Taxes and Fees that may not have cleared the Debtors' banks. To the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Taxes and Fees have not cleared the banks as of the Petition Date, the Debtors request the Court authorize the banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and to pay such checks or electronic transfers, provided that there are sufficient funds available in the applicable accounts to make such payments.  The Debtors also seek authorization to issue replacement checks or to provide for other means of payment to the Taxing Authorities, to the extent necessary to pay such outstanding Taxes and Fees owing for periods prior to the Petition Date.[20]

133.    The Taxes and Fees include, without limitation, the following:

134.    **Property Taxes**: Although payment of pre-petition property taxes are not usually authorized at the inception of a chapter 11 case, the exigent circumstances in these Cases warrant the relief requested.  The Debtors own certain real property in Indiana, which property is subject

---

[20]    Because each of the checks or electronic transfers is readily identified as relating directly to an authorized payment of prepetition Taxes, the Debtors believe that checks and electronic transfers for payments that are not authorized will not be honored inadvertently.

to state and local property taxes (the "**Property Taxes**"). The Property Taxes are payable to certain of the Taxing Authorities. The Property Taxes normally accrue on a semi-annual basis and are paid in installments throughout the calendar year. Failure by the Debtors to pay their Property Taxes when due may subject the Debtors to administrative penalties or fines, including possible suspension or revocation of certain of Debtors' licenses. *See* Ind. Code §§ 6-1.1-22 *et seq.* The Debtors estimate that as of the Petition Date, the Debtors have accrued unpaid Property Taxes in the approximate aggregate amount of $3,130,000.00.

135. **Sales Taxes**: The Debtors collect from customers or incur an assortment of state and local sales and food and beverage taxes (collectively, the "**Sales Taxes**"), and remit the Sales Taxes to the appropriate Taxing Authority. Sales Taxes accrue as tangible goods and services are invoiced to customers and are calculated based on a statutory percentage of the sale price that is invoiced to the customer. If the Sales Taxes are not remitted timely to the requisite Taxing Authorities, the Taxing Authorities may impose personal liability on the officers of a corporation. The Debtors remit the Sales Taxes on a monthly basis. The Debtors estimate that as of the Petition Date, the Debtors have accrued unpaid Sales Taxes in the approximate aggregate amount of $80,000.00.

136. **Racing Fees and Taxes**: The Debtors are responsible to remit certain racing fees and taxes to the applicable Taxing Authority ("**Racing Fees and Taxes**"). For example, Debtors are responsible to pay certain pari-mutuel taxes ("**Pari-Mutuel Taxes**"), which are based on a percentage of the total amount of wagers collected on a race from which payouts and purse funds are calculated, or the "handle." *See* Ind. Code § 4-31-9-3. The Pari-Mutuel Taxes are assessed at 2% of handle earned from live and simulcast events at the racetrack located in Shelbyville, Indiana and at 2.5% of handle earned at the Debtors' OTB Facilities. The Pari-Mutuel Taxes are

assessed and paid daily. The failure by the Debtors to pay their Pari-Mutuel Taxes when due, may subject the Debtors to administrative penalties or fines, including being prevented from accepting racing wagers. The Debtors estimate that as of the Petition Date, the Debtors have accrued unpaid Racing Fees and Taxes in the approximate aggregate amount of $320,000.00.

137. **Gaming Fees and Taxes**: The Debtors are responsible to pay certain additional gaming and racing fees and taxes to Indiana state and county agencies ("**Gaming Fees and Taxes**"). The requirements for a company to obtain gaming and business licenses and the manner that the Gaming Fees and Taxes are computed vary according to local tax laws. The Gaming Fees and Taxes are paid daily, monthly, or annually. Failure by the Debtors to pay their Gaming Fees and Taxes may subject the Debtors to administrative penalties or fines, including possible revocation or suspension of Debtors' relevant gaming licenses. *See* Ind. Code §§ 4-35-4-1 and 4-35-4-10. The Debtors estimate that as of the Petition Date, the Debtors have accrued unpaid Gaming Fees and Taxes in the approximate aggregate amount of $3,850,000.00.

138. The payment of prepetition Taxes and Fees will help the Debtors avoid serious disruption to their operations that would result from the failure to pay such Taxes and Fees, including the distraction and adverse affect on morale that could result from liability for nonpayment imposed upon the Debtors' directors and officers. Furthermore, nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in applicable jurisdictions, and seeking to lift the automatic stay, all of which could disrupt the Debtors' day-to-day operations, impose significant costs on the Debtors' estates, and destroy the going-concern value of the Debtors' business.

