# EXHIBIT "B"

## (Engagement Letter)



March 15, 2011

Mr. Fred Burford
Chief Financial Officer
Indianapolis Downs, LLC d/b/a Indiana Live! Casino and Indiana Downs
4300 North Michigan Road
Shelbyville, IN 46176

This letter shall serve to confirm our Agreement as follows:

1.  Indianapolis Downs, LLC ("Client") hereby retains FD U.S. Communications, Inc. ("FD") effective as of March 15, 2011, to provide strategic communications services on a project basis as outlined in FD's revised proposal dated March 15, 2011, attached as Exhibit A.

2.  The project shall begin on March 15, 2011, and it is anticipated that it will conclude on or about April 7, 2011. However, this Agreement shall remain in full force and effect – under the terms set forth in Exhibit A -- for as long as FD is providing said project services to Client.

3.  As compensation for the professional services to be rendered by FD, Client shall pay FD a fixed fee of $115,000.00, in the manner described in Exhibit A.

    In the event that the services under this Agreement may continue past the first anniversary of its start date, then prior to such anniversary and prior to each subsequent anniversary the parties agree to revisit all payment amounts and, if need be, to increase them based upon the current work level and anticipated scope of work. If, however, no such change is agreed prior to any anniversary, then effective with each anniversary each periodic charge for retainers; hourly rates; telephone, fax, and internet usage; and news retrieval access, analyst reports, and financial and industry publications will be increased by five percent (5%) of each such periodic charge before such increase.

    Subsequent projects agreed to, if any, including media training, presentation training, design, speechwriting and/or ongoing activities and budget allocation will only be enforceable if entered via a writing signed by an authorized representative of each party.

4.  Client shall be responsible for all reasonable and necessary disbursements made by FD on behalf of Client, including, but not limited to, postage and stationery, photocopies, and travel expenses. Specific periodic expenses include:

    *   A monthly pro-rated charge of $350.00, which represents FD's costs associated with telephone, fax, and internet usage for account management purposes.

    *   A monthly pro-rated charge of $750.00, which represents FD's costs associated with the multiple data sources that are required to facilitate daily program activities such as news retrieval access, analyst reports, and financial and industry publications.

    As described in Exhibit A, on April 1, 2011, FD shall bill Client, and Client shall reimburse FD for all expenses and disbursements made on behalf of Client. All expenses and disbursements incurred will be itemized in each monthly invoice.

WALL STREET PLAZA, 88 PINE STREET, 32nd FLOOR, NEW YORK, NY 10005, USA

www.fd.com

TEL +1 (212) 850 5600, FAX +1 (212) 850 5700

FINANCIAL DYNAMICS INTERNATIONAL LIMITED
A MEMBER OF FTI CONSULTING, INC.

Client will, in addition to paying for all such out-of-pocket costs, pay FD an administrative fee of five percent (5%) of all paragraph 4 costs, exclusive of the telecommunications and news retrieval fees.

Notwithstanding the foregoing, the following expenses shall be directly billed to Client for payment: (i) slide presentation and related presentation activities; (ii) broadcast conference calls; (iii) broadcast faxes; (iv) business wire/public relations news-wire services; and (v) any other vendor services in which any single disbursement exceeds $1,000.00. The foregoing expenses shall be paid by Client to such vendor in accordance with the terms of the respective invoice.

5.  Invoices are due and payable upon receipt. The name and address of the Client designee to receive and approve FD's invoices is indicated on the signature page of this latter. In the event any invoice is not paid by Client within thirty (30) days of date of invoice, then Client shall, in addition to the delinquent amount, pay to FD a late payment fee of five (5%) percent of the delinquent amount. Client agrees that such late payment fee is a fair and reasonable sum calculated to defer administrative expenses incurred by FD as a result of such late payment. Such late payment fee shall be due and payable thirty-one (31) days following the date of invoice of such delinquent amount. In addition, and without limiting FD's other rights and remedies, in the event any payment is not paid by Client within thirty (30) days of date of invoice, then interest shall accrue, from the thirty-first (31st) day until payment in full is received, at the rate of one and one half (1 1/2%) percent per month. Nothing herein shall be construed as extending the due date of payments to be made by Client under this Agreement. In addition, Client agrees to pay all court costs, attorney fees (whether or not contingent on collection from Client) and other expenses which may be associated with the collection of unpaid invoices. In addition to the remedies set forth above and any other remedies available at law, FD reserve the right to defer rendering services until payment is received on past-due invoices.

