## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INDIANAPOLIS DOWNS, LLC, *et al.*, | Case No. 11-11046 (BLS) |
| Debtors. | Jointly Administered<br>Related DI Nos. 25 & 26 |

## OMNIBUS OPPOSITION OF POWER PLANT ENTERTAINMENT CASINO RESORTS INDIANA, LLC AND LIVEHOLDINGS!, LLC TO (I) MOTION OF DEBTORS TO ASSUME THE TRADEMARK LICENSE AGREEMENT [D.I. 26], AND (II) MOTION OF THE DEBTORS TO REJECT THE MANAGEMENT CONTRACT [D.I. 25]

Power Plant Entertainment Casino Resorts Indiana, LLC ("PPE") and LiveHoldings!, LLC ("LiveHoldings"), by undersigned counsel, hereby file this Omnibus Opposition to (i) the *Motion of Debtors Pursuant to Bankruptcy Code Section 365(a) and Bankruptcy Rule 6006 for an Order Authorizing the Debtors to Assume the Trademark License Agreement* (the "Motion to Assume"), [D.I. 26], and (ii) the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject the Development, Financing & Management Agreement Between Power Plant Entertainment Casino Resorts Indiana, LLC and Indianapolis Downs, LLC nunc pro tunc as of the Petition Date* (the "Motion to Reject" and with the Motion to Assume, the "Motions"), [D.I. 25], and respectfully state as follows:

## INTRODUCTION

1.  By the Motions, Indianapolis Downs, LLC (the "Debtor")[1] seeks to undermine the cardinal rule that prohibits exploitation of the right to assume or reject executory contracts by "cherry-picking" favorable benefits of contractual arrangements while, at the same time, relieving itself of those terms which, although part and parcel of the business agreement, are

---

[1] The Debtors in these chapter 11 cases are Indianapolis Downs, LLC and Indiana Downs Capital Corp. which are collectively referred to herein as the "Debtors." Although both Debtors filed the Motions to which this Opposition relates, only Indianapolis Downs, LLC, referred to herein as the "Debtor," is a party to the contracts that are the subject of the Motions.

burdensome or costly. As this Court has explained, "'The [debtor] may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.'" *See In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) (Walrath, J.) (quoting *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) (citing *In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007)).

2.     PPE, LiveHoldings, and Indianapolis Downs, LLC ("Indiana Downs") are parties to indivisible contracts, which, by virtue of their intent, purpose, and express linking, were entered into in furtherance of, in their own words, a "Project" for the development and management of the Debtor's gaming and entertainment operations. Significantly, the undertaking of the Project was memorialized in a Management Contract,[2] by which PPE provided its development and management services, which was inextricably intertwined with a Trademark Contract,[3] through which PPE and its affiliate, LiveHoldings, licensed trademarks to the Debtor. Indeed, the composite nature of the contracts that comprise the Project agreement was made clear by the parties in, among other things, the express terms of the Trademark Contract. Specifically, the Trademark Contract indivisibly ties the services and intellectual property provided by PPE and LiveHoldings under the Project contracts by linking the effectiveness of the Trademark Contract component of the Project to the Management Contract component of the Project, stating at D.I. 26-1, § 3:

> "**Term**. **This Agreement, and all rights granted hereunder, shall be effective as of the Effective Date and continue in full force and effect until the Management Agreement expires or is terminated in accordance with the provisions thereof.**"

Trademark Contract at ¶ 3 (Emphasis supplied). As more fully detailed below, the Debtor's effort to pick and choose by selecting only favorable components of an agreement is wrongful.

---

[2] Development, Financing & Management Agreement, [D.I. 25-1].
[3] Trademark License Agreement, [26-1].

3. Moreover, given the significant loss to the Debtor and the estate of what they accurately confirm are "vital" and "crucial" trademarks to their business operations, the decision to reject the Management Contract component of the Project, which, in turn, will cause the rejection of the indivisible Trademark Contract, is a violation of the Debtor's duty to exercise sound business judgment. Motion to Assume at ¶ 10.

4. In recognition of this, and notwithstanding that PPE and LiveHoldings have the absolute right to bar assumption of the Trademark Contract without assumption of the Management Contract, PPE and LiveHoldings will consider providing their consent to the assumption of the Trademark Contract if the Debtor exercises appropriate business judgment and assumes the Management Contract, or some modified variation thereof. PPE and LiveHoldings respectfully request that the Court require the Debtor to pursue assumption of both the Management Contract and Trademark Contract for the best interests of the Debtor's estate and all creditors.

