IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>INDIANAPOLIS DOWNS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-11046 (BLS)<br><br>(Jointly Administered)<br><br>Objection Deadline: September 6, 2011 at 4:00 p.m.<br>Hearing Date: September 19, 2011 at 10:00 a.m. |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(a), 363, AND 365, FED. R. BANKR. P. 9019 APPROVING THE SETTLEMENT AGREEMENT WITH THE CORDISH ENTITIES

The above-captioned debtors and debtors-in-possession (collectively, the **"Debtors"**), hereby move the Court (the **"Motion"**), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the **"Bankruptcy Code"**) and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), for an order approving the Settlement Agreement (the **"Settlement Agreement"**), a true and correct copy of which is attached hereto as Exhibit A, by and among Indianapolis Downs, LLC (**"Indiana Downs"**), Power Plant Entertainment Casino Resorts Indiana, LLC (**"PPECRI"**), Live Holdings!, LLC (**"LH"**) and The Cordish Company (together with PPECRI and LH, the **"Cordish Entities"**) resolving certain of the claims that are the subject of the dispute between the Cordish Entities and Indiana Downs. The Settlement Agreement represents a fair and reasonable disposition of the disputes at issue and is a proper exercise of the Debtors' business judgment, and should, therefore, be approved by the Court. In support of their Motion, the Debtors further respectfully state as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are Indianapolis Downs, LLC (5457) and Indiana Downs Capital Corp. (3803). The Debtors' address is 4300 N. Michigan Road, Shelbyville, IN 46176.

## Jurisdiction and Venue

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1534.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

## Background

### A. The Chapter 11 Case

4. On April 7, 2011 (the **"Petition Date"**), the Debtors commenced these cases (the **"Cases"**) by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5. The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6. Indiana Downs and the Cordish Entities are parties to a pre-petition Trademark License Agreement dated January 2008 (the **"Trademark Agreement"**), and Indiana Downs and PPE are parties to a pre-petition Development, Financing and Management Agreement dated September 7, 2007, as amended (the **"Management Agreement"** and together with the Trademark Agreement, the **"Agreements"**).

7. On April 7, 2011, the Debtors filed the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject the Development, Financing & Management Agreement Between Power Plant Entertainment Casino Resorts Indiana, LLC and Indianapolis Downs, LLC Nunc Pro Tunc as of the Petition Date* [Docket No. 25] (the **"Rejection Motion"**) and the *Motion of the Debtors Pursuant to Bankruptcy to Bankruptcy Code Section 365(a) and*

*Bankruptcy Rule 6006 for an Order Authorizing the Debtors to Assume the Trademark License Agreement* [Docket No. 26] (the "**Assumption Motion**").

8. On May 2, 2011, the Cordish Entities filed a Proof of Claim [Docket No. 275] (the "**PPE Proof of Claim**") asserting a general unsecured claim of $17,039,07.47 plus additional unliquidated amounts related to, among other things, the Agreements and the use of certain intellectual property against the Debtors, which the Debtors dispute.

9. On May 4, 2011, PPE filed the *Omnibus Opposition of Power Plant Entertainment Casino Resorts Indiana LLC and Live Holdings!, LLC to (I) Motion of Debtors to Assume the Trademark License Agreement [D.I. 26], and (II) Motion of the Debtors to Reject the Management Contract [D.I. 25]* [Docket No. 158] (the "**Objection**").

B. **The Settlement Agreement**

10. To avoid protracted and expensive litigation, Indiana Downs and the Cordish Entities engaged in good faith negotiations to evaluate settlement opportunities. These negotiations were led by Mr. Rayburn and Mr. Cordish and were conducted at arms-length. The parties worked diligently to evaluate various proposals and ultimately agreed to the terms contained in the Settlement Agreement. The Settlement Agreement has been approved by all parties, and each party believes the Settlement Agreement provides a fair and reasonable compromise.

