# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**Indianapolis Downs, LLC.,**<br>***et al.***<br>Debtors. | Chapter 11<br><br>Case No. 11-11046 (BLS)<br><br>(Jointly Administered)<br><br>Related to Docket Nos. 313, 314, 353, 405, 433, 452, 455, and 470 |

## OPINION[1]

Before the Court is Indianapolis Downs, LLC's ("Indianapolis Downs" or the "Debtor") motion for a determination of the legality of certain taxes under § 505(a) of the Bankruptcy Code[2] (the "Tax Motion").[3] This contested matter[4] presents a dispute between Indianapolis Downs, a corporate debtor in the gaming industry, and the Indiana Department of Revenue (the "Department"),[5] a state taxing authority. The parties disagree over whether an Indiana tax reaches all, or only part, of the Debtor's revenue from slot-machine wagering. The Debtor

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] 11 U.S.C. § 101 *et seq.* (2011).

[3] Docket No. 313.

[4] Requests for a court to determine a debtor's tax liability under § 505 are made by motion, not by filing a complaint. *See* Fed. R. Bankr. P. 9014; *In re Taylor*, 132 F.3d 256, 262 (5th Cir. 1998) ("Filing a § 505 motion institutes a contested matter" because "it does not fall within adversary proceedings as delineated by Rule 7001.").

[5] The Department functions, in part, to administer Indiana tax laws, develop regulations, and decide tax policy. *About DOR*, IN.gov (October, 23 2011), http://www.in.gov/dor/3324.htm; *see* Ind. Code. § 6-8.1-3-1 (2011) ("The department has the primary responsibility for the administration, collection, and enforcement of … listed taxes.").

claims the latter, arguing that the tax does not extend to slot-machine revenue that it must, by statute, transfer to third parties. The Department insists, however, that the tax extends to all slot-machine receipts, without exception. The Department also challenges the Court's jurisdiction over this dispute on the basis of sovereign immunity, the Tax Injunction Act, and various abstention doctrines.

The Court concludes that it has jurisdiction and that the Debtor's view of the Indiana tax is correct. First, jurisdiction lies because § 505(a) of the Bankruptcy Code gives the Court the express authority to determine the Debtor's tax obligations. Second, the state tax does not reach the slot-machine revenues that the Debtor must set aside for others because the Debtor acts as a mere conduit for those funds; that is, it cannot use and does not enjoy the benefits of that money. The Court will grant the Tax Motion.

## I. BACKGROUND

Indianapolis Downs, a debtor in these chapter 11 cases, operates a combined horse racing track and casino—"racino," for short—in Shelbyville, Indiana. It employs over 1,000 people and provides its patrons a wealth of wagering options. In addition to betting on horse races, visitors to Indianapolis Downs can try their luck at roughly two thousand electronic wagering games, including slot machines. The games are available at Indianapolis Downs thanks to a 2007 law (as codified at Ind. Code. § 4-35-1-1 *et seq.* (2011), the "Racino Statute") that extended the privilege of operating slot machines beyond riverboat casinos, where they had been on offer since 1993, to the state's horse racing tracks. Under the statute, two tracks may be licensed to run racinos; the Debtor is one of them.[6] As a licensee, the Debtor is subject to all of the Racino Statute's provisions, two of which give rise to this dispute.

---

[6] Hoosier Park, L.P., the other state-licensed racino in Indiana, and also a debtor in this Court, *see In re Hoosier Park L.P.*, 10-10801-KJC (jointly administered with *In re Centaur, LLC, et. al.*, No.10-10799-KJC), moved to intervene in the Tax Motion and join Indianapolis Downs' position. [Docket No. 353]. That request was granted. [Docket No. 405].

*The Graduated Tax*: The Racino Statute imposes a graduated tax (the "Graduated Tax") on the adjusted gross receipts ("AGR") that the Debtor receives from slot-machines wagering.[7] *Id.* § 4-35-8-1(a) (the "Graduated Tax Provision"). AGR includes "all cash and property … received by a" racino from slot-machine wagering, minus what is "paid out to patrons as winnings" and certain "uncollectible" amounts. *Id.* § 4-35-2-2. Depending on how much AGR the Debtor takes in each year, the Graduated Tax rate ranges from 25% (on the first $100 million of AGR) to 35% (on AGR above $200 million). *Id.* § 4-35-8-1(a)(1)-(3). After applying the proper rate, the Debtor remits what it owes to the Department "before the close of … business" the next day. *Id.* § 4-35-8-1(b).

*The Set-Aside Funds*: In addition to paying the Graduated Tax, the Debtor must, each month, "distribute" 15% of its slot-machine AGR (the "Set-Aside Funds") to various third parties, as detailed in the Racino Statute and its implementing regulations. *Id.* § 4-35-7-12(b) (the "Set-Aside Funds Provision"); 71 Ind. Admin. Code 1-1-1 *et seq* (2011).

- The first $1.5 million of Set-Aside Funds goes to "the treasurer of the state for deposit in the Indiana tobacco master settlement agreement fund[.]" Ind. Code § 4-35-7-12(b).
- The next $250,000 goes to "the Indiana horse racing commission, for deposit in the gaming integrity fund[.]" *Id.*
- Funds beyond that go to horse racing purse trust accounts and to various horsemen's associations to "promot[e] the equine industry or equine welfare[,] or for a benevolent purpose that … is in the best interests of horse racing in Indiana." *Id.* § 4-35-7-12(b), (c); *see* 71 Ind. Admin. Code 4-2-7.
- Finally, after the Debtor makes all of those distributions, and if certain statutory caps are met, any remaining Set-Aside Funds

---

[7] The Racino Statute refers to slot machines as "gambling games." *See* Ind. Code. § 4-35-2-5.

are deposited in Indiana's general fund. Ind. Code § 4-35-7-12(j). [8]

For as long as it has been a racino, Indianapolis Downs has calculated and paid the Graduated Tax on its slot-machine AGR without excluding the Set-Aside Funds. For instance, in the 2011 fiscal year, it paid Indiana approximately $69 million in Graduated Tax, of which $10.4 million represented taxes paid on the Set-Aside Funds. The Debtor objects to the $10.4 million payment, arguing that because it is statutorily obliged to distribute the Set-Aside Funds to others, it never actually "receives" that money.[9]

In November 2010, five months before filing for bankruptcy, Indianapolis Downs filed a timely claim with the Department seeking a refund of all taxes it had paid to that point on the Set-Aside Funds. The Department denied the claim and the Debtor appealed. On August 31, 2011, it lost the initial appeal at the administrative level.

