## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 11-11046 (BLS) |
| INDIANAPOLIS DOWNS, LLC, *et al.*, | Jointly Administered |
| Debtors. | |

### REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Power Plant Entertainment Casino Resorts Indiana, LLC ("PPE") and LiveHoldings!, LLC ("LiveHoldings"), by undersigned counsel, hereby file this Motion for allowance and payment of administrative expenses (the "Motion"), and respectfully state as follows:

## I.   INTRODUCTION

1.     By this Motion, PPE and LiveHoldings seek the Court's allowance of an administrative expense claim against the bankruptcy estate of Indianapolis Downs, LLC ("Indiana Downs" or the "Debtor"),[1] arising from the Debtor's continuous post-petition use of trademarks licensed by PPE and LiveHoldings to the Debtor pursuant to a certain Trademark License Agreement (the "Trademark Contract"), entered into between the Debtor, on the one hand, and PPE and LiveHoldings, on the other hand.[2] The Trademark Contract was executed in conjunction with a Development, Financing & Management Agreement (the "Management Contract"), entered into between the Debtor and PPE.[3]   PPE and LiveHoldings seek an administrative claim for the use of the trademarks in the amount of $5,090,383 and a claim of no

---

[1] The Debtors in these chapter 11 cases are Indianapolis Downs, LLC and Indiana Downs Capital Corp. which are collectively referred to herein as the "Debtors."  Although both Debtors filed the Motions to which this Opposition relates, only Indianapolis Downs, LLC, referred to herein as the "Debtor," is the licensee of the trademarks.

[2] PPE and LiveHoldings are filing this Request for Payment of Administrative Expense Claim (the "Request") to formally comply with the Court's January 23, 2012 Administrative Bar Order.  PPE and LiveHoldings has heretofore filed a separate motion (the "Motion") on February 13, 2012, Docket No. 795, seeking allowance of the administrative expenses stated in this Request which PPE and LiveHoldings are pursuing as a contested matter pursuant to the Federal Rules of Bankruptcy Procedure. This Request is not intended to supersede the Motion, but rather to meet the formal stated requirements of the Bar Date Order.

[3] Copies of the Trademark Contract and Management Contract are attached hereto as Exhibits 1 and 2 respectively.

less than $28.4 million for damage caused to the value of trademarks by Indiana Downs continuing use of the trademarks.[4]

2.      On April 7, 2011 (the "Petition Date"), in an attempt to secure the use of the valuable trademarks licensed to it without providing any monetary consideration whatsoever to PPE and LiveHoldings, the Debtors filed First Day Motions seeking this Court's authorization to assume the Trademark Contract (the "Motion to Assume"), [D.I. 26], and reject the Management Contract (the "Motion to Reject").  [D.I. 25].  Although the Trademark Contract is inseparably related to the Management Contract, the Debtors sought to reject the Management Contract because it obligates Indiana Downs to provide certain monetary consideration to PPE and LiveHoldings – a portion of which was specifically designed to fairly compensate PPE and LiveHoldings for Indiana Down's use of the trademarks.

3.      On May 5, 2011, PPE and LiveHoldings filed an opposition to the Motion to Assume and the Motion to Reject (the "Opposition"), explaining that the Debtors cannot assume the benefits of the Trademark Contract, *i.e.*, use of valuable trademarks, while at the same time rejecting the burdens of the Management Contract, *i.e.*, paying for the use of valuable trademarks.

4.      As will be explained below, the Debtors, recognizing from the Opposition that their initial strategy of rejecting the Management Contract while assuming the Trademark Contract, which required PPE's and LiveHoldings's consent, would not succeed in achieving their goal of using the trademarks without compensating the licensors for their use, the Debtors embarked on a new stratagem.  The Debtors induced PPE, Liveholdings and affiliated entities

---

[4]      PPE and LiveHoldings have engaged The Innovation Group to determine the extent of damages to the LiveHoldings Live trademark.  The $28.4 million in damages to the Live trademark is the damages amount which is at the bottom of the range for this claim and is subject to revision when The Innovation Group completes its expert opinion and analysis.

(collectively the "Cordish Entities") to enter into settlement discussions to allow Indiana Downs the continued use of the trademarks and resolve all disputes arising out of the Management Contract that are being litigated in an arbitration proceeding (the "Arbitration Proceeding") that is stayed by the bankruptcy case.

