# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INDIANAPOLIS DOWNS, LLC, *et al.*,[1] | Case No. 11-11046 (BLS) |
| Debtors. | Jointly Administered |
| | Proposed Hearing Date: July 17, 2012 at 10:30 a.m.<br>Proposed Objection Deadline: July 16, 2012 at 4:00 p.m. |

### MOTION OF DEBTORS FOR ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105(A), 363, AND 365, FED. R. BANKR. P. 9019 APPROVING THE SETTLEMENT AGREEMENT WITH THE CORDISH ENTITIES

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), move the Court (the "**Motion**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order approving the Settlement Agreement (the "**Settlement Agreement**"), a true and correct copy of which is attached hereto as Exhibit A, by and among Indianapolis Downs, LLC ("**Indiana Downs**"), Power Plant Entertainment Casino Resorts Indiana, LLC and Live!Holdings, LLC (collectively, the "**Cordish Entities**") resolving certain claims and disputes between the Cordish Entities and the Debtors. In support of the Motion, the Debtors respectfully state as follows:

### Jurisdiction, Venue and Predicates for Relief

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1534. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Indianapolis Downs, LLC (5457) and Indianapolis Downs Capital Corp. (3803). The Debtors' address is 4300 N. Michigan Road, Shelbyville, Indiana 46176.

2235865.7

2.      The predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules.

## Background

### A.  The Chapter 11 Case

3.      On April 7, 2011 (the "**Petition Date**"), the Debtors commenced these cases (the "**Cases**") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not been appointed in the Cases.

6.      Indianapolis Downs, LLC ("**Indiana Downs**") and the Cordish Entities are parties to a pre-petition Trademark License Agreement dated January 2008 (the "**Trademark Agreement**"), and Indiana Downs and Power Plant Entertainment Casino Resorts Indiana, LLC ("**PPE**") are parties to a pre-petition Development, Financing and Management Agreement dated September 7, 2007, as amended (the "**Management Agreement**" and together with the Trademark Agreement, the "**Agreements**").

7.      The Trademark Agreement granted Indiana Downs a non-exclusive, royalty-free license to use certain trademarks in connection with the gaming facility.

8.      Pursuant to the Management Agreement, PPE agreed to construct, develop and manage a gaming facility for Indiana Downs. For PPE's development and management of the gaming facility, the Management Agreement provided that PPE would receive a development fee of 7.5% of construction costs and a management fee equal to 4.5% of gross revenues from the gaming facility.

2

2235865.7

9. The Cordish Entities ceased managing the gaming facility in July 2010. On August 12, 2010, the Cordish Entities made a demand for arbitration in connection with certain disputes under the Management Agreement (the "**Arbitration Proceeding**").

10. In the Arbitration Proceeding, the Cordish Entities sought: (i) a declaratory judgment that the Management Agreement had not been terminated; (ii) a determination that Indiana Downs had breached the Management Agreement; and (iii) $10 million in damages from Indiana Downs. Indiana Downs asserted certain counterclaims and defenses against the Cordish Entities.

11. On the Petition Date, the Debtors filed the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Reject the Development, Financing & Management Agreement Between Power Plant Entertainment Casino Resorts Indiana, LLC and Indianapolis Downs, LLC Nunc Pro Tunc as of the Petition Date* [Docket No. 25] (the "**Rejection Motion**") and the *Motion of the Debtors Pursuant to Bankruptcy to Bankruptcy Code Section 365(a) and Bankruptcy Rule 6006 for an Order Authorizing the Debtors to Assume the Trademark License Agreement* [Docket No. 26] (the "**Assumption Motion**").

12. On May 2, 2011, the Cordish Entities filed a proof of claim (the "**Cordish Proof of Claim**") asserting a general unsecured claim of $17,039,07.47 plus additional unliquidated amounts related to, among other things, the Agreements and the use of certain intellectual property against the Debtors, which the Debtors dispute. *See* Docket No. 275.