139.    The Debtors' business operations rely heavily on their compliance with applicable federal, state and local law.   If the Debtors are unable to immediately comply with the requirements of the applicable Taxing Authorities, the Debtors' ability to conduct business in the state of Indiana.  Accordingly, the Debtors submit that the relief requested in the Taxes and Fees Motion is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

**I.     Motion of the Debtors for Interim and Final Orders (I) Authorizing Post-Petition Secured Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Providing Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Providing Related Relief; and (VI) Scheduling a Final <u>Hearing</u>**

140.    By this motion (the "**DIP Motion**"), the Debtors request entry of the Interim Order and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), authorizing the Debtors to enter into the $102.5 million DIP Credit Agreement (substantially in the form annexed as <u>**Exhibit 1**</u> to <u>**Exhibit B**</u> to the DIP Motion and incorporated herein by reference).

141.    I believe that an immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of their businesses and provide the appropriate comfort to customers and employees.   Because the Prepetition First Priority Agent has a lien on substantially all of the Debtors' cash, and is not willing to consent to the use of cash collateral alone, the Debtors are unable to obtain the required funds (a) in the forms of (i) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (ii) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (iii) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code or (iv) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code or (b) on terms more favorable than those offered by the DIP Lenders under the DIP Budget (defined below), the DIP Credit Agreement

and the Interim Order. The Debtors' need is immediate because (c) it provides comfort to vendors that might otherwise discontinue service with the Debtors; (d) it assures customers of continued operations; and (e) it allows the Debtors to satisfy regulatory requirements regarding cash reserves to honor ticket/voucher payments.

142. The Debtors have requested that, pursuant to the terms of the DIP Credit Agreement, the DIP Lenders make loans and advances and provide other financial accommodations to the Debtors. The ability of the Debtors to continue their businesses and reorganize under chapter 11 of the Bankruptcy Code depends upon the Debtors obtaining such financing. The DIP Lenders are willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described in the DIP Motion, pursuant to the terms and conditions of the DIP Credit Agreement. Accordingly, the relief requested in the DIP Motion is necessary, essential and appropriate for the continued operation of the Debtors' businesses, the management and preservation of their assets and properties, the satisfaction of all regulatory requirements, and is in the best interests of the Debtors, their estates and creditors.

143. The Debtors (in consultation with myself and their other advisors) have determined that (a) the DIP Budget is reasonable and will allow the Debtors to operate in the Cases without the accrual of unpaid allowed administrative expenses; and (b) the DIP Budget includes all reasonable, necessary, and foreseeable expenses to be incurred for the period set forth in the DIP Budget.

144. I submit that it is in the best interests of the Debtors' estates that they be allowed to finance their operations under the terms and conditions set forth in the DIP Motion and related documents. The relief requested by the DIP Motion is necessary to avoid harm to the Debtors'

estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested therein, and the immediate entry of the Interim Order. I believe that the terms of the DIP Facility and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

145.    With the assistance of the Debtors and their other advisors, to best assess the Debtors' funding needs during the Cases, I have analyzed their cash needs to determine what is necessary to maintain their operations in chapter 11 and work toward a successful reorganization. In undertaking this analysis, the Debtors, their advisors and myself have considered the Debtors' near-term projected financial performance, including trends in the gaming sector and the cost to better optimize the Debtors' operations. Together with the Debtors' management, we also conferred with key operational divisions to understand essential business metrics in both the near and long-term.

146.    As part of the Debtors' financial review and analysis, I worked with the Debtors to develop a 13-week cash flow forecast that takes into account anticipated cash receipts and disbursements during the projected period. This forecast considers a number of factors, including the impact of the chapter 11 filing, material cash disbursements, required vendor payments, cash flows from the Debtors' ongoing operations and the cost of necessary goods and materials and includes all of the expenditures for which the Debtors seek authority to pay in various First Day Motions.

147.    Utilizing this cash flow forecast to project their cash needs during these Cases, I believe that approximately $5 million in liquidity availability is necessary for operations during the early stages of these Cases. The proposed DIP Financing will provide the Debtors with

immediate access of up to $5 million. The immediate availability of this initial DIP Financing is necessary to provide assurance of payment and "business as usual" continued operations to trade vendors. Without such assurances, trade vendors may very well refuse to provide goods and services to the Debtors and/or require cumbersome credit terms, which could negatively affect the Debtors' reorganization efforts and the Debtors' bankruptcy estates as a whole. Further, customers may take their gaming/racing business elsewhere, and, the Debtors run the risk of not satisfying all the applicable regulatory requirements. In addition, entering into the DIP Facility, versus the use of Cash Collateral, will lower the Debtors' interest expenses by as much as $500,000 a month ($6 million over the next year).