6.  Client will furnish to FD certain material, nonpublic information concerning Client. As a condition of receiving such information, FD agrees to treat any such information concerning Client, which is furnished to FD by or on behalf of Client (herein collectively referred to as the "Information") in accordance with the provisions of this agreement. The term "Information" does not include Information which (a) was or becomes generally available to the public other than as a result of a disclosure by FD or its directors, officers, employees, agents or advisors, (b) was available prior to its disclosure to FD by Client or its representatives, (c) becomes available on a nonconfidential basis from a source other than Client or its representatives, provided that such source is not known by FD to be subject to another confidentiality agreement with or another obligation of secrecy to Client or another party, or (d) is independently developed by FD.

FD hereby agrees that the Information will be kept confidential by FD in perpetuity following the receipt of such Information, and will not be disclosed to any outside party except as so directed by Client.

If FD is requested or required (by oral questions, interrogatories, requests for Information or documents, subpoena, Civil Investigative Demand or similar process) to disclose any Information supplied to FD in the course of dealings with Client, it is agreed that FD will provide Client with prompt notice of such request or requirement so that Client may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement. It is further agreed that if, in the absence of a protective order or the receipt of a waiver hereunder, FD is nonetheless, in the opinion of our counsel, required to disclose Information concerning Client to any tribunal or else stand liable for contempt or suffer other censure, penalty or other liability, FD may disclose such Information to such tribunal without liability hereunder. The provisions of this paragraph shall survive the expiration or termination of this Agreement.

The preceding paragraphs potentially to the contrary notwithstanding, FD will be entitled to list Indianapolis Downs, LLC, and Indiana Downs, but not Indiana Livel Casino, or its logo, as well as a general description of

the services being provided to Client, in FD's materials. FD will be permitted to disseminate such information, among other ways, in its brochures, in its Website, and in its proposals to other actual or prospective clients.

7. Client hereby acknowledges that FD shall rely upon the accuracy of all information provided by Client to FD. Client assumes full and complete responsibility and liability for the financial and other information furnished to FD for its use on behalf of Client hereunder and Client shall indemnify and hold harmless FD from and against any demands, claims, damages, or liability relating thereto. Client shall pay FD any amounts payable by FD in settlement of any claims or in satisfaction of any judgments resulting from FD's use of any financial or other information furnished by Client in connection with the services rendered by FD hereunder, except for FD's violation of its confidentiality obligations, together with all costs and expenses incurred in connection therewith, including without limitation, reasonable attorneys' fees and costs of litigation. Without limiting the foregoing, Client shall reimburse FD for all costs and expenses, including reasonable attorneys' fees incurred in responding to any subpoena or other court process in any action or proceeding or investigation in which Client or its affiliates are a party or are otherwise involved. Such indemnities do not apply to claims resulting from the negligence or willful misconduct of FD. The provisions of this paragraph shall survive the expiration or termination of this Agreement.

8. Client agrees that during the term of this Agreement (including the Initial Term as it may be extended) and for a period of one (1) year thereafter, Client will not employ, retain or attempt to employ or retain or assist anyone else to employ or retain (whether as an employee, consultant or in any other capacity) any FD employees that have worked or otherwise been associated with Client's account, nor will Client, during the term (including the Initial Term as it may be extended) nor for one (1) year thereafter, retain the employee's new employer. The provisions of this paragraph shall survive the expiration or termination of this Agreement. The obligations of Client set forth in this paragraph are material terms of this Agreement, and in the event of any the breach or threatened breach of any such obligations by Client, whether directly or indirectly, FD may enforce these obligations by obtaining immediate injunctive relief before any court having jurisdiction, in addition to such other rights and remedies as FD may have. The Client hereby agrees to pay FD liquidated damages of three (3) times the annual compensation for the 12-month period immediately prior to such person's termination of employment with FD for any FD employee to which Client either offers employment (whether as an employee or a contractor) or directly or indirectly influences others to offer employment (whether as an employee or a contractor) without the prior written consent of FD.