5. Moreover, the Debtor's strategic efforts to obtain the use of the valuable trademarks for no consideration, irrespective of the Debtor's improper efforts to pick and choose terms through the rejection and assumption of the Management Contract and Trademark Contract, respectively, the Debtor, as a debtor in possession, has failed to obtain, much less even request, the requisite consent of PPE and LiveHoldings to assume the contracts. As required under applicable non-bankruptcy law, and pursuant to section 365(c) of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), assumption of a trademark license requires the affirmative consent of the licensor. The Lanham Trade-Mark Act, 15 U.S.C. §§ 1051, *et seq.*, is applicable non-bankruptcy law, and as enforced by the courts, serves as an absolute bar to the Debtor's attempted assumption of the Trademark Contract component of the Project without PPE's

consent because "under applicable trademark law, trademarks are personal and non-assignable without the consent of the licensor, [the licensor's] trademark would be unassumable as part of the bankruptcy estate of [the licensee] without the [licensor's] consent." *In re N.C.P. Mktg. Group, Inc.*, 337 B.R. 230, 237 (D. Nev. 2005), *aff'd,* 279 Fed. Appx. 561 (9th Cir. 2008), *cert. denied,* 129 S. Ct. 1577 (2009); *see also In re West Elecs., Inc.*, 852 F.2d 79 (3d Cir. 1988).

6.      Furthermore, to the extent that PPE and LiveHoldings provide consent for the Debtor to assume the Trademark Contract (which would require either assumption of the Management Contract or modification to the Trademark Contract to expressly incorporate relevant protections, term, consideration, default provisions, and other contractual rights customarily found in a stand-alone trademark license agreement), the Debtor must cure all defaults owed to PPE and LiveHoldings, and provide for adequate assurance of future performance, including, but not limited to, paying for the prior use of the trademarks, maintaining the use of the trademarks in a "First Class" and "High Quality" manner as specifically required in the Trademark Contract, and paying for future use of the trademarks.

## FACTUAL BACKGROUND OF THE PROJECT

### A.      The Relationship between the Debtor, PPE and LiveHoldings

7.      The Debtor owns and operates a horse racetrack in Shelbyville, Indiana and two off-track wagering facilities.

8.      Through a debt offering in 2007, the Debtor sought to construct a casino gaming facility adjacent to the racetrack (the "Facility").

9.      After a national search, the Debtor selected PPE to develop and operate the Facility. To that end, on September 10, 2007, the Debtor entered into the Management Contract with PPE. Prior to the Facility's grand opening in March 2009, PPE established a temporary,

70,000 square foot gaming complex in less than five months, which opened on June 6, 2008. Thereafter, PPE successfully developed a state-of-the-art, 233,000 square foot facility, featuring 2,000 slot machines and electronic table games.

10.     As acknowledged in the Debtor's October 18, 2007 debt offering circular, the Facility was to make use of trademarks owned by PPE and its affiliate, LiveHoldings, or licensed by a third-party to an affiliate of LiveHoldings.

11.     As outlined above, to effectuate the planned branding of the Facility, and as part of the Project, LiveHoldings and PPE entered into the Trademark Contract in January 2008, in which LiveHoldings and PPE granted the Debtor certain limited, royalty free, non-exclusive license rights to trademarks owned by LiveHoldings and PPE, or licensed by third parties to an affiliate of LiveHoldings and PPE, that were to be used for the Project. The Trademark Contract was entered into subsequent to the Management Contract because the Management Contract had to first be in place to secure PPE's control over its trademarks. Accordingly, and consistent with the purpose and intent of the parties, the Trademark Contract expressly provides that its term expires upon the termination or expiration of the Management Contract, *i.e.* when PPE no longer managed the Project, and, in turn, could not protect its trademarks and those trademarks licensed to it by third parties, from mismanagement or misuse. *See, supra,* at ¶ 2 ("Term. This Agreement, and all rights granted hereunder, shall be effective as of the Effective Date and continue in full force and effect until the Management Agreement expires or is terminated in accordance with the provisions thereof.").

12.     When the Facility opened, it was branded "Indiana Live!® Casino." The coffee bar was branded, "Live!® Java Bar", the twenty-four hour convenience market was branded "Live!® On the Run", the deli was branded "Live!® Deli", the lunch and dinner buffet was

branded, "Live!® Market Buffet." Additionally, the Facility includes a lounge and nightclub branded "Angels Rock Bar®", a sports bar and grill branded "NASCAR® Sports Grille", and an upscale restaurant branded "Maker's Mark® Bourbon House & Lounge." "Live!®" and "Angels Rock Bar®" are brands owned by LiveHoldings. The "NASCAR® Sports Grille" and "Maker's Mark® Bourbon House & Lounge" are brands licensed by third parties to affiliates of PPE and LiveHoldings.