11. The salient terms of the Settlement Agreement are as follows:

> **Compromise of the PPE Proof of Claim**. The PPE Proof of Claim is deemed allowed as a prepetition unsecured non-priority claim in the amount of $12,000,000, inclusive of interest, and disallowed for any amount greater than $12,000,000. Neither PPE, nor any other of the Cordish Entities will assert any other pre-petition claims against the Debtors in the proceedings, other than claims that may arise under the Settlement Agreement. Further, PPE, or any Cordish Entity, agrees to not oppose or object to the confirmation of any plan of reorganization proposed by the Debtors that provides that the PPE Proof of Claim be treated in the same manner as other general unsecured claims and is otherwise consistent with the Settlement Agreement.

**Assumption Motion and Rejection Motion**. The Parties agree to submit consent orders, in the forms attached to this Motion as Exhibit B and Exhibit C to the Bankruptcy Court (i) granting the Assumption Motion subject to the modifications to the Trademark Agreement provided for in the Settlement Agreement and conditioned upon entry of the Final Order (as defined in the Settlement Agreement) approving the Settlement Agreement, and (ii) granting the Rejection Motion, conditioned upon entry of the Final Order (as defined in the Settlement Agreement) approving the Settlement Agreement.

**Use of Intellectual Property and Payment**.

    **Twelve Month Period**. Upon entry of the Order and assumption of the Trademark Agreement, and in exchange for the Agreed License Fees (defined below), Indiana Downs shall have the right to use the Marks (as defined in the Trademark Agreement) for a period of twelve (12) months from the Petition Date, subject to the terms of the Trademark Agreement as modified by the Settlement Agreement. At the expiration of the twelve month period on April 7, 2012, the Trademark Agreement shall renew automatically on a month-to-month basis unless a notice of cancellation is received by the Cordish Entities from Indiana or if there is a breach or default then existing under the Trademark Agreement or the Settlement Agreement, including a failure to pay the Agreed License Fees. The Parties agree to modify the Trademark Agreement by deleting Paragraphs 9(b)(i)-(iii) such that there is no transition period provided to Indiana Downs upon cancelation or termination and modifying Paragraph 3 to provide for a term consistent with the terms provided for in the Settlement Agreement.

    **Successive One Month Extensions**. Indiana Downs may, at its sole discretion, provide written notice to the Cordish Companies by March 7, 2012, and every thirty (30) days thereafter, that it is canceling its right to use the Marks subject to the Trademark Agreement as modified by the Settlement Agreement on a monthly basis. The rights of Indiana Downs to use the Marks shall, as provided in subparagraph (a), renew automatically after April 7, 2012 on a monthly basis until such time that either (i) Indiana Downs provides a notice of cancelation of the Trademark Agreement on thirty (30) days' written notice to the Cordish Entities, or (ii) the Cordish Entities provide a notice of termination based upon a breach or default of the Trademark Agreement, the Settlement Agreement, or both.

    **Agreed License Fees**. Indiana Downs agrees to pay the Agreed License Fees to the Cordish Entities for a period of no less than twelve months from the Petition Date regardless of whether it discontinues use of the Marks prior to the expiration of the twelve month period. The "Agreed License Fee" shall mean a fee equal to 1.75% of Indiana Downs "Gross Gaming Revenue" as defined below. The term "Gross Gaming Revenue" shall mean all revenues resulting from the gaming operations of the casino. Within five (5) business days from an order approving the Settlement Agreement by the Bankruptcy Court becoming final and non-appealable (the "Final Date"), Indiana Downs shall pay the Agreed License Fees

in arrears for the period from the Petition Date to the Final Date. Thereafter, Indiana Downs shall pay the Agreed License Fee on a monthly basis in arrears on the tenth (10th) day of each successive month based on the Gross Gaming Revenue during the preceding month. To the extent that Indiana Downs exercises its option to renew the Trademark Agreement on a month-to-month basis, Indiana Downs shall pay the Agreed License Fee in the same fashion on a monthly basis until the Trademark Agreement is terminated.