Meanwhile, in April 2011, Indianapolis Downs voluntarily entered bankruptcy.[10] Three months later, it filed the Tax Motion, asking the Court to enter an order under § 505(a)(1) of the Bankruptcy Code "declaring that the Debtor need not include the 15% Set-Aside [F]unds in its calculation and payment of the Graduated Tax."[11] Significantly,

---

[8] A simple illustration may help to make all of this more concrete: Say that Indianapolis Downs' patrons spend a total of $500 playing slot machines on Monday, all of which is collectible. Of that $500, the machines pay out jackpots totaling $400, leaving Indianapolis Downs with $100 in AGR for Monday. From that $100, Indianapolis Downs must set-aside $15 (15%) under the Set-Aside Funds Provision; it now has $85 remaining. Come Tuesday, Indianapolis Downs must pay the Graduated Tax on Monday's AGR. The Department insists that the tax should be applied to the $100 in AGR from Monday. Indianapolis Downs, however, contends that the Graduated Tax applies only to the $85 remaining after the Set-Aside Funds are removed.

[9] The Debtor does not dispute its obligations to pay the Graduated Tax or to distribute the Set-Aside Funds. It only disputes the amount of the Graduated Tax. Indianapolis Downs thus believes that for fiscal year 2011 it owes Indiana roughly $58 million in Graduated Tax. Mot. p. 10.

[10] Docket. No. 1.

[11] Mot. p. 25.

the Debtor does not use the Tax Motion to request a refund for the taxes it has already paid — the issue on which it lost its initial appeal in August. Rather, the relief sought in the Tax Motion is limited to fixing the Debtor's present and future tax obligations. The Department objected to the Tax Motion[12] and, following the Debtor's reply,[13] the Court heard oral argument.[14] Because the Department has lodged several challenges to the Court's jurisdiction, the Court's analysis begins there, and then proceeds to the merits.

## II.  LEGAL ANALYSIS

### A. The Department Challenges the Court's Jurisdiction

The Department first contends that either sovereign immunity or the Tax Injunction Act, 28 U.S.C. § 1341, operate to shield it from the Court's jurisdiction. But if the Court finds it has jurisdiction, the Department asks the Court to abstain from hearing this dispute and allow an Indiana state court to decide it. The Court has carefully considered the Department's arguments but rejects them.

The Court plainly has jurisdiction over the parties and the subject matter of the pending Tax Motion. Jurisdiction flows from § 505(a) of Bankruptcy Code, which provides, in relevant part:

> [T]he court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

The Third Circuit has "consistently interpreted § 505(a) as a jurisdictional statute that confers on the bankruptcy court authority to determine certain tax claims." *City of Perth Amboy v. Custom Distrib. Servs. (In re Custom Distrib. Servs.)*, 224 F.3d 235, 239-40 (3d Cir. 2000); *Quattrone Accountants, Inc., v. IRS*, 895 F.2d 921, 923 (3d Cir. 1990) ("Section

---

[12] Docket No. 433.

[13] Docket No. 452.

[14] Docket No. 470.

505 was intended to clarify the bankruptcy court's jurisdiction over tax claims."). Though the statute does not specify that this authority extends to determinations of state tax claims, "courts have interpreted the statute to cover them." *In re Stoecker*, 179 F.3d 546, 549 (7th Cir. 1999) (citations omitted) (Posner, J.), *aff'd on other grounds sub nom. Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000). Congress gave bankruptcy courts this broad power under § 505 to promote prompt and centralized estate administration; that is, to avoid making the estate "litigate the tax or assessment in several state jurisdictions." *In re Cable & Wireless USA, Inc.*, 331 B.R. 568, 575 (Bankr. D. Del. 2005).

### 1. The Department's Sovereign Immunity Defense Has No Bearing on the Court's Jurisdiction

Despite the above authority supporting the Court's jurisdiction, the Department challenges it by invoking sovereign immunity. That argument, grounded in the Eleventh Amendment of the U.S Constitution,[15] starts from the premise that the Tax Motion is injunctive in nature because it is aimed at "regulat[ing] the future interactions between [Indianapolis Downs] and … Indiana," not at "adjudicating … property of the[] estate[]."[16] Injunctive relief, the Department argues, requires that the Court have personal (*in personam*) jurisdiction over the party to be enjoined. But because "[b]ankruptcy courts lack *in personam* jurisdiction over sovereign states," the Department concludes that "the relief requested … is barred."[17]

The Court finds that the Department's initial premise is mistaken. The Tax Motion—without question—"asks this Court to adjudicate issues concerning the property"[18] of the Indianapolis Downs estate. In bankruptcy, property of the estate includes a debtor's interest in prop-

---

[15] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

[16] Dep't Obj. p. 8.

[17] Dep't Obj. pp. 8, 9.

[18] Dep't Obj. p. 8.

erty acquired after the bankruptcy case begins. 11 U.S.C. § 541(a)(7). So as the Debtor generates revenue post-petition, the revenue becomes property of the estate. Up to now, the Debtor's estate has, each day, paid a portion of that revenue (i.e., that property) over to the Department in the form of the Graduated Tax on the Set-Aside Funds. The Tax Motion asks the Court to determine whether the estate must keep making those payments. If the Debtor prevails and the Court finds the payments need not be made, then the amount of money in the estate will increase—perhaps by quite a lot.[19] If the Department prevails, the amount will decrease. Thus, a ruling on the Tax Motion would directly affect the property of the Debtor's estate.

The Court's power to "adjudicate issues" involving property of the estate stems from its *in rem* jurisdiction over the bankruptcy estate, not, as the Department suggests, its *in personam* jurisdiction over Indiana. *See Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (In bankruptcy, "the court's jurisdiction is premised on the debtor and his estate, and not on the creditors."); *In re Pa. Cent. Brewing Co.*, 135 F.2d 60, 64 (3d Cir. 1943) ("A proceeding in bankruptcy is a proceeding *in rem* against the [debtor's] estate …. As such the entire estate is within the jurisdiction of the bankruptcy court[,] which must dispose of the entire estate and not only the portion or portions thereof to which particular [creditors] may lay claim or be entitled."); *United States v. Crookshanks*, 441 F. Supp. 268, 270 (D. Or. 1977) ("An example of the *in rem* jurisdiction of the federal courts is that of bankruptcy, in which the ability of nonparty creditors to enforce their rights is restricted. The *res* in bankruptcy is the estate of the bankrupt."). Jurisdiction *in rem* encompasses "a court's power to adjudicate the rights to a given piece of property," *Black's Law Dictionary* 929 (9th ed. 2009), even if the court does not have *in personam* jurisdiction over all the parties affected by that adjudication.