5.     The Settlement Agreement (the "Settlement Agreement") that was entered into provides for the continued use of the trademarks at a negotiated rate based on the Debtors' gross gaming revenues, dismissal of the Arbitration, reduction in the PPE and LiveHoldings' pre-petition claim from $17 million to $12 million, and obligates the parties to use their best efforts to obtain Court approval of the Settlement Agreement.[5]

6.     The Debtors, however, after (i) executing the Settlement Agreement, (ii) filing a motion for court approval (the "Settlement Motion") which acknowledged the Debtor's obligation to compensate the Cordish Entities for the use and critical need of the trademarks, (iii) seeking from the Cordish Entities agreements to postpone at least three hearings to consider the settlement, which the Cordish Entities granted, and (iv) repeatedly assuring the Cordish Entities of their intention to proceed with the settlement, unilaterally withdrew the Settlement Motion on November 3, 2011, and a week later withdrew the Motion to Assume and the Motion to Reject. As a result of the foregoing machinations, the Debtors have achieved, so far, through their tactics, their original goal of continuing to use the Cordish Entities' trademarks without compensating the licensor entities.

7.     The administrative claim requested herein consists of two separate elements. The first is a claim based on the value to the estate of the continued use of the trademarks during the bankruptcy. The second element is the damage caused to the value of the trademarks by Indiana

---

[5] A copy of the Settlement Agreement is attached hereto as Exhibit 3.

Downs' continuing use of the trademarks as a financially troubled company and a chapter 11 debtor.

## II.    BACKGROUND

### A.    PRE-PETITION RELATIONSHIP BETWEEN THE DEBTOR, PPE AND LIVEHOLDINGS

8.      Indiana Downs owns and operates a pari-mutuel horse racetrack in Shelbyville, Indiana, and two off-track wagering facilities.  Through a debt offering in 2007, Indiana Downs sought to construct a casino gaming facility adjacent to the racetrack (the "Facility").

9.      After a national search, Indiana Downs chose PPE to develop and operate the Facility.  To that end, on September 10, 2007, Indiana Downs entered into the Management Contract with PPE through which the parties agreed that PPE would undertake certain development, financing, leasing, consulting, and management services for the gambling operations at the Facility.  The joint effort of Indiana Downs and PPE, as set forth in the Management Contract, is referred to therein and herein as the "Project."   Prior to the Facility's grand opening in March 2009, PPE established a temporary, 70,000 square foot gaming complex in less than five months that opened on June 6, 2008.  Thereafter, PPE successfully developed a state-of-the-art, 233,000 square foot Facility featuring 2,000 slot machines and electronic table games.

10.      As acknowledged in Indiana Downs' October 18, 2007 debt offering circular, the Facility was to contain several "branded" dining and entertainment options contemplated and arranged pursuant to the Project, including a 400-seat market style buffet and food court, a "Maker's Mark®" themed fine dining restaurant, a sports bar, an "Angel's Rock Bar®" themed night club, a coffee bar, and a 4,500 square foot center bar.  Several of the brands that were

4

contemplated to be used in the Facility were owned by the PPE and its affiliate LiveHoldings or licensed from a third-party by an affiliate of LiveHoldings.

11.    As outlined above, to effectuate the planned branding of the Facility, and as part of the Project, LiveHoldings and PPE, entered into the Trademark Contract in January 2008, in which LiveHoldings and PPE granted Indiana Downs certain limited, royalty free, non-exclusive license rights to trademarks owned by LiveHoldings and PPE, or licensed from third parties by an affiliate of LiveHoldings and PPE, that were to be used for the Project.  The Trademark Contract was entered into subsequent to the Management Agreement because the Management Agreement had to first be in place to secure PPE's control over its trademarks.  Accordingly, and consistent with the purpose and intent of the parties, the Trademark Contract expressly provides that the term expires upon the termination or expiration of the Management Contract, *i.e.* when PPE no longer controlled the management and, in turn, could not protect its trademarks and those trademark it licenses from third parties and from mismanagement or misuse.  *See* Trademark Contract at ¶ 3 ("Term.  This Agreement and all rights granted hereunder, shall be effective as of the Effective Date and continue in full force and effect until the [Management Contract] expires or is terminated in accordance with the provisions thereof.").

12.    When the Facility opened, it was branded "Indiana Live!® Casino."  The coffee bar was branded, "Live!® Java Bar", the twenty-four hour convenience market was branded "Live!® On the Run", the deli was branded "Live!® Deli", the lunch and dinner buffet was branded, "Live!® Market Buffet."  Additionally, the Facility includes a lounge and nightclub branded "Angels Rock Bar®", a sports bar and grill branded "NASCAR® Sports Grille", and an upscale restaurant branded "Maker's Mark® Bourbon House & Lounge."  "Live!®" and "Angels Rock Bar®" are brands owned by LiveHoldings.  The "NASCAR® Sports Grille", and "Maker's

Mark® Bourbon House & Lounge" are brands licensed by affiliates of PPE and LiveHoldings from third parties. In addition, the Debtor utilizes Live®Rewards as its rewards program to entice gamblers to its casino.