13. On May 4, 2011, the Cordish Entities filed their *Omnibus Opposition of Power Plant Entertainment Casino Resorts Indiana LLC and Live Holdings!, LLC to (I) Motion of Debtors to Assume the Trademark License Agreement [D.I. 26], and (II) Motion of the Debtors*

*to Reject the Management Contract [D.I. 25]* [Docket No. 158] (the "**Objection**"). The Debtors filed a reply to the Cordish Entities' Objection. *See* Docket No. 244.

14. On February 13, 2012, the Cordish Entities filed their *Motion to Compel Assumption or Rejection of Trademark License Agreement and Management Contract and to Deem Trademark License Agreement and Management Contract Rejected* [Docket No. 796] (the "**Motion to Compel**"). In the Motion to Compel, the Cordish Entities assert that the Court should deem the Agreements rejected as the Cordish Entities do not consent to the Debtors' assumption of the Trademark Agreement.

15. On February 13, 2012, the Cordish Entities also filed the *Motion of Power Plant Entertainment Casino Resorts Indiana, LLC and LiveHoldings!, LLC for Allowance and Payment of Administrative Expenses* [Docket No. 795] (the "**Administrative Claim Motion**") seeking no less than $33 million from the Debtors' estates. Subsequently, on February 23, 2012, the Cordish Entities filed their Request for Payment of Administrative Expense Claim [Docket No. 850] (the "**Administrative Claim Request**").[2]

16. On April 18, 2012, the Debtors filed their *Response of the Debtors to the Motion to Compel Assumption or Rejection of Trademark License Agreement and Management Contract and to Deem Trademark License Agreement and Management Contract Rejected filed by the Cordish Entities* in which they sought to have: (i) the Management Agreement deemed rejected *nunc pro tunc* as of the Petition Date and (ii) the Trademark Agreement deemed rejected *nunc pro tunc* as of May 15, 2012. *See* Docket No. 953.

---

[2] The Cordish Entities filed the Administrative Claim Request to be in formal compliance with the Court's January 23, 2012 administrative bar date order. (Admin. Claim Request at n.2) The Administrative Claim Request is not intended to supersede the Administrative Claim Motion. *Id.*

4

2235865.7

17. On April 18, 2012, the Debtors filed their objection to the Administrative Claim Motion, challenging the administrative expenses sought by the Cordish Entities. *See* Docket No. 954. Subsequently, the parties agreed to multiple scheduling orders, ultimately setting a date for trial on the Administrative Claim Motion and the Motion to Compel beginning on July 18, 2012. *See, e.g.*, Docket No. 1113.

## B. The Settlement Agreement

18. To avoid protracted and expensive litigation, the Debtors and the Cordish Entities engaged in good faith negotiations conducted at arms-length to evaluate settlement opportunities. The parties worked diligently to evaluate various proposals and ultimately agreed to the terms contained in the Settlement Agreement. The Settlement Agreement has been approved by all parties, and each party believes the Settlement Agreement provides a fair and reasonable compromise. The Settlement Agreement is also supported by the Debtors' creditors.

19. The salient terms of the Settlement Agreement are as follows:[3]

**Compromise of the Cordish Proof of Claim**. The Cordish Proof of Claim is deemed allowed as a prepetition unsecured non-priority claim in the amount of $12,000,000.00, inclusive of interest, and disallowed for any amount greater than $12,000,000.00. The Cordish Entities will not assert any other claims, either pre-petition or post-petition, including any rejection damages claims or administrative claims, against the Debtors in the Proceedings, other than claims that may arise from this Settlement Agreement. Further, the Cordish Entities agree to (i) not oppose or object to the confirmation of any plan of reorganization proposed by the Debtors that provides that the Cordish Proof of Claim be treated in the same manner as other general unsecured claims and is otherwise consistent with this Settlement Agreement and (ii) not oppose any sale of all or substantially all of the Debtors' assets in connection with the Proceedings.

**Payment.** The Debtors agree to pay $3,500,000.00 (the "**Payment**") to the Cordish Entities. Within ten (10) business days from the entry of an order approving this Settlement Agreement (the "**First Installment Date**"), the Debtors will pay $2,500,000.00 to the Cordish Entities. The Debtors will pay $250,000.00 weekly to the Cordish Entities beginning on the first Friday after the First Installment Date and each

---

[3] The following only an overview of the significant terms of the Settlement Agreement. If there is any conflict between this overview and the actual terms of the Settlement Agreement, the terms of the Settlement Agreement control.