148. Given the Debtors' significantly constrained liquidity position, the DIP Facility is of critical importance to the Debtors' continued operations and to preserving going concern value, especially following the commencement of these Cases and the general uncertainty in the marketplace that will accompany this process.

149. Specifically, the Debtors have an urgent need to obtain access to the DIP Facility to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships and assure the continuity of operations with, and ability to make payment to, vendors, suppliers and customers, pay approximately 1,000 employees and satisfy other working capital and operational needs, not the least of which includes satisfying certain regulatory requirements regarding required cash for payment of all tickets/vouchers — each of which is vital to preserving and maintaining the value of these estates for the benefits of all stakeholders. Moreover, I believe that granting the Debtors' access to the DIP Facility will provide comfort and confidence to all parties in interest at this critical juncture, as well as a

reduction of $500,000 a month in interest expense. A significant savings realized immediately and throughout the Cases.

150. Thus, the Debtors have an immediate need to obtain access to liquidity to, among other things, provide comfort to their employees, customers and suppliers as well as to continue to operate their business, maintain key business relationships, make payroll and satisfy other working capital and operational needs. Funding each of these expenditures is necessary to preserve and maintain the value of the Debtors' estates for the benefit of all parties in interest.

151. Without approval of the DIP Financing, considering the Prepetition First Priority Agent's unwillingness to consent to cash collateral use, trade vendors might discontinue the provision of goods and services, which would disrupt operations and frustrate the Debtors' reorganization efforts. Additionally, absent access to liquidity under the DIP Facility, the Debtors face the potential inability to satisfy their payroll and other direct operating expenses necessary to run their businesses in the ordinary course. Thus, availability of sufficient working capital and liquidity is vital to the preservation and maintenance of the value of the Debtors' estates.

152. Accordingly, I submit that the Debtors' entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest.

**J.** **Chapter 11 and Ordinary Course Professionals**

153. The Debtors have filed and are seeking entry of orders authorizing them to employ and retain various professionals to assist them in the conduct of these cases, including:

(a) Greenberg Traurig, LLP as counsel for the Debtors;

(b) Lazard Freres & Co., LLC to provide investment banking advice to the Debtors;

(c)     Epiq Bankruptcy Solutions, LLC as claims and noticing agent for the Clerk of this Bankruptcy Court;

(d)     Robert E. Neiman, P.C. as general corporate counsel to the Debtors;

(e)     Bose McKinney & Evans as counsel to the Debtors with respect to various regulatory matters;

(f)     Polsinelli Shughart, P.C. as conflicts counsel to the Debtors;

(g)     Kobi Partners, LLC, as to provide the services of the chief restructuring officer;

(h)     FD U.S. Communications, Inc., to provide strategic communications services;

(i)     Professionals utilized by the Debtors in the ordinary course of business

154.    The Debtors further have filed an application for an administrative order establishing procedures for the interim and monthly compensation and reimbursement of expenses of professionals. I believe that the retention of the professionals listed above is necessary under the circumstances of these Cases. Indeed, with the filing of these Cases, the Debtors and their professionals will turn their attention to various issues requiring their professional expertise that are expected to arise as a result of the filing of the Cases.

## IV.
## CONCLUSION

155.    The primary purpose of the filing of these Cases is to prevent deterioration and to protect the going-concern value of the business operated by the Debtors during the Cases. In the interim, through the Motions and Applications described above, the Debtors seek to minimize certain adverse effects that these Cases might otherwise have on their business, while honoring the spirit of the chapter 11 process.

156.    To preserve the value of their business to the fullest extent possible, the Debtors' immediate objective is to maintain "business as usual" for the Debtors' operating assets following the commencement of these Cases by minimizing the adverse impact of the filing on the Debtors' assets and operations. For the reasons described herein and in the First Day

Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if this Bankruptcy Court grants the relief requested in each of the First Day Motions and respectfully request the Bankruptcy Court to do so.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: April 7, 2011

GREGORY F. RAYBURN
CHIEF RESTRUCTURING OFFICER
INDIANAPOLIS DOWNS, LLC and INDIANA
DOWNS CAPITAL CORP.
Debtor and Debtor-in-Possession