9. This Agreement constitutes the entire understanding and Agreement between the parties with respect to the subject matter covered herein and all prior or contemporaneous understandings, negotiations and agreements are herein merged.

10. The Agreement may not be altered, extended, or modified nor any of its provisions waived, except by a document in writing signed by the party against whom such alteration, modification, extension or waiver is sought to be enforced.

11. A waiver by either party of any breach, act or omission of the other party is not to be deemed a waiver of any subsequent similar breach, act or omission.

12. The terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of each of us and our respective successors and assigns.

13. This Agreement shall be governed by the laws of the State of New York, without giving effect to the choice of law provisions thereof. As to any dispute arising out of Paragraph 3, 4 or 5 it shall be subject to binding arbitration before the American Arbitration Association, New York County, New York, before a single arbitrator

whose decision will be final and binding. For all other terms of this agreement each party hereby agrees to jurisdiction and venue in the State or Federal courts in New York County, New York. To facilitate judicial resolution and save time and expense, FD and the Client irrevocably and unconditionally agree to waive a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the services provided hereunder.

14. FD shall not be liable for any special, incidental, indirect, punitive or consequential damage or for the loss of profit, revenue, or data arising out of the subject matter of this Agreement. Without limiting the foregoing, FD will not be liable for any damages exceeding FD's fees charged to Client under Paragraph 3 of this Agreement for the twelve (12) months preceding the first alleged FD action (or failure to act) resulting in any such FD liability for damages.

15. This Agreement may be executed in counterparts. Facsimile copies are as effective as the original.

16. All notices, requests, demands, or other communications under this Agreement shall be in writing, notice shall be sufficiently given for all purposes as follows:

> *Personal delivery.* When personally delivered to the recipient, notice is effective on delivery.

> *Certified mail.* When mailed certified mail, return receipt requested, notice is effective on receipt, if delivery is confirmed by return receipt.

> *Overnight delivery.* When delivered by overnight delivery Federal Express/Airborne/United Parcel Service/DHL Worldwide Express, charges prepaid or charged to the sender's account, notice is effective on delivery, if delivery is confirmed by the delivery service.

> *Telex or facsimile transmission.* When sent by telex or fax to the last telex or fax number of the recipient known to the party giving notice, notice is effective on receipt, provided that: (a) a duplicate copy of the notice is promptly given by first-class or certified mail or by overnight delivery, or (b) the receiving party delivers a written confirmation of receipt. Any notice given by telex or fax shall be deemed received on the next business day if it is received after 5:00 p.m. (recipient's time) or on a non-business day.

Addresses for purpose of giving notice are as follows:

| | |
|---|---|
| To FD: | Attn: COO |
| | FD |
| | Wall Street Plaza |
| | 88 Pine Street, 32nd Floor |
| | New York, NY 10005 |
| | |
| To Client: | Attn: Chief Financial Officer |
| | Indianapolis Downs, LLC |
| | 4300 North Michigan Road |
| | Shelbyville, IN 46176 |

17. If a court or an arbitrator of competent jurisdiction holds any provision of this Agreement to be illegal, unenforceable, or invalid, in whole or in part for any reason, the validity and enforceability of the remaining provisions, or portions of them, will not be affected, unless an essential purpose of this Agreement would be defeated by the loss of the illegal, unenforceable, or invalid provision.

18. Pursuant to 68 Indiana Administrative Code 1-4-1, the Indiana Gaming Commission has the right to review and disapprove of this contract.

If the foregoing correctly sets forth the terms and conditions of our Agreement, please have the enclosed copy of this letter signed by a duly authorized officer beneath the words "Agreed to and Accepted" and return same to us.

Agreed to and Accepted:

FD U.S. Communications, Inc.