13.     Under the Management Contract, PPE was to earn a development fee paid during the construction of the Project, as well as an ongoing management fee equal to 4.5% of gross revenues from the Facility operations. The Trademark Contract was deliberately crafted so that it does not provide for any monetary consideration for the Debtor's use of the trademarks, as the fees due to PPE under the Management Contract were intended to fairly compensate PPE and LiveHoldings for the Debtor's use of the trademarks. The royalty free Trademark Contract was "stapled" to the Management Contract and was intended, by its express terms, to be inextricably linked to the Management Contract. Needless to say, PPE and LiveHoldings are obviously not in the business of licensing for free their valuable trademarks, or trademarks for which they pay third parties, to entities like the Debtor. It was never the intent of the parties that the Debtor would enjoy the trademarks for free.

14.     PPE was paid its development fee and management fee as required by the Management Contract for approximately one year. The Debtor unilaterally began withholding payment of the Management Contract fees in April 2009 and then approached PPE to defer certain fees from April 2009 through December 2009 pursuant to a modification to the Management Contract. In the spirit of helping the enterprise, PPE agreed; however, the Debtor continually failed to make payments of fees owed to PPE per the extension agreement. In

approximately March 2010, PPE demanded full payment of its fees due under the Management Contract. Indeed, on July 30, 2010, PPE provided a notice of default under the Management Contract to the Debtor for non-payment.

15.    In response, the Debtor sent a letter indicating that it had terminated the Management Contract. Shortly thereafter, the Debtor barred PPE from the Facility premises, locked it out, prohibited it from providing its services to the Debtor, and PPE has not managed the Facility since August 2010.

### B.    The Debtors' Bankruptcy Cases and the Motion to Assume

16.    On April 7, 2011 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are presently in possession of their properties and are operating and managing their businesses as debtors-in-possession.

17.    On the Petition Date, the Debtors filed, among other things, the Motion to Assume (concerning the Trademark Contract) and the Motion to Reject (concerning the Management Contract).

18.    By the Motion to Assume and the Motion to Reject, the Debtors seek to improperly reject an agreement to avoid paying fees, while at the same time seek to assume the Trademark Contract to effectively continue using the valuable trademarks licensed to the Debtor by LiveHoldings and PPE. Putting aside the extreme inequity of the Debtor's plan to continue the free use of the trademarks, it is legally prohibited from doing so, as discussed in detail below, unless consent is provided by PPE and LiveHoldings.

## ARGUMENT

**A.    The Debtor Cannot Assume the Trademark Contract without Also Assuming the Management Contract**

**1.    The Management Contract and Trademark Contract are Indivisible**

19.    The Debtor's Motion to Assume should be denied because the Debtor is improperly attempting to assume only one of two stapled, intertwined and indivisible contracts that make up a single, bargained-for agreement between the parties.

20.    Delaware bankruptcy courts routinely recognize that an executory contract must be assumed or rejected *in toto*. *See In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008); *In re Exide Techs.*, 340 B.R. 222, 228-29 (Bankr. D. Del. 2006), *vacated on other grounds*, 607 F.3d 957 (3d. Cir. 2010); *In re ANC Rental Corp., Inc.*, 277 B.R. 226, 238-39 (Bankr. Del. 2002).   For this reason, this Court has recognized that "all of the contracts that comprise an integrated agreement must either be assumed or rejected, <u>since they all make up one contract</u>." Exide Techs., 340 B.R. at 228 (emphasis supplied) (citing, in turn, *Philip Servs. Corp. v. Luntz (In re Philip Servs., Inc.)*, 284 B.R. 541, 547-48 (Bankr. D. Del. 2002) and *In re Karfakis,* 162 B.R. 719, 725 (Bankr. E.D. Pa. 1993)).

21.    The obvious policy behind this principle is that a Debtor should not be permitted to "cherry-pick" only those provisions of a global agreement between the parties that are favorable, and cast aside those provisions that are not. *See Buffets Holdings*, 387 B.R. at 119 ("If the debtor decides to assume a lease . . . it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. 'The [debtor] may not blow hot and cold.  If he accepts the contract he accepts it *cum onere*.  If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.'") (quoting *In re Italian Cook Oil*

*Corp.*, 190 F.2d 994, 997 (3d Cir. 1951)) (citing *In re Fleming Cos., Inc.*, 499 F.3d 300, 308 (3d Cir. 2007)).

22.    While it is true that the question of whether an agreement is divisible is "fact-intensive," and ultimately depends upon the intention of the contracting parties, the determination is essentially based upon a single principle – "'*[e]ven if the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it "as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out."*'" *Buffets Holdings*, 387 B.R. at 122 (quoting *In re United Air Lines, Inc.*, 453 F.3d 463, 468, 470 (7th Cir. 2006)) (emphasis supplied); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 204 (2d Cir. 1989) (same); *Karfakis*, 162 B.R. at 725 (holding that a fast-food franchise contract and a separate commercial real estate lease contract between the debtor-franchisee and the franchisor were a single agreement because it was "readily apparent that one agreement is of no utility without the other" and that "two contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties.") (emphasis supplied).