**Dismissal of the Arbitration.** The Parties agree that upon the entry of a non-appealable order of the Bankruptcy Court approving the Settlement Agreement, the Parties will file a dismissal of the Arbitration in its entirety, with each party bearing its own costs.

**Releases by Cordish Entities.** On the Final Date and upon the full and complete performance of the obligations identified above, the Cordish Entities, on their own behalf and on behalf of their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives, do hereby fully release, remise and forever discharge the Debtors and their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives of and from any and all claims, whether previously asserted or otherwise, and whether known or unknown, that exist as of the date of the Settlement Agreement. Notwithstanding the foregoing, the Settlement Agreement does not and is not intended to (i) release claims that may arise under the Settlement Agreement; (ii) release claims in the PPE Proof of Claim in the agreed upon amount of $12,000,000; and (iii) release, compromise or affect the rights, claims and defenses asserted in the action filed in the Circuit Court for Baltimore City, Maryland and styled as Power Plant Entertainment Casino Resort Indiana, LLC v. Mangano, et al., Case No. 24-C-11001014, wherever such rights, claims, and defenses are pursued, transferred to, or brought, and regardless of whether the claims, rights, and defenses are maintained in Baltimore City or proceed in another venue (the "Baltimore City Litigation"). None of the Parties to the Settlement Agreement may use the Settlement Agreement as evidence or for any purpose whatsoever in the Baltimore City Litigation, including but not limited to establishing waiver, collateral estoppel or release of claims.

**Releases by Debtors.** On the Final Date and upon the full and complete performance of the obligations identified above, the Debtors, on their own behalf and on behalf of their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives, do hereby fully release, remise and forever discharge the Cordish Entities and their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives of and from any and all claims, whether previously asserted or otherwise, and whether known or unknown, that exist as of the date of the Settlement Agreement. Notwithstanding the foregoing, the Settlement Agreement does not and is not intended to (i) release claims that may arise under the Settlement Agreement; or (ii) release,

compromise or affect the rights, claims and defenses asserted in the Baltimore City Litigation.

## Relief Requested

12. By this Motion, the Debtors request the entry of an order, pursuant to Bankruptcy Rule 9019, approving the Settlement Agreement.

### *Applicable Authority to Approve the Settlement Agreement*

13. "Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Additionally, Bankruptcy Code section 105(a) allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

14. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Section 365 of the Bankruptcy Code does not provide a standard to be applied in determining whether a court should approve a debtor's decision to assume or reject an unexpired executuroy contract. Generally, courts have applied a "business judgment" test in reviewing a debtor's decision to assume or reject an executory contract or unexpired lease. *See In re Federal Mogul Global, Inc. T&N Limited, et al.*, 293 B.R. 124, 126 (D. Del. 2003) ("In general, motions to reject executory contracts are evaluated under the business judgment test"); *In re Vencor, Inc.*, 2003 WL 21026737, *3 (Bankr. D. Del. Apr. 30, 2003) (in reviewing a debtor's decision to assume or reject an executory contract, the court "should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it").

CHI 61,462,643v3 8-19-11

6

15. Courts generally do not second guess a debtor's business judgment concerning the assumption of an executory contract or unexpired lease. *See In re Trans World Airlines, Inc.*, 261 B.R. 103 (Bankr. D. Del. 2001); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir. 1985); and *In re Health Science Products, Inc.*, 191 B.R. 895 (Bankr. N.D. Ala. 1995) ("The issue thereby presented for determination by the bankruptcy court is whether the decision of the debtor is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice.").

16. Section 363(b) of the Code seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate." *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir. 1983). *See also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

17. Additionally, under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtors' assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code") (citation omitted). *See also Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy ... is that equitable principles govern") (citations omitted); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors

as long as that protection is implemented in a manner consistent with the bankruptcy laws") (citation omitted).