---

[19] According to Indianapolis Downs, a ruling in its favor could lead to an additional $15 million per year for the estate. Mot. p. 2.

State sovereign immunity is waived when a bankruptcy court exercises its *in rem* jurisdiction. Justice Stephens, writing for the Supreme Court in *Central Virginia Community College v. Katz*, 546 U.S. 356 (2006), concluded that "[i]n ratifying the bankruptcy clause, the states acquiesced in subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." *Id.* at 378. The Court also noted that "exclusive jurisdiction over all of the debtor's property, [and] the equitable distribution of that property among the debtor's creditors" is a "[c]ritical feature[] of every bankruptcy proceeding." *Id.* at 363-64. Thus, when the a bankruptcy court acts in conformity with its *in rem* jurisdiction, "its exercise [of jurisdiction] does not, in the usual case, interfere with state sovereignty even when State's interests are affected." *Id.* at 370 (quotations omitted).

In sum, because the Court has *in rem* jurisdiction over the Debtor's estate – the subject matter of the Tax Motion – its purported lack of *in personam* jurisdiction over Indiana is a nonissue.[20]

## 2. The Tax Injunction Act Does Not Bar the Court from Exercising Jurisdiction

The Department's next argument, that the Tax Injunction Act ("TIA") "bars injunctive relief by this Court,"[21] is both factually and legally misplaced. The TIA states that federal courts cannot "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. As a matter of fact, nowhere does the Tax Motion refer to an "injunction," or any variation of the term. Rather, it asks for "an order *declaring* that [Indianapolis Downs]

---

[20] Even if deciding the Tax Motion required the Court to have personal jurisdiction over Indiana—which it does not—sovereign immunity would still not be a defense. That is because the Court finds that having jurisdiction over Indiana in this proceeding is "necessary to effectuate" the Court's *in rem* jurisdiction, which, under *Katz*, is the test for overcoming a state sovereign immunity defense. *See Katz*, at 546 U.S 378; *Fla. Dep't of Revenue v. Diaz (In re Diaz)*, 647 F.3d 1073 (11th Cir. 2011) (discussing the *Katz* "necessary to effectuate standard").

[21] Dep't Obj. p. 9.

need not include the 15% Set-Aside Funds in its calculation and payment of the Graduated Tax."[22] (Emphasis added). Such relief is neither inappropriate nor unusual in the § 505 context. A treatise notes that "declaratory relief may be obtained" under § 505(a)(1) "to accelerate the[] [Court's] determination[]" of the amount or legality of the challenged tax. 1 Collier on Bankruptcy ¶ 3.09[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). In fact, the Declaratory Judgment Act, which empowers courts to declare parties' rights in certain situations, specifically contemplates determinations under § 505 within that power, at least as to federal taxes. *See* 28 U.S.C § 2201(a) ("In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than … *a proceeding under section 505* … of title 11, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.") (emphasis added).

Moreover, as a matter of law, many courts — including the Third Circuit — have concluded that the TIA does not affect a bankruptcy court's subject matter jurisdiction under § 505. *See Baltimore Ctny. v. Hechinger Inv. Co. of Del., Inc. (In re Hechinger Inv. Co. of Del., Inc.)*, 335 F.3d 243, 247 n.1 (3d Cir. 2003) ("It is well established … that the Tax Injunction Act does not prevent a Bankruptcy Court from enforcing the provisions of the Bankruptcy Code that affect the collection of state taxes."); *In re Plymouth House Health Care Ctr., Inc.*, Bankr. No. 03-19135F, 2004 Bankr. LEXIS 2616, at *5-8 (Bankr. E.D. Pa. Sept. 10, 2004) (holding bankruptcy court subject matter jurisdiction under 11 U.S.C.S. § 505(a) not affected by the provisions of the Tax Injunction Act). Though "the jurisdictional bar of the TIA is indeed broad," *Pontes v. Cunha (In re Pontes)*, 310 F. Supp. 2d 447, 453 (D.R.I. 2004), § 505 reflects, in clear terms, Congress' choice to allow bankruptcy courts to determine a debtor's tax liability. *See Daniels v. Cnty. of Chester (In re Daniels)*, 304 B.R. 695, 700 (Bankr. E.D. Pa. 2003) ("To the extent that a bankruptcy court

---

[22] Mot. p. 25.

must determine a debtor's tax liability in an area where such a determination may otherwise be barred by the Tax Injunction Act, the overwhelming majority view is that Congress expressly conferred jurisdiction on bankruptcy courts to do so in § 505 of the Code."). Giving bankruptcy courts that authority helps "finalize the estate and move the bankruptcy case to closure." *In re Pontes*, 310 F. Supp. at 453. Otherwise, if courts "had to abstain pending a determination of [tax] liability in state court—bankruptcy proceedings would be even more protracted than they are." *In re Stoecker*, 179 F.3d at 549. Put simply, because § 505 is an exception to the TIA, the act does not impair the Court's exercise of jurisdiction over this proceeding.

### 3. The Court Need Not, and Will Not, Abstain

The Department's next argument, that the Court must (or at least should) abstain from deciding the Tax Motion, also fails to persuade; the Court will not abstain. Under 28 U.S.C. 1334(c)(2), mandatory abstention does not apply to "core" proceedings. Core proceedings include matters that "invoke[] a substantive right provided by title 11 or [that] … could arise only in the context of a bankruptcy case." *Beard v. Braunstein,* 914 F.2d 434, 444 (3d Cir. 1990). Just so here: the Tax Motion invokes the Debtor's right to have this Court determine its tax liability—a substantive right provided by § 505(a)(1). *See, e.g., ANC Rental Corp. v. Dallas Cnty. (In re ANC Rental Corp.),* 316 B.R. 153, 157 (Bankr. D. Del. 2004) (holding debtor's claim brought under § 505 constituted a core proceeding "because it invokes a right given to the [d]ebtor under title 11"); *United States v. Wilson,* 974 F.2d 514, 517 (4th Cir. 1992) (same); *In re Hunt,* 95 B.R. 442, 444 (Bankr. N.D. Tex. 1989) (same); *Drummond v. Dep't of Revenue (In re Kurth Ranch),* No. CV-90-084-GF, 1991 U.S. Dist. LEXIS 21133, at *7 (D. Mont. April 23, 1991) (same). Accordingly, the Court is not required to abstain.