13.    Under the Management Contract, PPE was to earn a development fee paid during the construction of the project as well as an ongoing management fee equal to 4.5% of gross revenues from the Facility operations. The Trademark Contract was deliberately crafted so that it provided for consideration for the Debtor's use of the trademarks as part of the fees due to PPE under the Management Contract and was intended to fairly compensate PPE and LiveHoldings for the Debtor's use of the trademarks. The royalty free Trademark Contract was "stapled" to the Management Contract and was intended by its express terms to be inextricably linked to the Management Contract.

14.    PPE was paid its development fee and management fee as required by the Management Contract for approximately one year. Indiana Downs unilaterally began withholding payment of the Management Contract fees in April 2009 and then approached PPE to defer certain fees from April 2009 through December 2009 pursuant to a modification to the Management Contract. In the spirit of helping the enterprise, PPE agreed; however, Indiana Downs continually failed to make payments of fees owed to PPE as per the extension agreement. In approximately March 2010, PPE demanded full payment of its fees due under the Management Contract. Indeed, on July 30, 2010, PPE provided a notice of default under the Management Contract to Indiana Downs for non-payment.

15.    In response, Indiana Downs sent a letter indicating that it had terminated the Management Contract. Shortly thereafter, Indiana Downs barred PPE from the Facility premises, locked it out, prohibited it from providing its services to the Debtors, and PPE has not

managed the Facility since August 2010.

**B.    THE DEBTORS' BANKRUPTCY CASES**

16.    On April 7, 2011, the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are presently in possession of their properties and are operating and managing their businesses as debtors-in-possession.

17.    As stated above, on the Petition Date, the Debtors filed, among other things, the Motion to Assume and the Motion to Reject.  The purpose of these motions (together, the "Trademark and Management Motions"), [D.I. 25, 26], ultimately was to seek relief from this Court to allow the Debtors to continue using certain trademarks owned or licensed  by the Cordish Entities (the "Marks"), which the Debtors described as "**vital**" and "**crucial**" to their business operations, [D.I. 26 at ¶ 10], without having to compensate the Cordish Entities for such use. (Emphasis added).

18.    Recognizing the Debtors' improper intentions and lack of legal authority to support the relief sought, on May 5, 2011, PPE and LiveHoldings jointly filed the Opposition, [D.I. 158], explaining that: (i) the Debtors were legally prohibited from rejecting the Management Contract while simultaneously seeking to assume the Trademark Contract; (ii) the Debtors' decision to reject the Management Contract was not an exercise of sound business judgment, given that the "vital" and "crucial" Trademark Contract would also have to be rejected; and (iii) the Debtors' efforts to assume either contract was contingent on the Cordish Entities' consent.

19.    In the face of the Opposition, the Debtors sought to delay the inevitable denial of their motion to assume the Trademark Contract by inducing the Cordish Entities to enter into

settlement negotiations, which began in June 2011. After several weeks of negotiations, the parties reached an agreement in principle in early July 2011. In the Settlement Agreement, the parties allegedly reached an amicable resolution of all disputes between them (before this Court and in the Arbitration) and allowed the Debtors to continue their use of the Marks without the expense of rebranding and the disruption that rebranding would cause to the Debtors' business and reorganization efforts, which the Debtors admitted to this Court are "vital" and "crucial" to their business. [D.I. 26 at ¶ 10].

20.     The Debtors – acting through their Chief Restructuring Officer, Gregory Rayburn ("Mr. Rayburn") – advised the Cordish Entities, on July 7, 2011, that the Debtor's board of directors (the "Board") would have to approve the settlement and, thereafter, on July 12, 2011, Mr. Rayburn notified the Cordish Entities that the Board approved the Settlement Agreement.

21.     The Settlement Agreement is dated August 15, 2011.  The principal provisions of the Settlement Agreement are set forth below:

    a.  PPE proof of claim is allowed in the reduced amount of $12 million, a reduction of over $5 million from the amount in the proof of claim.

    b.  The Cordish Entities will not oppose or object to a plan of reorganization that treats the PPE claim in the same manner as other general unsecured claims and is otherwise consistent with the Settlement Agreement.

    c.  The Motions would be granted on the condition that the Trademark Contract was modified as agreed upon, including:

        1.  The Debtor is permitted to use the Marks for a 12-month period commencing on the Petition Date, with month-to-month use thereafter; and

        2.  The Debtor will pay for use of the Marks for a period of no less than 12 months from the Petition Date at a rate of 1.75% of the Debtor's "Gross Gaming Revenue."

    d.  The pre-petition arbitration proceeding between PPE and the Debtor would be dismissed in its entirety with each party bearing its own costs.

e.  The parties would provide mutual releases with the exception of (i) claims arising out of the Settlement Agreement, (ii) PPE's $12 million proof of claim and (iii) claims, rights and defenses arising in the litigation styled *Power Plant Entertainment Casino Resorts Indiana, LLC v. Ross J. Mangano et al.,* Case No. 24-C-11001014 (Circuit Court of Maryland for Baltimore City), to which the Debtors are not parties.

f.  The parties agreed to use reasonable efforts to obtain this Court's approval of the Settlement Agreement.