5

2235865.7

Friday thereafter until Payment is paid in full. The Payment will be completed by August 22, 2012 (the "**Effective Date**"). Interest will accrue on any balance after August 27, 2012 at a rate of ten (10) percent per annum. Upon the Effective Date, the Administrative Claim Motion and the Administrative Claim Request shall be deemed to be withdrawn with prejudice without the need for any further action on the part of the Bankruptcy Court or the Parties. The Cordish Entities shall also file a notice of withdrawal of the Administrative Claim Motion and the Administrative Claim Request within three (3) business days of the Effective Date.

**Rejection of Management and Trademark Agreements.** Upon the Effective Date, and without any need for further action on the part of the Bankruptcy Court or the Parties, (i) the Management Agreement shall be deemed to be rejected as of the Petition Date, and (ii) the Trademark Agreement shall be deemed to be rejected as of the date of this Settlement Agreement. The Motion to Compel shall also be deemed to be withdrawn upon the Effective Date without any need for further action on the part of the Bankruptcy Court or the Parties, and the Cordish Entities shall file a notice of withdrawal of the Motion to Compel within three (3) business days of the Effective Date. For the avoidance of doubt, except as otherwise provided in this Settlement Agreement, the Cordish Entities shall not assert and shall be deemed to have waived any rejection damages claims or administrative claims relating to the Agreements against the Debtors in the Proceedings as a result of the rejection of the Agreements or otherwise.

**Delivery of Letter.** The Debtors agree to deliver to the Cordish Entities a mutually agreed upon letter to be used by the Cordish Entities or any of their respective parents or affiliates for the sole purpose of issues pertaining to the casino formerly known Indiana Live!. Consistent with this paragraph, the letter (a) shall not be used as evidence or for any other purpose in any litigation, including the Baltimore City Litigation (as defined herein), (b) shall not be disclosed by the Cordish Entities to anyone other than in responding to an inquiry with regard to the Cordish Entities' involvement with the casino formerly known as Indiana Live! and (c) shall not be used or disseminated by the Cordish Entities for any purpose other than those set forth herein.

**Dismissal of the Arbitration.** The Parties agree that upon the entry of a non-appealable order of the Bankruptcy Court approving this Settlement Agreement, the Parties will file a dismissal of the Arbitration in its entirety, with each party bearing its own costs.

**Releases by Cordish Entities.** On the Effective Date, and upon the full and complete performance of the obligations identified above, the Cordish Entities, on their own behalf and on behalf of their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives, do hereby fully release, remise and forever discharge (i) the Debtors and their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives and (ii) with respect to the holders of (a) the 11% Senior Secured Notes due 2012 issued by the Debtors and (b) the 15.5% Senior Subordinated Pay-In-Kind Notes due 2013 issued by the Debtors, of and from any and all claims relating to the matters resolved by this Settlement Agreement, whether previously asserted or otherwise,

6

and whether known or unknown, that exist as of the date of this Settlement Agreement. Notwithstanding the foregoing, this Settlement Agreement does not and is not intended to (i) release claims or obligations that may arise under this Settlement Agreement, including the claim asserted by the Cordish Entities against Indiana Downs in the Cordish Proof of Claim, which claim is deemed allowed as a pre-petition unsecured non-priority claim in the amount of $12,000,000.00 pursuant to Section 1(a) of this Settlement Agreement, or (ii) release, compromise or affect the rights, claims and defenses asserted in the action filed in the Circuit Court for Baltimore City, Maryland and styled as Power Plant Entertainment Casino Resort Indiana, LLC v. Mangano, et al., Case No. 24-C-11001014, wherever such rights, claims, and defenses are pursued, transferred to, or brought, and regardless of whether the claims, rights, and defenses are maintained in Baltimore City or proceed in another venue (the "**Baltimore City Litigation**") or (iii) release personal claims the Cordiidsh Entities may have against the Oliver Estate, LLC, Oliver Racing, LLC, Troon & Co., J. Oliver Cunningham Trust, Jane C. Warriner Trust, Anne C. McClure Trust and Ross Mangano . The Cordish Entities also agree that they will not add the Debtors as a party to the Baltimore City Litigation. Nothing contained herein shall be deemed a waiver or release of any rights that the Cordish Entities (or any affiliate thereof) have as a holder of i) 11% Senior Secured Notes due 2012 and ii) 15.5% Senior Subordinated Pay-In-Kind Notes due 2013 issued by the Debtors as more fully described in this paragraph.