By: _____

Mark McCall
Chief Operating Officer

Date: _____3-17-11_____

Indianapolis Downs, LLC

By: _____

Fred Burford
Chief Financial Officer

Date: 3/17/11

Name and Address of Client contact designated to receive and approve invoices related to this Agreement:

Name: FRED BURFORD
Address: _____

Phone: _____
Fax: _____
E-Mail: _____



*Privileged and Confidential*
*Attorney-Client Work Product*

THE STRATEGIC COMMUNICATIONS DIVISION OF FTI CONSULTING
Financial Dynamics
227 West Monroe Street  Suite 900, Chicago, IL 60606
T +1 (312) 553-6700  F + (312) 553-6740

## MEMORANDUM

TO:        Fred Burford
           Indianapolis Downs LLC

Cc:        Greg Rayburn

FROM:      FD

DATE:      March 15, 2011

SUBJECT:   Proposal for Communications Support (Revised)

As promised, this memorandum provides FD's proposal to provide Indianapolis Downs LLC with strategic communications counsel and execution in association with its proposed restructuring activities.  Our proposal assumes an immediate start-up date, and a filing in the early part of April.

### Introduction

Following our brief discussion with you and Greg last week, FD has a relatively clear – albeit preliminary – understanding of the situation the Company is facing.

Although Indianapolis Downs, LLC soon will enter a very challenging period, it appears its future will in fact be quite positive as long as perceptions surrounding the near-term issues and events are managed as effectively as possible.  Clearly, communications is going to be critical to ensuring that outcome, and delivering the right messaging to your key stakeholders will be the core focus of our activities.  This kind of situation goes beyond traditional business and corporate communications, and we believe FD's significant experience advising clients in critical situations and complex restructurings will add value and effective support for your ongoing efforts.

### Communications Goals

Effective communication during the planned restructuring will help achieve the Company's long-term corporate goals and, in the near-term, protect the Company's business, brand, and reputation.  The communication program we will develop and implement will support the Company's efforts to achieve the following overarching objectives:

- Position the Chapter 11 filing as a strategic and tactical tool that will allow the Company to create a better long-term business model and ensure all key stakeholders there is a positive future.

- Reassure affected parties – particularly customers, vendors and employees – that the Company is financially sound, will meet its business obligations, and will emerge from the Chapter 11 process as a strengthened entity.

- Mitigate rumors, conjecture and uncertainty regarding the Company's future by providing concrete details on operational achievements and a clear outline of steps in the restructuring process and the vision going forward.



- Demonstrate clear and focused leadership by the Company's senior management, including cooperation working with the new owners to address uncertainty surrounding industry business challenges, the pending restructuring, and other factors.

- Utilize a trained internal team, as well as selected trade media relations, to support and communicate the Company's key messages during this time of transition.

- Ensure that management has a sounding board for key communications issues.

- Protect the reputation and credibility of the ongoing enterprise.

## Program Scope

We have outlined below the key activities that need to occur between now and the Company's filing as well as the immediate post-filing period. Clearly, there certainly is emergence and corporate positioning and marketing-support work that could or should continue going forward, and we look forward to the opportunity to create a longer-term communications program after we move through an initial project period.

### Overview of Strategy

FD would provide strategic counsel and provide tactical implementation necessary to communicate with employees, customers, vendors, the media and any other key audiences as important business decisions are made and Indianapolis Downs, LLC moves through the restructuring process.

The following communications strategies will apply to the current situation:

- Communicate simultaneously with all affected parties to limit uncertainty and ensure a consistent message.

- Develop a reputation for candor and honesty through regular communications – anticipate questions and provide as much information as possible to those affected by the Company's decision to file for Chapter 11 protection.

- Provide feedback channels to answer – in real-time – any additional questions and concerns from employees, customers, vendors and others.

- Through a training program supported by a "Communications Toolkit," establish a designated group of internal company spokespeople who are permitted to speak both internally and externally about the restructuring process.

- Demonstrate commitment to the brand and ongoing business.

### Overview of Tactical Plan

Below are preliminary suggestions for Indianapolis Downs, LLC based on our prior experience and initial research on the Company's specific situation. This plan is designed to meet the unique needs of employees, customers, vendors and others affected by the filing, while also ensuring consistent messages across all communications. This plan will be customized as more information is made



available to us. (A sample of the materials we would develop for an engagement such as this is included at the end of this proposal.)