23.    Whether the parties herein intended that the Trademark Contract would not have been entered into but for the Management Contract is a question of state law. *See United Air Lines, Inc.*, 453 F.3d at 467; *Buffets Holdings*, 387 B.R. at 120; *Karfakis*, 162 B.R. at 725. Both the Trademark Contract and the Management Contract employ Delaware state law, without regard to the law of conflicts. *See* Trademark Contract at ¶ 10.f, [D.I. 26-1]; Management Contract at ¶ 13.19, [D.I. 25-1].

24.    "Under Delaware law, 'when interpreting a contract, the role of a court is to effectuate the parties' intent.'" *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. Supr. 2008)

(citations omitted). If the intent of the parties can be determined from within the four corners of the contract, then the decision can be made as a matter of law. *See id.* "However, '[i]f there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended.'" *Id.* at 253 (citations omitted).

25.     Here, the plain language of the Trademark Contract, on its face, demonstrates that it would not have been entered into but for the Debtor's prior entry into the Management Contract with PPE and the global undertaking of the Project. Significantly, the term of the Trademark Contract "shall be effective as of the Effective Date and continue in full force and effect ***until the Management Contract expires or is terminated in accordance with the provisions thereof.***" Trademark Contract at § 3 (emphasis supplied), [D.I. 26-1].

26.     Moreover, the Trademark Contract explains the fundamental and integral dependency of the Trademark Contract on the Management Contract. The third "WHEREAS" clause in the recitals explains that,

> pursuant to [the Management Contract] dated September 7, 2007 between [the Debtor Indiana Downs] and [PPE] (the "Management Agreement"), [the Debtor Indiana Downs] and [PPE] have agreed that [PPE] will manage the gambling operations at the Facility (the "Project"), anticipated to be named [ˈˈ]INDIANA LIVE! CASINO" or "INDIANA LIVE" and anticipated to be written without regard to logo style and an "electrified" logo font (all such renditions collectively referred to as the "Project Mark"), which Project Marks are to be owned by [LiveHoldings].

Trademark Contract at 1, [D.I. 26-1]. The "Project," as expressly defined by the parties, was the venture by which PPE would "manage the gambling operations at the Facility." *Id.*

27.     The parties also agreed in the fifth, sixth, and seventh "WHEREAS" clauses that the limited, royalty free, non-exclusive license to use the trademarks was intended to be given

solely "in connection with the Project," which, again, is defined as PPE's management of the gambling operations. *See id.* at 1-2.

28.     In Paragraph 2 of the Trademark Contract, which grants the license, the parties again limited the grant of the license "solely for the purposes of naming and promoting the Project" and provided that the Debtor "shall have no right to use the Live! Mark by itself or in any way other than as part of the Project Mark." *See id.* at 3, ¶¶ 2(a)-(f).

29.     Further, the Trademark Contract provides the Debtor with the right to use trademarks of LiveHoldings and trademarks licensed to affiliates of LiveHoldings by third parties for a fee, on a royalty free basis with no payment consideration. *See id.* at ¶¶ 2(a)-(c). It would be ridiculous to argue that PPE and LiveHoldings would grant a license to the Debtor to use these valuable trademarks on a royalty free basis. They have not; indeed, the consideration to be received from the Debtor with respect to the trademark licenses is significant and derived from the management fees to which PPE is entitled in the Management Contract. That is the reason why the Trademark Contract terminates when the Management Contract terminates, and that is also why the Trademark Contract limits the use of the trademarks to the Project, which is defined as the management of the gambling operations by PPE.

30.     Moreover, the typical trademark license agreement is lengthy because it provides for very specific uses and protections of the licensor's marks. For instance, the license agreement between the PPE affiliate and NASCAR and Maker's Mark, both of which are sublicensed to the Debtor, are 85 pages and 17 pages, respectively. The Trademark Contract at issue here, however, is a mere nine pages because, and as intended by the parties, PPE was able to control and manage the use of the trademarks through its management duties under the Management Contract. It was never intended that the Debtor could utilize the trademarks

without the Management Contract in place; hence, the related termination clauses. PPE's and LiveHolding's protection for the abbreviated Trademark Contract was that it would be the manager at all times. There could be no greater protection.

31.     Furthermore, the Trademark Contract specifically provides for "Quality Control for the Project", and "Quality Control for Products." *See id.* at ¶¶ 6-7. These provisions require that the Debtor shall use the trademarks "for the Project in a 'First Class' manner", and in a "High Quality manner." *Id.* For this reason, the Trademark Contract states that "the Parties agree that 'First Class' shall mean the quality and manner in which the respective owner of the Mark, or the owner's permitted user, uses the Mark for its own services", and "'High Quality' shall mean the quality and manner in which the owner of the Mark, or the owner's permitted user, as of the date of this Agreement, use their respective Marks for their own products." *See id.* Here again, it was intended and agreed that PPE and LiveHoldings would control and manage the use of the trademarks and ensure that they were used in a First Class and High Quality manner through PPE's management rights and duties under the Management Contract. Indeed, this provision is to ensure that the use of the trademarks and products was consistent with the quality and manner in which the owner uses the trademarks and products for its own services. Consequently, unstapling the Trademark Contract from the Management Contract may also result in ongoing and additional litigation in this Court regarding the performance of the Debtor under the Trademark Contract.