18. Bankruptcy Rule 9019 empowers the Court to "approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a). The standards for approval are well settled and require the Court to inquire into the reasonableness of the proposed settlement. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Marvel Enter. Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (describing ultimate inquiry as "whether the compromise is fair, reasonable, and in the interest of the state") (citation omitted). "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy'." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY, ¶ 9019.03[1] (15th ed. 1993)). Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interest of the debtor's estate. *In re Martin*, 91 F.3d at 394; *In re Marvel Entm't Group, Inc.*, 22 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

19. The analysis required under this standard directs the bankruptcy court to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d at 393. To do so, bankruptcy courts typically weigh the following factors, enunciated in *Martin*: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount

interests of the creditors. *Id.*; *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 309 U.S. 414, 424-25 (1968) (setting forth above factors as ones courts should consider in determining whether to approve settlements under former Bankruptcy Act); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994) (affirming an order approving a compromise and settlement of claims against the estate where it was "unlikely" that the debtor would succeed on the claims, litigation of the claims would involve considerable expense and the claimant would withdraw all claims upon approval of the settlement). A court need not determine each legal and factual issue raised; rather, a court should "canvas the issues" and reject a settlement only if it "fall[s] below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

### *The Settlement Agreement Meets the Applicable Standards*

20. The Debtors, in the exercise of their sound business judgment, have determined that the Settlement Agreement is reasonable and in the best interests of their estates and submit that the Settlement Agreement satisfies the standards set forth above. The Debtors have carefully considered and analyzed the terms of the Settlement Agreement, and in light of the circumstances described herein, have concluded that entering into the Settlement Agreement is in their best interest and will maximize the value of the Debtors' estates for the benefit of all the Debtors' constituents.

21. In its demand for arbitration, PPE alleges, among other things, that (i) the Debtors' attempts to terminate the Management Agreement were without force and effect because they did not comply with the notice and cure provisions contained therein, (ii) the

Debtors directly interfered with PPE's day-to-day operations at the Debtors' facilities, causing irreparable harm to PPE by damaging its reputation, creating operational chaos, and damaging its relationships with state licensing authorities, and (iii) the Debtors materially defaulted under the Management Agreement by failing to pay the management fee and by wrongfully and intentionally interfering with PPE's exclusive management right. If PPE were to succeed in proving these allegations, PPE would be entitled to significant damages.

22. In addition, PPE filed a proof of claim in the Cases, asserting an unsecured claim in an amount of $17,039,027.47 on account of amounts alleged to be past due under the Agreements as of the Petition Date, plus additional unliquidated amounts related to, among other things, the Debtors' alleged defamation and reputational harm to PPE in an undetermined amount.

23. Although the Debtors dispute PPE's allegations, their books and records demonstrate that they may have owed at least $8,320,570 as of the date of the purported termination of the Management Agreement and approximately $15,246,710 as of the Petition Date, to the extent the earlier termination was not deemed effective. In addition, regardless of whether the termination was effective, the Debtors have been and continue to use the Marks for which PPE would likely be entitled to some compensation. Moreover, litigation of all of the potential issues between PPE and the Debtors would be costly and time consuming.

24. Accordingly, avoiding potential liability significantly in excess of the amounts proposed to be paid under the Settlement Agreement represents a sound business purpose for entering into the Settlement Agreement. The Settlement Agreement caps the Debtors' potential liability at a level that is significantly lower than what would be owed if PPE were able to obtain entry of a judgment against the Debtors in the arbitration and have its proof of claim allowed in

full. Further, the Settlement Agreement contemplates treating the full allowed amount of PPE's claim as a general unsecured claim, thus avoiding the risk of liability for an administrative expense claim that would be entitled to a higher priority in distribution.