The general rule is that if a matter falls within a bankruptcy court's "core" jurisdiction, then the court should decide it. *See Garland & Lachance Constr. Co. v. City of Keene (In re Garland & Lachance Constr. Co.),* Bankr. No. 89-11258, CM No. 90-126-S, 1991 Bankr. LEXIS 2123, at

*22 (Bankr. D.N.H. Feb. 22, 1991) (noting that "abstention is normally inappropriate if a matter is a core proceeding [but that] … the rule is not inflexible and the [c]ourt retains the power to abstain for reasons of justice, comity with state courts, or respect for state law") (citation omitted). For example, in *ANC Rental*, the debtor asked the bankruptcy court to determine its tax liability to certain state taxing authorities under § 505. One of the taxing authorities, citing the predominance of state law issues and concerns over the uniform assessment of the tax, argued that the bankruptcy court should abstain and require the debtor to seek redress at the state and local level. The court ultimately agreed with the taxing authority and abstained. It noted that while federal courts "should exercise abstention sparingly[,] … [o]nly in exceptional circumstances," and for "a compelling reason," abstention was appropriate in that instance because the case was post-confirmation and there was no prejudice in having the matter heard by the state court. *In re ANC Rental*, 316 B.R. at 158-59 (citations and quotation marks omitted).

Courts have generally looked to the following six factors to guide their abstention analysis in the § 505 context: 1) the complexity of the tax issue; 2) the need to administer the bankruptcy case in an orderly and efficient manner; 3) the asset and liability structure of the debtor; 4) the prejudice to the debtor and the potential prejudice to the taxing authority 5) the burden on the bankruptcy court's docket; 6) the length of time required for trial and decision. *Id.* at 159.

Applying these factors, the Court notes first that the tax issue raised in the Tax Motion is not complex. Courts that have abstained in the § 505 context have generally done so if deciding the claim would require "a fact intensive review of the value of the property and the amount of the taxes in question," or if its decision "could affect the uniformity of assessment of … taxes imposed on other taxpayers." *Id.; see In re AWB Assoc., G.P,* 144 B.R. 270, 276 (Bankr. E.D. Pa. 1992) ("Abstention from deciding a tax adjudication question under [§] 505 is only appropriate under a showing that uniformity of assessment is of significant importance."). These concerns are largely absent here. For instance, deciding the Tax Motion does not involve valuation at all, or

anything beyond basic computation; rather, it requires the Court to interpret and apply the Indiana statutes at issue using traditional tools of statutory interpretation. Similarly, uniformity of assessment is not a significant issue as there are only two Racinos in Indiana and they are both parties to this proceeding. The first factor therefore, weighs against abstention.

As do the second, third and fourth factors. Unlike in *ANC Rental*, where a plan had been confirmed and all that remained were adversary proceedings, this bankruptcy case remains at a relatively early stage. As such, having this Court resolve the Tax Motion allows the Court to oversee the disclosure statement and plan process, and to keep the bankruptcy case moving forward in an orderly and expeditious fashion. The Court has found compelling the Debtor's argument that a ruling on the Tax Motion — regardless of the outcome — will materially aid the Debtor in structuring its plan of reorganization, which in turn will likely impact the entire creditor body.

Because the Motion has already been fully presented to the Court both through briefing and at oral argument, and because the Court stands prepared to rule, the fifth and sixth factors—the burden on the bankruptcy court's docket, and the length of time required for trial and decision, respectively — also favor this Court deciding the Motion.

Nothing in the Department's final abstention argument, which is based on the *Burford* abstention doctrine, *see generally Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), has convinced the Court to abstain. *Burford* abstention "may be warranted 'where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). Nonetheless, the Supreme Court has found that "[w]hile *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even at all in cases where there is a potential for conflict

with state regulatory policy." *Id.* at 362 (quotation marks omitted). Indeed, the "balance rarely favors abstention, and the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the [c]ourt to adjudicate a controversy properly before it." *Quackenbush v. Allstate, Inc. Co.*, 517 U.S. 706, 706, (1996); *see Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (recognizing longtime holding that federal courts have a "virtually unflagging obligation" to adjudicate claims within their jurisdiction).

The Department cites, as "a matter of great state concern" Indiana's "overarching interest in independently and uniformly addressing [its] tax imposition statutes."[23] Yet that concern is present any time a debtor invokes § 505 to determine its tax liability to a state, and "Congress is presumed to have been fully aware of the potential for conflict when it enacted § 505, and to have concluded that bankruptcy policy nonetheless compelled provision for resolving tax disputes in the bankruptcy forum." *In re Super Van*, 161 B.R. 184, 190 (Bankr. W.D. Tex. 1993).

The Court, in declining to abstain under *Burford*, has found Bankruptcy Judge Clark's *Super Van* opinion to be especially persuasive. In *Super Van*, a business debtor filed a motion under § 505 for a determination of its tax liability, if any, to the Texas Employment Commission. The commission argued for *Burford* abstention based on Texas' interest in protecting the administrative scheme it had developed to handle disputes involving the commission. Because the scheme included judicial review of commission orders, the state courts had specialized knowledge of the regulations. According to the commission's argument "[f]ederal court jurisdiction invoked in such a context ... could only lead to the same sort of delays, misunderstandings of local law, and needless federal conflict with state policy as were found likely to occur in *Burford*." *Id.* at 188.

After a thoughtful analysis, Judge Clark rejected the commission's argument. He concluded, in part:

---

[23] Dep't Obj. p. 16.

> *Burford* abstention is not at issue in the bankruptcy context be-
> cause we do not here have the mere resort to a federal court in
> order to attack or evade a state regulatory scheme; rather we
> have the incidental ability to employ the federal forum to do
> what would otherwise have to be done in the state's adminis-
> trative scheme, in service to the larger policies underlying the
> administration of the bankruptcy case. There is no "interfe-
> rence," such as in *Burford* – unless one wants to argue that the
> sole purpose of filing the bankruptcy itself was to interfere
> with the state administrative process. No one has made that ar-
> gument here, and … were a debtor to file bankruptcy solely for
> that reason …, abstention would not be the proper tool to grab
> for; dismissal for bad faith filing would.

*Id.* at 190-91.

This Court agrees with Judge Clark's analysis and rejects the De-
partment's *Burford* abstention argument.