*See* Settlement Agreement at 7.

22.     On August 23, 2011, the Debtors filed a motion for approval of the Settlement Agreement (the "Settlement Motion"). [D.I. 394].  After summarizing the terms, the Settlement Motion states that "[t]he Debtors, in the exercise of their sound business judgment, have determined that the Settlement Agreement is reasonable and in the best interests of their estates . . . ." Settlement Motion at ¶ 20.  The Debtors also represent that they "have carefully considered and analyzed the terms of the Settlement Agreement, and in light of the circumstances described herein, have concluded that entering into the Settlement Agreement is in their best interest and will maximize the value of the Debtors' estates for the benefit of all the Debtors' constituents." *Id.*

23.     The Debtors also concede that they owe the Cordish Entities for the use of the Marks.  In the Settlement Motion, the Debtors state that "regardless of whether the termination [of the Management Contract] was effective, **the Debtors have been and continue to use the Marks for which PPE would likely be entitled to some compensation.**" *Id.* at ¶ 23 (emphasis added).

24.     "[I]n addition to the economic benefits of entering into the Settlement Agreement," the Debtors acknowledge that they "**would suffer irreparable harm if they were to have their rights to the licensed intellectual property terminated immediately,**" as the

**"trademarks licensed to the Debtors under the Trademark [Contract] are consistently and pervasively used throughout the Debtors' business in connection with the promotion and operation of the Casino."** *Id.* at ¶ 25. (emphasis added).  The Debtors repeatedly emphasize that the Settlement Agreement is a sound exercise of business judgment. *See, e.g., id.* at ¶¶ 20, 24, 26, 27.

25.    Moreover, in their first motion to extend exclusivity, the Debtors explain the Settlement Agreement's extensive benefits to the estates and cite to the Settlement Agreement with the Cordish Entities as one of the main accomplishments achieved in the reorganization. *See Motion of Debtors for an Order Extending Exclusive Periods During Which Debtors May File and Solicit Acceptance of a Plan or Reorganization* [D.I. 315] at ¶ 22 ("The proposed settlement preserves the Debtors' ability to continue to market the Casino, while also investigating opportunities to rebrand or rename the Casino.  The settlement of these claims also eliminates a potential on-going distraction to the Debtors' reorganization efforts and eliminates any uncertainty as to the Debtors' liabilities arising from any alleged misuse or misappropriation of the intellectual property under the Trademark [Contract].").

26.    The two principal groups of secured lenders in this case, Fortress Credit Opportunity Advisors, LLC and its affiliates ("Fortress") and the Ad Hoc Second Lien Committee (the "Committee") objected to the Settlement Agreement shortly after the Settlement Motion was filed (the "Objections").[6]  The substance of the Objections is that the 1.75% of "Gross Gaming Revenue" payments under the Settlement Agreement would exceed a 1.00% cap on management fees to be paid to PPE (the "Management Fee Cap") allegedly in violation of the

---

[6]        Copies of the Objections are attached hereto, and incorporated by reference herein, as Exhibit 4.

indenture agreements (the "Indentures") to which the Debtors are parties.[7]   *See* Exhibit 4, Fortress Objection at 2-3.[8]

27.    The parties were to seek approval of the Settlement Agreement at the August 26, 2011 omnibus hearing date, or such other date that the parties agreed upon.  *See* Settlement Agreement at ¶ 7.   Because the Debtors delayed filing the Settlement Motion until August 23, 2011, it could not be heard on the August 26, 2011 omnibus hearing date.

28.    As a result of the Debtors' stated desire to direct their attention to litigation unrelated to the circumstances described above, the hearing on the Settlement Motion was moved to the October 2011 omnibus hearing date, at the Debtors' request.  Again, the Debtors (through their Chief Restructuring Officer, Mr. Rayburn, and counsel) assured the Cordish Entities that they were committed to the Settlement Agreement and that they would seek from the Court approval of the Settlement Agreement, notwithstanding the Objections, especially in light of the Debtors' view that the Objections were without merit.