**Settlement Agreement Not Evidence**. None of the Parties to this Settlement Agreement may use this Settlement Agreement, or any action taken or statement made in connection with this Settlement Agreement, as evidence or for any purpose whatsoever in the Baltimore City Litigation, including but not limited to establishing waiver, collateral estoppel or release of claims.

**Releases by Debtors**. On the Effective Date and upon the full and complete performance of the obligations identified above, the Debtors, on their own behalf and on behalf of their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives, do hereby fully release, remise and forever discharge the Cordish Entities and their officers, directors, shareholders, members, employees, divisions, parents, subsidiaries, affiliates, heirs, assigns, beneficiaries, successors, agents, attorneys, and representatives of and from any and all claims relating to the matters resolved by this Settlement Agreement, whether previously asserted or otherwise, and whether known or unknown, that exist as of the date of this Settlement Agreement. Notwithstanding the foregoing, this Settlement Agreement does not and is not intended to (a) (i) release claims or obligations that may arise under this Settlement Agreement; or (ii) release, compromise or affect the rights, claims and defenses asserted in the Baltimore City Litigation or (b) release any claims that are personal claims of Oliver Estate, LLC, Oliver Racing, LLC, Troon & Co., J. Oliver Cunningham Trust, Jane C. Warriner Trust, Anne C. McClure Trust and Ross Mangano.

2235865.7

## Relief Requested

20. By this Motion, the Debtors request the entry of an order, pursuant to Bankruptcy Rule 9019, approving the Settlement Agreement.

### A. Applicable Authority to Approve the Settlement Agreement

21. "Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1) (2012). Additionally, Bankruptcy Code section 105(a) allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." *Id.* § 105(a).

22. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease." *Id.* 365(a). Section 365 of the Bankruptcy Code does not provide a standard for determining whether a court should approve a debtor's decision to assume or reject an executory contract. Rather, courts apply the business judgment test in reviewing a debtor's decision to assume or reject an executory contract. *See In re Fed. Mogul Global, Inc. T&N Ltd.*, 293 B.R. 124, 126 (D. Del. 2003) ("In general, motions to reject executory contracts are evaluated under the business judgment test"); *In re Vencor, Inc.*, No. 99–3199 (MFW), 2003 WL 21026737, *3 (Bankr. D. Del. Apr. 30, 2003) (in reviewing a debtor's decision to assume or reject an executory contract, the court "should examine [the] contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it").

23. Courts generally do not second guess a debtor's business judgment concerning the assumption of an executory contract or unexpired lease. *See Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047-48 (4th Cir. 1985); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001); *In re Health Science Prods., Inc.*, 191 B.R. 895, 909

8

2235865.7


n.15 (Bankr. N.D. Ala. 1995) ("The issue thereby presented for determination by the bankruptcy court is whether the decision of the debtor is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim, or caprice.").

24. "Section 363(b) of the Code seems on its face to confer upon the bankruptcy judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary course of business, of property of the estate." *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2d Cir. 1983); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

25. Additionally, under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order that is in the interest of preserving or protecting the value of a debtors' assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *see also Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy ... is that equitable principles govern"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

26. Bankruptcy Rule 9019 authorizes the Court to approve settlements. *See* FED. R. BANKR. P. 9019(a) (2012) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."). The standard for approval is well settled and

2235865.7

requires the Court to inquire into the reasonableness of the proposed settlement. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interest of the debtor's estate. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996); *In re Marvel Entm't Group, Inc.*, 22 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.").