### i) Develop Key Messages

Given the sensitive nature of this announcement and the many competing interests that must be addressed, it is essential that Indianapolis Downs, LLC speak with a consistent voice in all of its internal and external communications. Further, it should be assumed that all internal communications may be "leaked" to external audiences, making consistency even more critical.

Accordingly, the first step in the communications process is to develop a comprehensive set of key messages that will do the following:

- Explain how Indianapolis Downs, LLC reached the decision to file for Chapter 11 protection and what the Company hopes to achieve through the restructuring process.

- Provide context around next steps and timing.

- Demonstrate strength financial position and ongoing day-to-day business.

- Characterize strength of senior leadership and its clear vision of the future.

- Address, to the fullest extent possible, the anticipated concerns of employees, customers, vendors and other key audiences.

All communications will be derived from these messages. Some will be incorporated in materials such as news releases, scripts, vendor communications, and internal and external letters, while others will be used only for Q&A purposes.

### ii) Effect Chapter 11 Announcement

To address the needs of all of Indianapolis Downs, LLC's key stakeholders, "day one" communications would include the following:

- News release
- Comprehensive internal and external Q&A
- Employee letter and FAQ
- Customer letter and FAQ
- Vendor packet – letter and FAQ
- Talking points for employee meeting/call, as well as calls to other audiences (customers, vendors, local officials, etc.)
- Prepared statement/protocol for responding to media inquiries

### iii) Manage Other Follow-on Announcements

Following the initial Chapter 11 announcement, we envision several additional "update" announcements that will require their own strategy, messages, statements, etc. Examples of such announcements include:



- Final arrangements on interim or DIP financing
- Updates on restructuring progress/key developments
- Ultimate plan of reorganization

After we move through the initial announcement, we would look to evaluate the situation and create a communications strategy – and plan of execution – to communicate key milestones in the Plan of Reorganization and prepare for the Company's emergence from Chapter 11.

## Budget

FD is a consulting firm and bills the time of its professionals on an hourly basis which, for an assignment such as this one, would range from $250 to $650 per hour. To begin working with you, we would require a minimum upfront retainer of $50,000, against which we would bill the time worked by our staff.

Regarding professional fees: We have agreed to a fixed fee of $115,000 for our services leading up to and including a Chapter 11 filing on or about April 6, 2011. If that filing date is delayed, or if the nature of the transaction changes in a significant way causing a delay, we will begin billing hourly – at the rates noted above – beginning on April 7, 2011. All hourly billing shall be itemized with a discernable description of the date, length of time, and activity performed provided at the time of billing for such time.

In any instance, all post-petition fees – irrespective of date – would be handled within the court-approved process for ordinary course providers.

As we move through the Chapter 11 preparation period, we would require the balance of $65,000 to be paid by April 1, 2011, to ensure payments are up to date prior to entering the Chapter 11 phase.

The fixed fee of $115,000 does not include any out-of-pocket expenses (materials, outside vendors, production costs, travel expenses, etc.) associated with the implementation of project activities. Out-of-pocket expenses should total approximately 10% of professional fees and will be billed separately in arrears. We expect to present you with an invoice for expenses on April 1, 2011; it will cover expenses to date as well as estimated expenses to be incurred prior to the filing.

To put the work flow into perspective: We currently anticipate significant upfront work in the next few weeks to prepare for and execute the filing. This would consist of messaging, creating internal and external documents, training internal staff to support the communications and possibly engaging in media relations.

In the weeks immediately post-filing, we anticipate efforts will mainly be focused on vendor and employee communications. After that, we anticipate a slowdown in work flow. However, we will be available for any and all activity that is helpful and would look to accelerate work when the Company is planning to provide updates or information regarding the plan for emergence.

## Next Steps

Thank you for the opportunity to provide Indianapolis Downs, LLC with this proposal, and we look forward to working with you through this process. Obviously, time is a pressing matter, and we hope



we can reach an agreement to move forward as quickly as possible so we can deploy a team to begin working with you and your other advisors.

Thank you.

###