32.     While it does not appear that Delaware state courts have addressed the precise issue presented here, *i.e.*, under what circumstances will two separate contracts constitute one agreement, the Delaware state courts have considered a closely related issue, *i.e.*, under what circumstances will separate agreements be found within a single contract. Given that the

principles underlying "severability of a contract" verses "dependency of multiple contracts" are analyzed under the same lens, *see, generally, Karfakis*, 162 B.R. 719 (determining that separate contracts constituted a composite agreement, relying on principles of "severability"), the Supreme Court of Delaware's decision in *Orenstein v. Kahn*, 119 A. 444 (Del. Supr. 1922) is instructive.

33.     In *Orenstein*, the owner of a parcel of real property and a store constructed thereon (which included merchandise and fixtures), contracted with a purchaser for the sale of same. *See id.* at 444. The purchaser "failed to complete the purchase of the real and personal property" and the seller filed suit for specific performance under the sale agreement. *See id.* The trial court held that the sale contract was divisible, and ordered the purchaser to complete the transaction *only* with respect to the store fixtures – not the real property. *See id.* at 444-45. The purchaser appealed, arguing, among other things, that the sale contract was not divisible. *See id.* at 445.

34.     On appeal, the court explained that "[i]n construing contracts, the essential question is to ascertain the intention of the parties." *Id.* at 445. Continuing, the court stated that "[t]he intention of the parties, in this respect, must be ascertained from the terms and subject matter of the contract, as well as from the other facts and circumstances shown by the evidence." *Id.*

35.     The court acknowledged that while a sale contract might provide for the sale of distinct types of property – and designated separate consideration to be paid for each type of property – the "essential question . . . is[:] 'Did the parties give a single assent to the whole transaction, or did they assent separately to several things?" *Id.* at 445-46 (citing 2 WILLISTON ON CONTRACTS § 863). Against this legal backdrop, the court considered whether it was the

intention of the parties that the purchaser's agreement to "accept . . . the store fixtures and stock of merchandise is binding, whether the agreement to convey the real estate be complied with or not." *Id.* at 446. The court answered this questions as follows:

> The uncontradicted evidence in this case shows that [the purchaser] agreed to purchase the real estate, with the immediate intention of using it for a place of business; the store located therein to be run for him by his brother. That this fact was known to [the seller], is also clear.
>
> From this aspect of the case it would, therefore, seem that the agreement to convey the store goods and fixtures in said store property was ***inseparably connected*** with the agreement to convey the business location; all of the property which was to be conveyed being material and important in the use of the location as a business stand.
>
> This is a fair inference from the evidence, even though, so far as [the purchaser] was concerned, the desire to purchase the real estate was the moving cause for the making of the contract.
>
> It is also a fair inference from the evidence that the ***acceptance of a conveyance of the store goods and fixtures, without the corresponding right to demand a conveyance of the property in which the business, to which they were essential, was to be conducted, would be a part performance of such diminished value that it could hardly have been contemplated by the parties as a right, at the time of the making of the contract.***

*Id.* (emphasis supplied).

36.     The holding in *Orenstein* is significant because it comports with this Court's recognition in *Buffets Holdings* that "'[e]ven if the parties entered a multi-part contract, that contract cannot be severed after the fact if the parties entered it "as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'" 387 B.R. at 122 (citations omitted). Based upon the factual circumstances presented above, which can be gleaned from the face of the Trademark Contract, the Trademark Contract would not have been entered into without the Management Contract, and it is, therefore, indivisible

from the Management Contract. Accordingly, the Debtor's two options are reject both contracts, or seek consent from PPE and LiveHoldings to assume both contracts.