25. Moreover, in addition to the economic benefits of entering into the Settlement Agreement, the continued license of the trademarks is important to the Debtors' business operations as it allows the Debtors to continue to evaluate various branding options. The settlement embodied in the Settlement Agreement allows the Debtors to maintain the present use of the intellectual property while allowing the Debtors to avoid being bound by a long-term commitment. The Debtors would suffer irreparable harm if they were to have their rights to the licensed intellectual property terminated immediately. The trademarks licensed to the Debtors under the Trademark Agreement are consistently and pervasively used throughout the Debtors' business in connection with the promotion and operation of the Casino. If the Debtors were forced to immediately stop using the trademarks, they would be forced to hastily re-brand the Casino. While the Debtors are indeed considering re-branding as an alternative to continued use of the trademarks licensed under the Trademark Agreement, the re-branding process will take time and, if undertaken without adequate preparation, would result in irreparable harm to the Debtors' business. Under these circumstances, the Debtors believe that the license fee in the Settlement Agreement represents fair consideration for the continued use of the trademarks licensed under the Trademark Agreement.

26. The settlement of the potential disputed liability for fair and reasonable consideration is the best and most efficient means of allowing the Debtors to work towards the development and formulation of a plan of reorganization that will allow them to successfully emerge from these Cases and to maximize value for the benefit of the estates and their various

constituencies. The Debtors intend to solicit support for a plan of reorganization in the upcoming months. Doing so requires the cooperation of the Debtors' constituents, and PPE's cooperation in the plan process is contingent upon the approval of the terms of the Settlement Agreement. Moreover, eliminating the distractions associated with the ongoing disputes with PPE will allow the Debtors to focus their energy on the development of a chapter 11 plan of reorganization. Accordingly, the Debtors submit that the Settlement Agreement should be approved because it is supported by a solid business justification.

27. In light of the foregoing, the Debtors submit that the relief requested herein is necessary to the Debtors' ability to continue to implement its business plan and grow its business, unhampered by disputed liabilities that, if liquidated, would significantly impact the Debtors' balance sheet. Accordingly, the Debtors request approval of the Settlement Agreement because their decision to enter into the settlement embodied therein is supported by a sound business purpose.

## Notice

28. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to Wells Fargo Bank, N.A., as administrative agent to the Debtors' prepetition secured lenders and post-petition secured lenders; (c) counsel to the ad hoc committee of holders of the 11% Senior Secured Notes due 2012; (d) counsel to Fortress Investment Group LLC, as a holder of 15½% Senior Subordinated Secured Pay-In Kind Notes due 2013; (e) counsel to Oliver Racing, LLC, Troon & Co., Anne C. McLure Trust, Jane C. Warriner Trust, J. Oliver Cunningham Trust and Ross J. Mangano; (f) counsel to The Bank of New York Trust Company, N.A., as trustee and collateral agent for the holders of the 11% Senior Secured Notes due 2012; (g) counsel to Wilmington

Trust Company, as trustee and collateral agent for holders of the 15½% Senior Subordinated Secured Pay-In Kind Notes due 2013; (h) creditors holding the twenty (20) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (i) the Office of the United States Attorney General for the District of Delaware; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Indiana Gaming Commission; and (m) the Indiana Horse Racing Commission. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested in this Motion and such other and further relief as the Court deems just and proper.

Dated: August ___, 2011

GREENBERG TRAURIG, LLP
Nancy A. Mitchell
Elizabeth M. Connolly
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com
       connollye@gtlaw.com

-and-

David D. Cleary
2375 East Camelback Road
Suite 700
Phoenix, AZ 85016
Telephone: (602) 445-8000
Facsimile: (602) 445-8100
Email: clearyd@gtlaw.com

GREENBERG TRAURIG, LLP

/s/ Scott D. Cousins

Scott D. Cousins (DE Bar No 3079)
Victoria W. Counihan (DE Bar No 3488)
Matthew L. Hinker (DE Bar No 5348)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: cousinss@gtlaw.com
       counihanv@gtlaw.com
       hinkerm@gtlaw.com

Counsel for the Debtors
and Debtors-in-Possession