Having considered each of the Department's jurisdictional and
procedural arguments, the Court finds no reason why it cannot, or
should not, decide the Tax Motion. The Court therefore concludes it has
jurisdiction over this contested matter under 11 U.S.C. § 505(a)(1), 28
U.S.C. §§ 157 and 1334(e)(1). Venue is also proper in this Court under
28 U.S.C. §§ 1408 and 1409. As this is a core proceeding under 28 U.S.C.
§ 157(b)(2),[24] the Court may enter a final order.

## B. The Set-Aside Funds Are Not Subject to the Graduated Tax

The Court will order that the Set-Aside Funds need not be in-
cluded in the Debtor's calculation and payment of the Graduated Tax.
The reason is that the Court finds the Racino Statute ambiguous on the
question of whether the Graduated Tax reaches the Set-Aside Funds.
The Court must therefore go beyond the statute's plain language to car-
ry out the legislature's intent. Given the dearth of sources revealing that
intent, the Court turns to Indiana state court decisions in similar situa-

---

[24] Specifically, the Court finds this proceeding to be core under 28 U.S.C. §
157(b)(2) (A), (B), (C), (E), (M), or (O).

~ 14 ~

tions for interpretive guidance. The case law reveals that Indiana generally does not tax receipts that a party collects and transfers to another if the collecting-party cannot use or control the funds transferred. Both the Racino Statute and its implementing regulations confirm that that rule applies to the Debtor here. In addition, the Department's reading of the Racino Statute would operate to impose a double-tax on the Debtor, which Indiana law has long disfavored where, as here, the directive to double-tax is not plain from the statute's face. All of this leads the Court to conclude that the Set-Aside Funds are not subject to the Graduated Tax.

### 1. The Racino Statute Contains an Ambiguity

The Court cannot determine from face of the Racino Statute whether the Graduated Tax applies to the Set-Aside Funds. Indiana courts[25] interpret statutes by first deciding "if the legislature has spoken clearly and unambiguously on the point in question." *Siwinski v. Town of Ogden Dunes*, 949 N.E.2d 825, 828-29 (Ind. 2011); *see* Ind. Code § 1-1-4-1(1) (setting out rules of statutory construction that apply to all Indiana statutes). If it has, "no room exists for judicial construction." *Siwinski*, 949 N.E.2d at 828. If it has not, and the "statute contains ambiguity that allows for more than one interpretation," the court should construe the statute to give "effect [to] the legislative intent." *Id.* ("[A] cardinal rule of statutory construction … is to ascertain the intent of the drafter." (quotation marks omitted)). That means courts must consider the "entire enactment" and "constru[e] the ambiguity … consistent" with it. *Id.* "If possible, every word [in the statute] must be given effect and meaning, and no part should be held to be meaningless if it can be reconciled with the rest[.]" *Id.* The Court should "not" presume[, however,] that the [l]egislature intended [statutory] language … to be applied illogically or to bring about an unjust or absurd result." *City of Carmel v. Steele*, 865 N.E.2d 612, 618 (Ind. 2007). Finally, Indiana courts strictly construe

---

[25] The parties agree that Indiana law applies to the merits of this dispute. *See* Mot. p. 6; Dep't Obj. pp. 19-25; *In re R-P Packaging, Inc.*, 278 B.R. 281, 288 (Bankr. M.D. Ga. 2002) (holding that in § 505 determinations bankruptcy courts apply substantive, but not procedural, aspects of state law).

tax statutes "against the imposition of the tax," though not if the construction "override[s] the plain language of a statutory provision." *RDI/Caesars Riverboat Casino, LLC v. Ind. Dep't of State Revenue*, 854 N.E.2d 957, 963 (Ind. T.C. 2006).

The Racino Statute does not "clearly and unambiguously" speak to whether the Graduated Tax applies to the Set-Aside Funds. Rather, the statutory language permits two plausible, yet opposing, answers to that question. The Court's analysis begins, as it must, with the statutory text. *State v. Am. Family Voices, Inc.*, 898 N.E.2d 293, 297 (Ind. 2008) ("The statute itself is the best evidence of legislative intent.").

The Racino Statute provides for the Set Aside Funds as follows:

> [A] licensee shall before the fifteenth day of each month distribute an amount equal to fifteen percent (15%) of the *adjusted gross receipts* of the slot machine wagering from the previous month[.] …. A licensee shall pay the first one million five hundred thousand dollars ($1,500,000) distributed under this section in a state fiscal year to the treasurer of state for deposit in the Indiana tobacco master settlement agreement fund …. A licensee shall pay the next two hundred fifty thousand dollars ($250,000) distributed under this section in a state fiscal year to the Indiana horse racing commission for deposit in the gaming integrity fund …. After this money has been distributed to the treasurer of state and the Indiana horse racing commission, a licensee shall distribute the remaining money devoted to horse racing purses and to horsemen's associations under this subsection[.]

Ind. Code § 4-35-7-12(b) (emphasis added).[26] In short, the Set-Aside Funds consist of the 15% of Indianapolis Downs' AGR from slot-machine wagering that must be "distributed" in the manner described in the statute. Based only on the Set-Aside Funds Provision, one cannot

---

[26] The Racino Statute was amended during the pendency of this proceeding. Because this dispute pertains to Indianapolis Downs' current and future obligations under the statute, the Court refers to the Racino Statute as amended.

say whether that 15% of AGR is subject to the Graduated Tax; the section, by itself, simply does not address the issue.

Turning to the Graduated Tax Provision reveals that the Graduated Tax "is imposed ... on one hundred percent (100%) of the *adjusted gross receipts received* before July 1, 2012, and on ninety-nine percent (99%) of the *adjusted gross receipts received* after June 30, 2012, from wagering on gambling games[.]" *Id.* § 4-35-8-1(a) (emphasis added). As with the Set-Aside Funds provision, the Graduated Tax Provision makes no explicit reference to whether the Set-Aside Funds are to be taxed.

The two provisions clearly apply to the same base – AGR. The statute defines AGR as:

> (1) the total of all cash and property (including checks received by a licensee, whether collected or not) received by a licensee from gambling games; minus
>
> (2) the total of:
>
>    (A) all cash paid out to patrons as winnings for gambling games; and
>
>    (B) uncollectible gambling game receivables, not to exceed the lesser of:
>
>       (i) a reasonable provision for uncollectible patron checks received from gambling games; or
>
>       (ii) two percent (2%) of the total of all sums, including checks, whether collected or not, less the amount paid out to patrons as winnings for gambling games.
>
> For purposes of this section, a counter or personal check that is invalid or unenforceable under this article is considered cash received by the licensee from gambling games.