29.    Thereafter, the Debtors advised the Cordish Entities that they needed additional time to investigate a state tax issue that could potentially impact the Debtors' ability to proceed with the Settlement Motion.  The Cordish Entities were, yet again, asked to accede and were assured that once the tax matter was resolved in a satisfactory manner, the Debtors would proceed with the Settlement Motion.  The Cordish Entities agreed to provide the Debtors

---

[7]    Counsel for the Debtors represented to the Court at a hearing on September 19, 2011, that the Debtors were going to make a demand on certain insider trusts for contribution to the Debtors' obligations under the Settlement Agreement in an amount in excess of the alleged Management Fee Cap.  In their September 22, 2011 response to the Objections, which the Debtors provided to the Cordish Entities, the Debtors informed Fortress that the demand by the Debtors to the trusts was made, and that by such demand they had satisfied the Fortress Objection.  The Debtors also affirmed their position that the proposed settlement is in their best interest and represents a reasonable exercise of their business judgment.

[8]    PPE is in the process of developing its claim against Fortess and the members of the Ad Hoc Committee for tortious interference for their action in causing the Debtors to breach their contractual obligation to seek court approval of the Settlement Agreement.

sufficient time to investigate and satisfy themselves that the tax claim would not be an issue affecting the Settlement Agreement.

30.     Due to the discovery related to the Objections and, separately, the state tax issue, the Cordish Entities once more agreed, at the request of the Debtors, to continuing the hearing on the Settlement Motion to the November 2011 omnibus hearing date.   The tax issue was subsequently resolved and the Debtors then resumed with the discovery relating to the Objections.   Throughout this entire period, the Cordish Entities relied on representations and assurances from Mr. Rayburn and the Debtors' counsel that, despite the Objections, the Debtors would seek approval of the Settlement Agreement as they were required to do under the Settlement Agreement and the Debtors did not do.

31.     On or about October 21, 2011, notwithstanding their prior representations to the contrary, and the obligation of the Debtors to use reasonable efforts to obtain this Court's approval of the Settlement Agreement, the Debtors and their counsel advised the Cordish Entities that they were repudiating the Settlement Agreement.   On November 3, 2011, the Debtors filed a Notice of Withdrawal of the Settlement Motion.

32.     The Debtors' unilateral withdrawal of the Settlement Motion was improper, *see, e.g., In re Seminole Walls & Ceiling Corp.*, 388 B.R. 386, 396 (M.D. Fla. 2008) (a party to a settlement agreement cannot "unilaterally repudiate his contract . . . after it was submitted to the bankruptcy court for approval"), and a blatant breach of the Debtors' obligation under Paragraph 7 of the Settlement Agreement to seek approval from this Court.

33.     The Cordish Entities relied in good faith, and to their detriment, on the Debtors' continued representations that, notwithstanding the various hurdles previously described, they would nonetheless seek approval of the Settlement Agreement.   As explained above, because of

the Debtors' numerous assurances, the Cordish Entities did not pursue their rights to seek an immediate end to Indiana Downs' use of the Marks or seek allowance of an administrative claim for Indiana Downs' use of the Marks – a claim which the Debtors acknowledge in the Settlement Motion is likely to be granted. *See* Settlement Motion at ¶ 23.

34.     Because the Settlement Motion was withdrawn, the Trademark and Management Motions were ripe (again) for decision. The Debtors, however, on November 11, 2011, unilaterally withdrew the Trademark and Management Motions to prevent the Court from ruling in favor of the Cordish Entities on their Opposition. [D.I. 560, 561]. Moreover, had the hearing proceeded on the Trademark and Management Motions, the circumstances of the Debtors' repudiation of the Settlement Agreement would have been presented to the Court, and the bad faith conduct directed at the Cordish Entities would have been revealed.

35.     In light of the Debtors' repudiation of the Settlement Agreement, which would have provided compensation to the Cordish Entities for the Debtors' use of the Marks, on November 30, 2011, the Cordish Entities sent a letter to counsel for the Debtors, demanding that the Debtors compensate the Cordish Entities at least at the rates to which the parties agreed in the Settlement Agreement (the "Demand Letter").[9]  The Debtors did not respond to the Demand Letter.  In addition to the foregoing liability for the use of the Marks, the Debtors' use of the Marks has caused, and continues to cause, harm and damage to the value of the Marks.  Events have already transpired that have adversely affected the value of the Marks for which the Cordish Entities are entitled to an administrative expense.

---

[9]      A copy of the Demand Letter is attached hereto, and incorporated by reference herein, as Exhibit 5.