27.     The Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Martin*, 91 F.3d at 393; *see also id.* ("To minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy.'" (quoting 9 COLLIER ON BANKRUPTCY, ¶ 9019.03[1] (15th ed. 1993)). To do so, bankruptcy courts typically weigh the following factors, enunciated in *Martin*: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors. *Id.*; *see Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *see also Protective Comm. for Indep. Stockholders of TMT*, 309 U.S. at 424-25 (stating courts should consider the above factors in determining whether to approve settlements under the former Bankruptcy Act); *Depoister v. Mary M Holloway Found*, 36 F.3d 582, 587 (7th Cir. 1994) (affirming an order approving a compromise and settlement of claims against the estate where it was "unlikely" that the debtor would succeed on the claims, litigation of the claims would involve considerable expense and the claimant would withdraw all claims upon approval of the settlement). A court need not determine each legal and factual issue raised; rather, a court

should "canvas the issues" and reject a settlement only if it "fall[s] below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (*quoting Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

## B.  The Settlement Agreement Meets the Applicable Standards

28.   The Debtors, in the exercise of their sound business judgment, have determined that the Settlement Agreement is reasonable and in the best interests of their estates and submit that the Settlement Agreement satisfies the standards set forth above. The Debtors have carefully considered and analyzed the terms of the Settlement Agreement, and in light of the circumstances described above, have concluded that entering into the Settlement Agreement is in their best interest and will maximize the value of the Debtors' estates for the benefit of all the Debtors' constituents.

29.   The Settlement Agreement resolves the Cordish Entities' Administrative Expense Claim, which was originally asserted at approximately $33 million. Through the Debtors' efforts in challenging, and ultimately settling, the Administrative Expense Claim, the Debtors have obtained an agreement from the Cordish Entities to reduce the Administrative Claim to $3.5 million, roughly 10% of the original amount asserted against the Debtors' estates. Thus, the Debtors have preserved significant value for their estates by obtaining the Settlement Agreement and reducing the Administrative Expense Claim.

30.   Furthermore, by entering into the Settlement Agreement, the Debtors avoid the uncertainty and expense of a protracted litigation with the Cordish Entities. While the Debtors believe they have a strong case against the Cordish Entities, the ultimate outcome of this litigation is unknown. Indeed, the Debtors and the Cordish Entities engaged respectable experts who concluded differently on the issues for trial, thus illustrating the uncertainty of this litigation.

11

31. Moreover, the need for further pre-trial practice and, ultimately, a trial on these issues would only increase the expenses and demands placed on the Debtors' estates, dissipating valuable assets. In fact, the parties have revised the schedule for this litigation on three occasions, further extending litigation, delaying trial and increasing costs. Therefore, the Settlement Agreement saves the Debtors' estates significant uncertainty, time and expense by resolving the Administrative Expense Claim and Motion to Compel.

32. Additionally, in its demand for arbitration, the Cordish Entities allege, among other things, that (i) the Debtors' attempts to terminate the Management Agreement were without force and effect because they did not comply with the notice and cure provisions contained therein, (ii) the Debtors directly interfered with the day-to-day operations of PPE at the Debtors' facilities, causing irreparable harm to PPE by damaging its reputation, creating operational chaos, and damaging its relationships with state licensing authorities, and (iii) the Debtors materially defaulted under the Management Agreement by failing to pay the management fee and by wrongfully and intentionally interfering with PPE's exclusive management right. The Debtors asserted counterclaims against Cordish Entities in the arbitration. Accordingly, significant litigation risk exists for both parties in the arbitration that is avoided by entered into the Settlement Agreement.

33. The Cordish Entities also filed a proof of claim in the Cases, asserting an unsecured claim in an amount of $17,039,027.47 on account of amounts alleged to be past due under the Agreements as of the Petition Date, plus additional unliquidated amounts related to, among other things, the Debtors' alleged defamation and reputational harm to the Cordish Entities in an undetermined amount. The Debtors dispute the Cordish Entities' allegations.

2235865.7

34. It is undisputed that the Debtors used the Marks (as set forth in and defined in the Trademark Agreement) into 2012 for which the Cordish Entities may claim to be entitled to some compensation, although the parties differ greatly on the amount of such compensation. Moreover, continued litigation of all of the issues between the Cordish Entities and the Debtors would be costly and time consuming.