### 2. The Debtor's Rejection of the Management Contract is not an Exercise of the Debtors' Sound Business Judgment

37.     With respect to the Debtor's Motion to Reject the Management Contract, the Debtor correctly acknowledges that it is held to a business judgment standard when reviewing whether the rejection of a contract is appropriate. Motion to Reject at ¶¶ 15-18, [D.I. 25]. Based on the above, however, the Debtor cannot reject the Management Contract without also rejecting the Trademark Contract governing the trademarks that the Debtors have made clear are both "crucial to the Debtors' estates" and "vital to the Debtors' business." *See* Motion to Assume at ¶¶ 10, 17, [D.I. 26] (emphasis supplied); *see also, e.g., In re Bullet Jet Charter, Inc.*, 177 B.R. 593 (Bankr. N.D. Ill. 1995) (chapter 11 debtor was not entitled to reject its prepetition contract for sale of its aircraft, where possibility that debtor could find buyer at higher price was minimal and debtor failed to demonstrate that rejection of contract would benefit debtor's estate or its reorganization efforts); *In re Huff*, 81 B.R. 531 (Bankr. D. Minn. 1988) (under the business judgment test, chapter 11 debtors were not entitled to reject a gravel mining lease because they failed to show that a more profitable gravel-sale arrangement was available, and even if debtors rejected lease, debtors would not be at liberty to enter into new lease arrangement with another party until expiration of lease). Therefore, rejection of the Management Contract and Trademark Contract will cause significant harm to the Debtors' estates and may jeopardize their reorganization efforts based on the Debtors' view of the importance of the trademarks.

38.     As a result, the Debtor is unable to reject the Management Contract and Trademark Contract, and must seek the consent of PPE and LiveHoldings to assume both contracts, which they have not yet done.

**B.** **Unless PPE and LiveHoldings Consent to Assumption, Section 365(c) of the Bankruptcy Code and the Lanham Trade-Mark Act Preclude Assumption of the Trademark Contract**

39.     Even if the Debtor chose to assume both the Management Contract and the Trademark Contract, consent of PPE and LiveHoldings is still required. The Debtor's ability to assume an executory contract is addressed in Section 365(a) of the Bankruptcy Code, which states: "Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

40.     Section 365(c) of the Bankruptcy Code contains an exception to the Debtor's right to assume an executory contract:

> (c)     The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibited or restricts assignment of rights or delegations of duties if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment . . . .

41.     Subsection 365(c), therefore, precludes a trustee or a debtor in possession from assuming or assigning an executory contract if applicable non-bankruptcy law would allow the non-debtor party to the contract to refuse acceptance of performance from a party other than the debtor in possession.

42.     It is well-established that laws protecting intellectual property rights — such as the law governing copyrights, patents and trademarks — are "applicable law" within the meaning of subsection (c) of 11 U.S.C. § 365. *See, e.g., In re Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004) (copyright license); *In re Catapult Entm't, Inc.*, 165 F.3d 747 (9th Cir. 1999) (patent

license); *In re Wellington Vision, Inc.,* 364 B.R. 129 (S.D. Fla. 2007) (trademark license); *N.C.P. Mktg. Group,* 337 B.R. 230 (D. Nev. 2005), *aff'd,* 279 Fed. Appx. 561 (9th Cir. 2007), *cert. denied* 129 S. Ct. 1577 (2008) (trademark license); *In re Travelot Co.,* 286 B.R. 447, 454-55 (Bankr. S.D. Ga. 2002) (trademark license); *In re Golden Books Family Entm't, Inc.,* 269 B.R. 300, 307-10 (Bankr. D. Del. 2001) (copyright license); *In re Access Beyond Techs., Inc.,* 237 B.R. 32, 42-45 (Bankr. D. Del. 1999) (patent license).

43.     In *Travelot,* the bankruptcy court explained that "'[a]pplicable law' sufficient to excuse a party to a contract from 'accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession' includes intellectual property law governing the assignment of licenses." 286 B.R. at 454 (citing *Catapult Entm't, Inc.* 165 F.3d at 750) and *Golden Books,* 269 B.R. at 308-10.

44.     The *Travelot* Court also explained that the Lanham Trade-Mark Act was "applicable law" under 11 U.S.C. § 365(c)(1), and that the "grant of a non-exclusive license is 'an assignment in gross,' that is, one personal to the assignee and thus, not freely assignable to a third party. Accordingly, a licensor need not accept performance from or render performance to an entity other than the licensee." *Travelot,* 286 B.R. at 455 (citations omitted).

45.     Similarly, in *N.C.P. Marketing,* the district court stated that "[b]ecause we find that under applicable trademark law, trademarks are personal and non-assignable without the consent of the licensor, [the licensor's] trademark would be unassumable as part of the bankruptcy estate of NCP without the [licensor's] consent." 337 B.R. at 237 (emphasis supplied). Here, neither LiveHoldings nor PPE has consented to the assumption or assignment of the trademark licenses. Pursuant to paragraph 4 above, however, PPE and LiveHoldings are willing under certain circumstances to provide their consent.

### 1.  The "Hypothetical" Test

46.    There has been extensive litigation concerning whether Section 365(c) of the Bankruptcy Code precludes assumption or assignment even if the debtor in possession does not intend to assign the contract to a third party.  The majority of circuit courts addressing this issue, including the Third Circuit, have held that the plain language of Section 365 precludes assumption under these circumstances, referring to the "hypothetical test" because the assignment is only hypothetical, *i.e.* the debtor in possession does not have the present intent to assign the contract.  *See West Elecs., Inc.*, 852 F.2d 79 (3d Cir. 1988); *Sunterra Corp.*, 361 F.3d 257 (4th Cir. 2004); *Catapult Entm't, Inc.*, 165 F.3d 747 (9th Cir. 1999); *In re James Cable Partners, L.P.*, 27 F.3d 534 (11th Cir. 1994); *see also Golden Books*, 269 B.R. at 300; *Access Beyond Techs.*, 237 B.R. at 32.