Ind. Code § 4-35-2-2 (emphasis added). Yet this definition, read together with the Graduated Tax and Set-Aside Funds provisions, permits both interpretations offered by parties. First, according to the Department, the Graduated Tax applies to the AGR from slot machine wager-

ing, and the Set-Aside Funds are AGR from slot machine wagering; therefore, the Graduated Tax applies to the Set-Aside Funds. That argument has a straightforward appeal with support in statutory language. But so does the Debtor's interpretation, namely, that the Graduated Tax applies to AGR that the Debtor actually *receives* as income, but that the Set-Aside Funds Provision applies to all AGR, even amounts that the Debtor cannot control or use for its own purposes.

The Department answers the Debtor's argument by pointing to the definition of AGR, claiming that though the definition "specifie[s] the exclusion of certain monies," it does  not specifically exclude the Set-Aside Funds.[27] Had the legislature intended to excluded the Set-Aside Funds from AGR, the Department claims, then it would have so expressly when it defined that term.

The Debtor, however, points to language in the last part of the definition, under which a "check that is invalid or unenforceable … is considered cash *received* by the licensee from gambling games." Ind. Code § 4-35-2-2 (emphasis added). It argues that the legislature, "by specifically including the amount of invalid checks in the definition of AGR 'received by a licensee,' … demonstrated that it knows how to include and, thus, tax funds that realistically are not 'received' by a racino[.]"[28]

The Court finds that both interpretations have support in the statutory text. Thus the key phrase "adjusted gross receipts received" reveals an ambiguity in the Racino Statute. *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind. 2001) ("A statute is ambiguous where it is susceptible to more than one interpretation."); *see also Dep't of Treas. of Ind. v. Muessel*, 32 N.E.2d 596, 597 (Ind. 1941) ("It is a settled rule of statutory construction that statutes levying taxes are not to be extended by implications beyond the clear import of the language used, … in case of doubt such statutes are to be construed more strongly against the state and in favor of the citizen.").

---

[27] Dep't Obj. p. 20.

[28] Reply p. 28-29.

## 2. Indiana Case Law and the Racino Statute's Implementing Regulations Reveal that the Set Aside Funds Are Not Subject to the Graduated Tax

Again, "[i]f a statute is ambiguous," the Court "must ascertain the legislature's intent and interpret the statute … to effectuate" it. *Elmer Buchta*, 744 N.E.2d at 942. Given the lack of case law and legislative history regarding the Racino Statute, the Court has construed the statute by focusing on three sources: (1) court decisions in analogous situations; (2) regulations adopted by the entities responsible for implementing the Racino Law; and (3) principles of Indiana tax policy. These sources have led the Court to conclude that because the Racino Statute prohibits Indianapolis Downs' from using or controlling the Set-Aside Funds for any purpose other than turning the funds over to third-parties, the Graduated Tax does not apply to those funds.

The Debtor argues that the cases most analogous to this one involve disputes over the reach of Indiana's gross income tax. The Department contends, however, that income tax principles do not apply here because this case involves an excise tax, not an income tax. The Court agrees with the Debtor, for three reasons. First, the Department fails to say how the distinction (excise tax versus income tax) affects analysis. Second, in 2004, the Indiana Tax Court examined a nearly identical graduated tax provision in the Riverboat Casino Law[29] and called it "an excise tax that is *measured by income*." *Aztar Ind. Gaming Corp. v. Ind. Dep't of State Rev.*, 806 N.E.2d 381, 386 (Ind. T.C. 2004) (holding that AGR "received" by a riverboat casino "certainly constitute[d] income") (emphasis added); *see also Miles v. Dep't of Treasury*, 199 N.E. 372, 382 (Ind. 1935) ("the term 'gross income' … is understood by lexicographers, and in common usage, to mean total receipts."). Third, the Indiana Supreme Court has said:

> [I]t is difficult to find any practical distinction to be made between a gross income tax and an ordinary excise tax. It is a tax on the recipient of the income, the tax being upon

---

[29] *See* Ind. Code. 4-33-13-1.

> the right or ability to produce, create, receive, and enjoy,
> and not upon specific property.

*Id.* at 377 (internal quotation marks omitted). The Debtor must therefore pay the Graduated Tax on the Set-Aside Funds if Indiana law considers those funds part the Debtor's income. But it does not.

A significant body of Indiana case law holds that funds for which a party acts as a "mere conduit" are not considered part of the party's income because the party lacks a "beneficial interest" in them. *See e.g., Starwood Hotels & Resorts Worldwide, Inc., v. Ind. Dep't of State Rev.*, No. 49T10–0504–TA–41, 2006 WL 367894, at *3 (Ind. T.C. Feb. 16, 2006); *Bloomington Country Club v. Ind. Dep't of State Rev.*, 543 N.E.2d 1, 3-4 (Ind. T.C. 1989); *U-Haul Co. of Ind. v. Ind. Dep't of State Rev.*, 784 N.E.2d 1078, 1083 (Ind. T.C. 2002); *Universal Grp. Ltd. v. Ind. Dep't of State Revenue*, 609 N.E.2d 48, 53 (Ind. T.C. 1993).

The Department's own administrative regulations "recognize that when taxpayers [receive money] as agents, they are 'mere conduits' … [and so] are not liable for … [or] subject to gross income tax" on that money. *Ne. Ind. Chevrolet Dealers Adver. Ass'n v. Ind. Dep't of State Revenue*, No. 02T10-0008-TA-93, 2004 Ind. Tax LEXIS 67, at *6-7 (Ind. T.C. Aug. 25, 2004); *see* 45 Ind. Admin. Code 1.1-6-10. This "agency exclusion to gross income" applies when the taxpayer is a true agent with no right, title, or interest in money or property received from the transaction. *Id.* A true agent is one who transacts business on behalf of, and under the control of, either a governmental entity or a non-governmental third-party. *See Miles*, 199 N.E. at 382 ("Taxes collected by the taxpayers as the *agent of the state or of the United States* are exempt, and we cannot conceive why they should not be."); 45 Ind. Admin. Code § 1.1-1-2.