III.    **ARGUMENT**

   A.    **THE DEBTOR'S POST-PETITION USE OF THE TRADEMARKS OWNED AND/OR CONTROLLED BY PPE AND LIVEHOLDINGS GENERATED AN ADMINISTRATIVE EXPENSE CLAIM IN FAVOR OF PPE AND LIVEHOLDINGS**

   36.    Section 503 of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") states that "[a]n entity may timely file a request for payment of an administrative expense" and that "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(a), (b)(1)(A). As explained by this Court in *In re Garden Ridge Corp.*, 321 B.R. 669 (Bankr. D. Del. 2005) (Kornreich, J.):

> Generally, courts apply a two-part test in determining whether a claimant is entitled to the payment of administrative expenses: "(1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction." *In re Waste Systems Intern., Inc.,* 280 B.R. 824, 826 (Bankr. D. Del. 2002) (citation omitted); *see also In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527, 532–33 (3d Cir. 1999). The claimant need not prove that the property was put to its highest and best use; instead, the claimant need only show that the property was actually used by the debtor in the ordinary course of business. *In re Continental Airlines, Inc.,* 146 B.R. 520, 527 (Bankr. D. Del. 1992).

*Id.* at 676.

   37.    Thus, a debtor's post-petition use of a licensor's marks entitles the licensor to an administrative expense claim. *See, e.g., In re Shreyas Hospitality, LLC*, No. 09-70523, 2010 Bankr. LEXIS 2074, *12-*13 (Bankr. C.D. Ill. July 15, 2010) (noting that "courts which have considered whether the use of trademarks, service marks, or the other benefits of franchise or licensing agreements by a debtor or trustee may support the allowance of an administrative expense claim have held that such claims should be allowed," and holding that "[c]ontinued use or the opportunity to continue to use all of the benefits of a franchise or licensing agreement provides sufficient value and benefit to an estate to justify the allowance of an administrative

expense claim"); *Meredith Corp. v. Home Interiors & Gifts, Inc. (In re Home Interiors & Gifts, Inc.)*, No. 08-31961-11, 2008 Bankr. LEXIS 2476, (Bankr. N.D. Tex. Oct. 9, 2008) (concluding that the owner of a trademark "is entitled to an allowed administrative expense claim to compensate it for [a debtor's] post-petition 'use' of the . . . Marks."); *In re Beverage Canners Int'l, Corp.*, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000) (holding that the licensor of certain trademarks used by a debtor post-petition – until the underlying contract providing for such use was rejected – was entitled to an administrative expense claim for such use); *In re B-K of Kansas, Inc.*, 99 B.R. 446 (D. Kan. 1989) (holding that the licensor of certain trademarks used by a debtor post-petition was entitled to an administrative expense claim for such use, notwithstanding that the contract providing for such use was terminated pre-petition).

38.    The Debtor's post-petition use of the Marks demonstrates that the Marks are integral to Indiana Downs' business operations.   Indeed, the Debtors have characterized the trademarks at issue as "vital to the maintenance and continued development of the goodwill that is crucial to the Debtors' estates."   Motion to Assume at ¶ 10, [D.I. 26]; *see also* the Settlement Motion at ¶ 23, (trademarks are used consistently and pervasively throughout the Debtors' business and Debtors would be irreparably harmed if they could not use the Marks). [D.I.394]. Accordingly, the two prerequisites for granting an administrative expense claim have been satisfied, *i.e.*, "(1) there must be a post-petition transaction between the creditor and the debtor; and (2) the estate must receive a benefit from the transaction." *Garden Ridge*, 321 B.R. at 676.

## B.    THE AMOUNT OF THE ADMINISTRATIVE EXPENSE CLAIM IS BASED ON THE BENEFIT THAT THE TRADEMARKS PROVIDE TO THE ESTATES

39.    "In the context of executory contracts, a non-debtor party to an executory contract is entitled to administrative expenses equal to the value of any postpetition benefit conferred on the estate prior to assumption or rejection of that contract." *Compass Bank v. N. Am. Petroleum*

*Corp. USA (In re N. Am. Petroleum Corp. USA)*, 445 B.R. 382, (Bankr. D. Del. 2011) (citing

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984) and *In*

*re BCE W., L.P.,* 264 B.R. 578, 584 (9th Cir. B.A.P. 2001)).

40.     In general, "the amount of an administrative expense claim will . . . be calculated

pursuant the parties' underlying contract or agreement." *Id.* at *13; *see also In re DVI, Inc.*, 308

B.R. 703, 708 (Bankr. D. Del. 2004) (Walrath, J.) (stating that, in the context of real property

leases, "[t]here is a presumption" that the value of the non-debtor landlord's administrative claim

is the "lease rate"); *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 174 (Bankr. D. Del. 2002)

(Walrath, J.) (same).