35. Accordingly, avoiding potential liability significantly in excess of the amounts proposed to be paid under the Settlement Agreement represents a sound business purpose for entering into the Settlement Agreement. The Settlement Agreement caps the Debtors' potential liability at a level that is significantly lower than what would be owed if the Cordish Entities were able to succeed on their Administrative Expense Claim. Further, the Settlement Agreement resolves all litigation between the Debtors and the Cordish Entities, including the arbitration, and contemplates treating the full allowed amount of the Cordish Entities' claim as a general unsecured claim, thus avoiding the risk of liability for an administrative expense claim that would be entitled to a higher priority in distribution.

36. The settlement of the potential disputed liability for fair and reasonable consideration is the best and most efficient means of allowing the Debtors to work towards the development and formulation of a plan of reorganization that will allow them to successfully emerge from these Cases and to maximize value for the benefit of the estates and their various constituencies. The Debtors intend to solicit support for a plan of reorganization in the upcoming months. Doing so requires the cooperation of the Debtors' constituents, and the Cordish Entities' cooperation in the plan process is contingent upon the approval of the terms of the Settlement Agreement. Moreover, eliminating the distractions associated with the ongoing disputes with the Cordish Entities will allow the Debtors to focus their energy on the

2235865.7

confirmation of a chapter 11 plan of reorganization. Accordingly, the Debtors submit that the Settlement Agreement should be approved because it is supported by a solid business justification.

37.  In light of the foregoing, the Debtors submit that the relief requested herein is necessary to the Debtors' ability to continue to implement its business plan and grow its business, unhampered by disputed liabilities that, if liquidated, would significantly impact the Debtors' balance sheet. Accordingly, the Debtors request approval of the Settlement Agreement because their decision to enter into the settlement embodied therein is supported by a sound business purpose.

38.  Finally, in order to permit prompt resolution of this matter, the Debtors also seek a waiver of the fourteen-day stay of the order imposed under Bankruptcy Rule 6004(h).

### Notice

39.  Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) counsel to Wells Fargo Bank, N.A., as administrative agent to the Debtors' prepetition secured lenders and post-petition secured lenders; (c) counsel to the ad hoc committee of holders of the 11% Senior Secured Notes due 2012; (d) counsel to Fortress Investment Group LLC, as a holder of 15'A% Senior Subordinated Secured Pay-In Kind Notes due 2013; (e) counsel to Oliver Racing, LLC, Troon & Co., Anne C. McLure Trust, Jane C. Warriner Trust, J. Oliver Cunningham Trust and Ross J. Mangano; (f) counsel to The Bank of New York Trust Company, N.A., as trustee and collateral agent for the holders of the 11% Senior Secured Notes due 2012; (g) counsel to Wilmington Trust Company, as trustee and collateral agent for holders of the 151/2% Senior Subordinated Secured Pay-In Kind Notes due 2013; (h) creditors holding the twenty (20) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (i) the Office of the

2235865.7

United States Attorney General for the District of Delaware; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Indiana Gaming Commission; and (m) the Indiana Horse Racing Commission. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested in this Motion and such other and further relief as the Court deems just and proper.

Dated: July 3, 2012
Wilmington, Delaware

Respectfully submitted,

**POLSINELLI SHUGHART**

*/s/ Christopher A. Ward*
Christopher A. Ward (Bar No. 3877)
Shanti M. Katona (Bar No. 5352)
Jarrett Vine (Bar No. 5400)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921

- and -

Jeffrey H. Kass (*Admitted Pro Hac Vice*)
1515 Wynkoop Street, Suite 600
Denver, Colorado 80202
Telephone: (303) 572-9300
Facsimile: (303) 572-7883

- and -

Keith J. Grady (*Admitted Pro Hac Vice*)
100 S. Fourth Street, Suite 1000
St. Louis, Missouri 63102
Telephone: (314) 889-8000
Facsimile: (314) 231-1776

*Special Conflicts Counsel for the Debtors*

2235865.7