47.    In *West Electronics*, the seminal and controlling case in this jurisdiction, the Court of Appeals for the Third Circuit was presented with a debtor that was a defense contractor with a contract to supply missile parts to the United States Air Force.  852 F.2d at 80.  The government sought relief from the automatic stay to permit it to terminate the contract.  *See id.* After the bankruptcy and district courts denied relief on grounds that the debtor had the capacity to cure the defaults and perform, the Court of Appeals for the Third Circuit reversed, holding that under Section 365(c), the contract at issue could not be assumed:

> [I]f non-bankruptcy law provides that the government would have to consent to an assignment of the debtor's contract to a third party, *i.e.* someone 'other than the debtor or debtor in possession,' then the [debtor], as the debtor in possession, cannot assume that contract.  This provision limiting assumption of contracts is applicable to any contract subject to a legal prohibition against assignment.

*Id.* at 83 (citations omitted).

48.     Only one circuit court, the Court of Appeals for the First Circuit, has rejected the "hypothetical test" and held that a debtor in possession may assume a contract unless it actually intends to assign it — hence, the "actual test." *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir. 1997). Because of the dispute among circuits created by the First Circuit's rejection of the hypothetical test, the issue was the topic of a petition for *certiorari* before the United States Supreme Court in the *N.C.P. Marketing* case.

49.     Justice Kennedy, in his statement regarding the United States Supreme Court's denial of *certiorari* in *N.C.P. Marketing*, described the "hypothetical test" as follows:

> According to the Court of Appeals for the Ninth Circuit, this language [§§ 365(c)(1)(A)-(B)] means that a debtor-in-possession may assume an executory contract only if hypothetically it might assign that contract to a third party. That is to say, if the debtor-in-possession lacks hypothetical authority to assign a contract, then it may not assume it – even if the debtor-in-possession has no *actual* intention of assigning the contract to another. *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (C.A. 9 1999). The so-called "hypothetical test" is preferred by majority of the other Courts of Appeals that have addressed this question. *See In re Sunterra Corp.* 361 F.3d 257 (C.A. 4 2004); *In re James Cable Partners, L.P.* 27 F.3d 534 (C.A. 11 1994) (*per curiam*); *In re West Electronics, Inc.* 852 F. 2d 79 (C.A. 3 1988).

129 S. Ct. at 1577. Because the Supreme Court denied *certiorari* in *N.C.P. Marketing*, and because there has been no subsequent decision in the Third Circuit to the contrary, *West Electronics* is the law in this circuit, which is in line with the majority of other circuits, and which adopts, and in fact is the source of the "hypothetical test." This Court consistently has applied and followed *West Electronics*. *See, e.g., Golden Books*, 269 B.R. at 300; *Access Beyond Techs.*, 237 B.R. at 32. Accordingly, the Debtor is precluded from assuming the Trademark Contract without the consent of LiveHoldings and PPE.

### 2. The Debtor has not Requested the Consent of LiveHoldings or PPE to Assume or Assign the Trademark Contract

50. Section 365(c) provides that the consent of the licensor, here LiveHoldings and PPE, must be provided in the context of the bankruptcy case regardless of the terms of the agreement. Specifically, subsection (c) states that a trustee cannot assume or assign the contract "whether or not such contract or lease prohibits or restricts assignments of rights or delegations of duties . . . ." 11 U.S.C. § 365(c). Therefore, regardless of what the contract provides, applicable law precludes assignments unless consent is given with respect to the assumption and/or assignment.

51. Intellectual property license agreements routinely have specific provisions that preclude assignment without the consent of the licensor, but provide for the continuation of the license in the event of a sale of substantially all of the licensee's assets or a change in control by virtue of the acquisition of the licensee's equity, so long as the successor entity agrees to be bound by the terms of the license agreement. The Trademark Contract has such a provision. *See* Trademark Contract at ¶ 10(a), [D.I. 26-1].

52. As explained in *Sunterra*, the United States Court of Appeals for the Fourth Circuit made clear that "assumption" and "assignment" are two distinct concepts, and that consent to assignment, if present, does not constitute consent to assumption. 361 F.3d at 271. In addition, the *Sunterra* Court specifically held that the transfer provision, cited at pages 270-71 of the opinion (which is analogous to paragraph 10 of the Trademark Contract here), "contemplates neither an assignment in the bankruptcy context nor assumption." *Id.* at 271 n.16. Thus, even if the Court were to find consent to assignment in the event of a change of control, such consent does not constitute consent to assumption or assignment in a bankruptcy context, such as the instant case.