For example, the taxpayer in *Bloomington* was a private country club with a restaurant and bar. It had a policy of automatically adding a 15% "service charge" to its member's checks. At first, the club used the service charge to generate additional revenue. It later changed the policy and made the charge a "gratuity" that the club passed on, in full, to

its wait staff. The Department sought to collect sales and income tax from the club, arguing that the club owed tax on the 15%-charge-money. Though the Indiana Tax Court agreed with the Department that the club could be taxed on the money it initially kept as additional revenue, it disagreed regarding the gratuity. Citing the rule that "[a] taxpayer is not subject to gross income tax on receipts received on behalf of a third person," the court held that the "[c]lub is not subject to the [gross income] tax" on the money it collected after the policy changed because at that point "it was merely acting as a conduit to pass along the service charges to service personnel." *Bloomington*, 543 N.E.2d at 3; *see also Summit Club, Inc. v. Ind. Dep't of State Rev.*, 528 N.E.2d 129 (Ind. T.C. 1988) (holding gratuity service charge not subject to sales tax).

In *U-Haul*, the Department argued that truck maintenance companies owed income tax on 100% of the money up-streamed to them from truck rental dealers, even though the maintenance companies were entitled to keep but a fraction of that money before again up-streaming the rest. The tax court framed the issue as "whether the [maintenance companies] are liable for gross income tax on 100% of the [up-streamed] rental amounts *collected* … when they did not *receive* 100% of those rental amounts." *U-Haul*, 784 N.E.2d at 1083-84 (emphases added). The court first noted that "the taxpayer's beneficial interest in income is central to the receipt of gross income," and that "the incidents of taxation follow the beneficial interest in income." *Id.* It then held that because the maintenance companies were "mere[] conduit[s]" for the funds, and because they "did not have a beneficial interest in 100% of the" the funds, they were "not liable for gross income tax on 100% of the" funds. *Id.* at 184.

The Tax Court applied the same reasoning in another dispute between U-Haul and the Department, and again sided with U-Haul. *U-Haul Int'l, Inc. v. Ind. Dep't of State Rev.*, 826 N.E.2d 713, 717-18 (Ind. T.C. 2005). The Indiana Supreme Court denied review, essentially leaving the Tax Court's analysis as the governing law of the State. *U-Haul Int'l, Inc. v. Ind. Dep't of State Rev.*, 841 N.E.2d 181 (Ind. 2005) (denying review).

The Department asserts that these cases are irrelevant because they require an agency relationship and here there is no "voluntary agreement that the Debtor[] accepted or consented to."[30] No — but there is a legislative edict. And while no Indiana case is directly on point, under federal case law, which Indiana finds instructive on tax matters, *see e.g., Allison Engine Co., v. Ind. Dep't of State Revenue*, 744 N.E.2d 606, 609, (Ind. T.C. 2001) (looking to federal law when faced with tax "issue of first impression in Indiana"), a taxpayer cannot be taxed on income received "under an unequivocal contractual, *statutory or regulatory* duty to repay it, so that [the taxpayer] is really just the custodian of the money." *Ill. Power Co. v. Comm'r of Internal Rev.*, 792 F.2d 683, 689 (7th Cir. 1986) (emphasis added). This view comports with the Indiana agency cases, which focus on the fact of the taxpayer's lack of control and beneficial interest, not on the source of that lack of control and interest. In fact, the rationale behind the "conduit" line of cases is even more compelling when the taxpayer faces a statutory command (as opposed to a contractual obligation) to collect and distribute funds to others. For instance, the 15% gratuity charged by the club in *Bloomington* was completely voluntary. It could have kept the money (or a portion of it) for itself if it wished. Yet even in that context the court found the club could not be taxed on funds received through the gratuity charge. *Bloomington*, 543 N.E.2d at 3. In short, the Court finds the agency cases persuasive.

Indiana courts "presume that the legislature is aware of the common law and intends to make no change therein beyond its declaration either by express terms or unmistakable implication." *Hinshaw v. Bd. of Comm'rs*, 611 N.E.2d 637, 639 (Ind. 1993). All of the rules regarding "mere conduits," "beneficial interests," and the like, existed before the legislature enacted the Racino Statute. With those rules in mind, the Court returns to the statutory language.

This much is clear: the Racino Statute dictates how every penny of Set-Aside Funds the Debtor collects is to be distributed. Ind. Code § 4-

---

[30] Dept' Obj. p. 23.

35-7-12(b), (j). All of the funds are devoted to the state's tobacco settle-
ment fund, its general fund, or to nongovernmental third parties – none
goes to the Debtor. *Id*. Should the Debtor defy its statutory obligations,
it risks civil penalties, the revocation of its license, or both. *See id*. at § 4-
35-7-12(h). So if, as *Miles* explains, a tax on income is based upon a tax-
payer's "right or ability to produce, create *receive and enjoy*," that in-
come, 199 N.E. at 377 (emphasis added), then the Graduated Tax cannot
reach the Set-Aside Funds. The Racino Law simply does not treat the
funds as the Debtor's money.

　　　Nor do the regulations implementing the Set-Aside Funds Provi-
sion. The Racino Statute charges the Indiana Horse Racing Commis-
sion, with promulgating and enforcing rules regarding the Set-Aside
Funds. Ind. Code. § 4-35-4-1. Those rules highlight how the Debtor acts
as a mere conduit for the funds. For instance:

> [I]f, at the time [the Debtor] is required to make a pay-
> ment of [Set-Aside] [F]unds to a horsemen's association,
> either: (1) the commission has not approved the registra-
> tion of a horsemen's association otherwise eligible to re-
> ceive the permit holder's payment; or (2) for any other
> reason, no horsemen's association is eligible to receive the
> permit holder's payment; then [the Debtor] shall pay the
> [Set-Aside] [F]unds ... into one (1) or more interest bear-
> ing escrow accounts established and maintained by [the
> Debtor] solely for the purpose of holding and distributing
> those funds as may be directed by the commission. When
> a horsemen's association becomes eligible to receive [the
> funds] ..., the commission shall immediately direct the re-
> lease of the escrowed funds and all interest earned on
> those funds to the eligible horsemen's association, and
> [Indianapolis Downs] shall thereafter make payments to
> that horsemen's association ....

71 Ind. Admin. Code § 13-1-1. Note that this regulation gives the com-
mission — not the Debtor — the right to "direct" how the funds in the
horsemen's account are held and distributed. The commission's control

extends even to the "interest earned" on the funds, thus reinforcing that the Debtor receives absolutely no benefit from the money in that account.

The regulations further mandate that the Debtor maintain segregated "trust" accounts for "any purse monies that it is obligated … to pay." *Id.* at § 4-2-7. The Debtor cannot commingle the trust funds with any of its own funds. *Id.* "Horse industry trust accounts" are defined as: "interest bearing account[s] established by a [racino] *in a fiduciary capacity* for the deposit and dispersal of funds that are *the property of a horsemen's association* representing the owners and trainers of a designated breed racing at [the racino.]" *Id.* at § 1-1-47.1 (emphasis added).