41.     Because the stated terms of an applicable executory contract will not always

inform the amount of a non-debtor's administrative expense claim, courts have acknowledged

that a claimant is entitled to some form of compensation for a debtor's post-petition use of its

property.   For example, in *In re Enron Corp.*, 300 B.R. 201 (Bankr. S.D.N.Y. 2003), the

bankruptcy court recognized that,

> "[I]t undisputable [sic] that a claimant is entitled to a *quantum meruit* recovery for
> benefit conferred post-petition." *In re Ralph Lauren Womenswear, Inc.,* 197 B.R.
> [771,] 776 [(Bankr. S.D.N.Y. 1996)].   If the debtor-in-possession elects to
> continue to receive benefits from another party pending a decision to reject or
> assume a contract, "the debtor-in-possession is obligated to pay for the reasonable
> value of those services which, depending on the circumstances of a particular
> contract, may be what is specified in the contract." [*N.L.R.B. v. Bildisco*, 465
> U.S. 513, 104 S. Ct. 1188 (1984)] (citations omitted).   *See also In re Ralph*
> *Lauren Womenswear, Inc.,* 197 B.R. at 776 (citing *Teamsters Local No. 310 v.*
> *Ingrum (In re Tucson Yellow Cab Co., Inc.),* 789 F.2d 701 (9th Cir. 1986))
> (acknowledging that the Ninth Circuit previously held that a rejected collective
> bargaining agreement was "a fair measure of the value of the services that were
> rendered during the period that the decision to reject or assume the contract was
> pending."); [*Mason v. Official Comm. of Unsecured Creditors for FBI*
> *Distribution Corp. and FBC Distribution Corp. (In re FBI Distribution Corp.),*
> 330 F.3d 36, 44 (1st Cir.2003)] (finding that although an employment agreement
> may be probative of the reasonable value of post-petition services, it is not the
> dispositive measure).

> Recovery in *quantum meruit* is appropriate in order to prevent the unjust enrichment of the party benefited by the work. *In re Chateaugay Corp.,* 139 B.R. 598, 606 (Bankr. S.D.N.Y. 1992). In determining the amount of a *quantum meruit* claim, the court looks not only towards the benefit to the estate, but also to the bargain between the parties and the consideration due the creditor for providing such benefit. *In re Ralph Lauren Womenswear, Inc.,* 197 B.R. at 777.

*Id.* at 218. In the instant case, an allocation of the post-petition revenue attributable to the use of the Marks provides the measure of value for the Debtor's continuing post-petition use of the trademark.

### C.    PPE AND LIVEHOLDINGS ARE ENTITLED TO ADMINISTRATIVE CLAIM FOR THE VALUE OF THE POST-PETITION USE OF TRADEMARKS

42.    There is no dispute that the use of the Marks is critical to Indiana Downs' operations. The above quoted statements from the Motion to Assume and Settlement Motion admit that the Marks are critical to the Debtors' reorganization. Thus, it is undisputed and admitted by the Debtors that the continued use of the trademarks has critical, substantial and significant value to the estates.

43.    The most appropriate means to value the use of the trademarks is to determine the percentage of the Debtor's post-petition revenues attributable to Indiana Downs' use of the Marks. The post-petition casino, food, beverage and retail revenues based on the monthly operating reports since the Petition Date through January 31, 2011 is $188,532,716. [10] The percentage of those revenues attributable to the use of the Marks is 2.7%. Accordingly, through January 31, 2012, the Cordish Entities that are the licensors of the Marks are entitled to an allowed administrative claim of $5,090,383.[11]

---

[10] The revenues for January 2012 are estimates.
[11] The licensors of the Marks are entitled to an administrative expense claim of 2.7% of post petition casino, food, beverage and retail revenue for January and for all subsequent months that Indiana Downs is the debtor-in-possession and uses the Marks.

**D.    PPE AND LIVEHOLDINGS ARE ENTITLED TO AN ADMINISTRATIVE CLAIM FOR POST-PETITION DAMAGES TO THEIR TRADEMARKS**

44.    In addition to being entitled to be compensated for the value of the use of the trademarks, the Cordish Entities are entitled to an administrative claim for the damage done to the Marks arising out of Indiana Downs' continued use of the Marks while it is a debtor in a Chapter 11 proceeding.  If a debtor uses an entity's property for the benefit of the estate and in so doing causes damage to the property, the property owner is entitled to be compensated for that loss as an administrative expense.  *In re Quinn*, 425 B.R. 136, 138 (Bankr. D. Del 2010) (Shannon, J.) ("It is well-settled that a debtor's post-petition, pre-confirmation conduct may give rise to liability of an administrative priority status.").

45.    In *Quinn*, this Court cited to and relied on *Reading Co. v. Brown*, 391 U.S. 471, 88 S. Ct. 1759, 20 L. Ed. 2d 751 (1968).  The *Reading* holding, which is still followed, is that a trustee's operation of a debtor can give rise to an administrative claim for tortious harm to a creditor's collateral.  Although *Quinn* involved a tort claim, the *Reading* case has been expanded beyond the tort context. In *In re Execuair Corp.*, 125 B.R. 600, 603 (Bankr. C.D. Cal. 1991), the Court stated that "*Reading* was used to support the proposition that those injured during the administration of the estate by the trustee are entitled to an administrative priority, even if there was no tort or other wrongdoing." *Id.* (citing *York v. NLRB*, 709 F.2d. 1138 (7th Cir. 1983)).

46.    In *Execuair,* the court allowed as an administrative expense, a creditor's post-petition attorney's fees incurred in litigating a pre-petition contempt judgment with the debtor and the creditors' committee.  The Court stated: "[A] post-petition act by the debtor-in-possession or trustee which was intended to benefit the estate but which led to the injury of a third party . . . qualif[ies] as administrative expenses . . . ." *Id.* at 604.

47.     The Trademark Contract requires that Indiana Downs use the trademarks in a "First Class" manner.  The parties agree that "First Class" shall mean the quality and manner in which the respective owner of the Mark, or the owner's permitted user, uses their Mark for their own services." *Id.* at ¶ 2(c).

48.     In the instant case, *i.e.* the Debtor's continued use of the Marks, particularly the Live! trademark, has caused great harm and damage to the value of the Marks.

49.     The Live! trademark is in use nationwide and is one of the most valuable and recognizable brands in the entertainment and gaming industry.  The Live! trademark is or will be being utilized in approximately seven separate developments, none of which, other than Indiana Downs, is a debtor in a bankruptcy.

50.     The value of an intangible asset such as the Live! trademark depends on reputation and prestige.  The Cordish Company's ability to attract investors for future projects using the Live! trademark and to secure entrepreneurs to utilize the mark depends on continuing confidence in the viability and financial soundness of the ventures and enterprises that have used that mark.

51.     When an entity such as Indiana Downs that has licensed the Marks and is identified with the Marks, files bankruptcy, the value of the Marks, regardless of the reasons for the bankruptcy and the outcome is diminished by the adverse publicity and notoriety of and association with the Debtors' poor performance and bankruptcy case.

52.     The Cordish Company has already lost investors for ongoing projects because of the Live! trademark's association with the Debtor which will be established through competent evidence at a hearing on this Motion.  The damages result from the harm to PPE and LiveHoldings' reputation and status in the industry, which is being damaged by adverse

publicity, and the notoriety of the Debtor's poor performance and bankruptcy case. All of these matters adversely affect the value of all of the licensed trademarks.

53.    The harm suffered by PPE and LiveHoldings after the Petition Date is in the amount of no less than $28.4 million.

## IV.    <u>CONCLUSION</u>

54.    PPE and LiveHoldings are entitled to (1) an administrative expense claim in the amount of $5,090,383 for the Debtors' use of the trademarks through January 31, 2011 and at the rate of 2.7% of casino, food, beverage and retail revenues per month for February 2012 and all subsequent months; and (2) an administrative claim in the amount of no less than $28.4 million to compensate LiveHoldings for the diminution in value of its trademarks.

Dated:  February 23, 2012

Respectfully submitted,

WHITEFORD, TAYLOR & PRESTON L.L.C.

/s/  Thomas J. Francella, Jr.
Thomas J. Francella, Jr. (DE ID 3835)
The Renaissance Centre
405 N. King Street, Suite 500
Wilmington, Delaware 19801
Telephone: (302) 357-3252
Facsimile: (302) 357-3272
tfrancella@wtplaw.com

 - and -

WHITEFORD, TAYLOR & PRESTON L.L.P.

Paul M. Nussbaum, Esquire
Kenneth Oestreicher, Esquire
Kevin G. Hroblak, Esquire
7 Saint Paul Street, Suite 1500
Baltimore, Maryland  21202-1636
Telephone: (410) 347-8700
Facsimile: (410) 223-4305
pnussbaum@wtplaw.com
koestreicher@wtplaw.com
khroblak@wtplaw.com

Counsel for
Power Plant Entertainment Casino Resorts Indiana, LLC
and LiveHoldings!, LLC


Power Plant Entertainment Casino Resorts Indiana, LLC

By:

LiveHoldings! LLC

By:

*1990530*

21