53.     Here, neither PPE nor LiveHoldings has given consent in this bankruptcy case for the assumption or assignment of the Trademark Contract (and the Debtor has not sought such consent). Thus, the Trademark Contract cannot be assumed by the Debtor.

**D.      Even if Assumption of the Trademark Contract was Possible, the Debtor Would Have to Cure all Defaults and Provide for Adequate Assurance of Future Performance**

54.     Even assuming that the Trademark Contract can be assumed by the Debtor without the consent of PPE and LiveHoldings, which respectfully it cannot, the Debtor would have to cure all defaults, none of which have been identified by the Debtor in its Motion to Assume, as well as provide adequate assurance of future performance under the Trademark Contract.

55.     In *In re Rickel Home Cntrs., Inc.*, 209 F.3d 291 (3d Cir. 2000), the Court of Appeals for the Third Circuit explained that,

> [i]f there has been a default in an executory contract or unexpired lease, the trustee may not assume it until the trustee: (1) cures or provides adequate assurance that it will promptly cure the default; (2) compensates or provides adequate assurance of prompt future compensation for actual pecuniary loss resulting from the default; and (3) provides adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1)(A), (B), (C). Once the trustee satisfies these requirements it may assume the contract or lease, but it must do so in its entirety. *See Stewart Title Guar. Co. [v. Old Republic Nat'l Title Ins. Co.]*, 83 F.3d [735 at] 741 [(5th Cir. 1996)].

*Id.* at 298.

56.     PPE is owed approximately $16,863,630.72 under the Management Contract/Trademark Contract as of the Petition Date. Of that amount, $7,512,748.38 relates to the value of the license of the trademarks to the Debtor. Thus, in order to assume just the Trademark Contract, $7,512,748.38 would need to be paid by the Debtor to PPE and LiveHoldings. An additional amount of two percent (2%) per month, times the gross revenues

generated per month by the Debtor, represents the value of the trademark license required to be paid from the Petition Date forward.

57.     In addition to the monetary cure, the Debtor is required to demonstrate adequate assurance for its future performance of the Trademark Contract. With respect to providing adequate assurance of future performance under the Trademark Contract, there are two principal obligations to be performed by the Debtor.

58.     First, the Debtor must establish that it will be in a position to compensate PPE and LiveHoldings for the continued use of the subject trademarks in the amounts set forth above. Second, the Debtor must establish that it will use the subject trademarks licensed to it (i) "in a 'First Class' manner," which the Trademark Contract defines as "the quality and manner in which the respective owner of the [trademarks], or the owner's permitted user, uses their [trademark] for their own services", and (ii) "in a 'High Quality' manner," which the Trademark Contract defines as "the quality and manner in which the owner of the [trademark], or the owner's permitted user, as of the date of this Agreement, use their respective [trademarks] for their own products." Trademark Contract at ¶¶ 6, 7 [D.I. 26-1].

59.     Paragraphs 6 and 7 of the Trademark Contract, respectively, call for certain procedures that must be implemented in order to ensure that the subject trademarks are being used in both a "First Class" and "High Quality" manner. That assumption of the Trademark Contract would be conditioned on such adequate assurances is without question, given that they are "material and economically significant", "bargained-for" provisions of the Trademark Contract. *See Fleming Cos.*, 499 F.3d at 304-08 (holding that the test for determining whether adequate assurance of future performance is required for any particular term of an agreement "is rightly placed on the importance of the term within the overall bargained-for exchange; that is,

whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance)."). The Debtor has made no showing in this regard and if assumption of the Trademark Contract were allowed without assumption of the Management Contract, potentially costly and protracted litigation in this Court over the Debtor's future performance could result.

## CONCLUSION

60.    For the reasons set forth above, there are three distinct and independent bases for denying the Debtor's Motion to Assume. Further, because rejection of the Management Contract would result in the loss of the Debtor's "vital" and "crucial" trademarks, the Motion to Reject should be denied.

Dated: May 4, 2011

Respectfully submitted,

WHITEFORD TAYLOR PRESTON LLC

/s/ Thomas J. Francella, Jr.
Thomas J. Francella, Jr. (DE ID 3835)
1220 N. Market Street, Suite 608
Wilmington, Delaware 19801
Telephone: (302) 357-3252
Facsimile: (302) 357-3272
tfrancella@wtplaw.com

- and –

WHITEFORD, TAYLOR & PRESTON L.L.P.

Paul M. Nussbaum, Esquire
Kenneth Oestreicher, Esquire
Kevin G. Hroblak, Esquire
7 Saint Paul Street, Suite 1500
Baltimore, Maryland 21202-1636
Telephone: (410) 347-8700
Facsimile: (410) 223-4305
pnussbaum@wtplaw.com
koestreicher@wtplaw.com
khroblak@wtplaw.com