Hence both the text of the Racino Statute and its implementing regulations confirm that the Debtor acts at least as a conduit and, at most, as a trustee for the Set-Aside Funds. Either way, the Debtor has no right to use, control, or enjoy the benefits of the Set-Aside funds.

### 3. The Department's Interpretation Of The Racino Statute Results In Unintended Double Taxation.

The Debtor claims, and the Court agrees, that under the Department's reading of the Racino Statute the Debtor is, in effect, doubly taxed. That is, the Department would have the Debtor pay the Graduated Tax on the Set-Aside Funds that the Debtor must hand-over to the state itself. The double taxation occurs in two instances. First, the Debtor must give the initial $1.5 million in Set-Aside Funds to the state treasurer for deposit in the state's tobacco settlement funds. The Department would then have the Debtor pay the Graduated Tax on that money — which it has just handed to the state. The amount of Graduated Tax the Debtor would owe on that money would range from $375,000 (25% of $1.5 million) to $525,000 (35% of $1.5 million).

The second instance of double taxation arises when the Set-Aside Funds given to non-governmental third parties exceeds certain caps listed in the Set-Aside Funds Provision. When that happens, the surplus Set-Aside Funds go to the state's general fund. *See* Ind. Code § 4-35-7-12(j).

These two examples show that under the Department's interpretation the Debtor pays an effective tax rate in the range of 125%-135% on the Set-Aside Funds that go to the state. In other words, for every dollar of AGR the Racino Statute directs to the state, the state receives both the 25%-35% Graduated Tax, and the underlying dollar itself. Thus, in this scenario the Debtor actually *loses* money because for each dollar of AGR that goes to the state, the Debtor must dip into its own pocket to pay tax on that dollar.

The Department claims that "[n]o double taxation exists" here because "the distribution required by the [Racino Statute] is not a listed tax."[31] Indeed, as far as the Court can tell, the Set-Aside Funds Provision is the only Indiana Code provision that requires an entity to devote and distribute a portion of its AGR to the state and third-parties without specifying if the extraction is a tax, fee, or fine. The Court concludes, however, that the Set-Aside Fund Provision, or "required distribution" (as the Department would have it), is a tax, listed or not. In *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011), the Court of Appeals for the Seventh Circuit, sitting en banc, considered an Illinois Code provision requiring riverboat casinos to pay 3% of their AGR into a state trust fund established to bolster the state's struggling horseracing industry. The question was whether the 3% extraction was a tax for purposes of the Tax Injunction Act. The court, held that, "whatever its nominal designation," the 3% extraction was a tax because it was "calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits." *Id.* at 728-29 (quoting *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992)). Indiana courts hold a similar view when deciding if an extraction is a tax. *See BellSouth Telecommunications, Inc. v. City of Orangeburg*, 337 S.C. 35, 522 S.E.2d 804, 806 (1999) ("Generally, a tax is

---

[31] Dep't Obj. p. 25. "Listed Taxes" are those that the Department administers. The Graduated Tax is a listed tax, the Set-Aside Funds are not. *See* Ind. Code § 6-8.1-1-1.

an enforced contribution to provide for the support of government …";
*Ace Rent-A-Car, Inc. v. Indianapolis Airport Auth.*, 612 N.E.2d 1104 (1993)
("A tax is compulsory and not optional; it entitles the taxpayer to receive nothing in return, other than the rights of government which are enjoyed by all citizens.")

Here, at least with respect to the Set-Aside Funds that the Debtor gives to the State of Indiana (for the tobacco settlement fund and the general fund), the Set-Aside Funds Provision functions as a tax. The Debtor receives no benefit other than what the general public receives. It is therefore beyond serious debate that the Set-Aside Funds Provision, combined with the Graduated Tax Provision, doubly taxes Indianapolis Downs.

While the Indiana Supreme Court may have long ago recognized a state policy of avoiding double taxation, *see Darnell v. State*, 90 N.E. 769, 774 (Ind. 1910) ("The intent manifest in our tax law is to require all property to contribute pro rata its share of taxes, and so far as practicable to avoid double taxation."), it has also recently held that double taxation is not per se illegal. *See State Bd. of Tax Comm'rs v. Jewell Grain Co., Inc.*, 556 N.E.2d 920, 925 (Ind. 1990). In *Jewell Grain*, the court said that "[w]hen the purpose of a taxing act is plain, courts will not interfere[;]" they will not, for instance, "ignore the words of the statute in order to avoid double taxation." *Id.*

However, if the Indiana legislature intended the Racino Statute to impose a double tax on Indianapolis Downs, it did not make that intent "plain." While the statute explicitly imposes Graduated Tax rates of 25%-35% on the Debtor's slot-machine revenue, it does not disclose or acknowledge that significant portions of the Debtors' adjusted gross receipts should be taxed at effective rates north of 100%. Given the Indiana Supreme Court's directive that where doubt exists a tax statute like this one "will be construed against the state and in favor of the taxpayer," *Gross Income Tax Div. v. Crown Dev. Co.*, 109 N.E.2d 426, 428 (Ind. 1952), the statutory language here does not support a construction demonstrably at odds with well-established principles of Indiana tax law. *See Ind. Dep't of State Rev. v. Safayan*, 654 N.E.2d 270 (Ind. 1995)

("We take care not to extend the force and operation of tax statutes beyond the clear import of their language. ...When in doubt about the imposition of a tax, we construe statutes against the State and in favor of the taxpayer.")

The Court finds that Indianapolis Downs has satisfied its burden to show that the Graduated Tax does not extend to the Set-Aside Funds. Again, in Indiana, "taxation follow[s] the beneficial interest in income, [and] a person who is a mere conduit for another is generally not taxable on the income." *U-Haul*, 784 N.E.2d at 1083-84. Here, the Set-Aside Funds belong to third parties, not the Debtor. The Debtor merely collects the funds and passes them along, and thus they are not included in the Debtor's income. Because the Graduated Tax is measured by the Debtor's income, the Set-Aside Funds cannot be subject to that tax.

## III. CONCLUSION

For all these reasons, the Court will enter an order declaring that the Debtor need not include the Set-Aside Funds in its calculation and payment of the Graduated Tax. The Tax Motion is therefore **GRANTED**. An appropriate Order follows.

**BY THE COURT**:

Dated: October 26, 2011
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge