# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

**Indianapolis Downs, LLC.,**
*et al*.
                    Debtors.[1]

Chapter 11

Case No. 11-11046 (BLS)

(Jointly Administered)

| | |
|---|---|
| Dennis A. Meloro, Esq.<br>Greenberg Traurig<br>The Nemours Building<br>1007 N. Orange Street<br>Wilmington, DE  19801 | Thomas M. Horan, Esq.<br>Womble Carlyle<br> Sandridge & Rice, LLP<br>222 Delaware Avenue,<br>Wilmington, DE  19801 |
| and | and |
| Nancy A. Mitchell, Esq.<br>David D. Cleary, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>New York, NY  10166 | Brian L. Shaw, Esq.<br>Shaw Gussis Fishman<br> Wolfson & Towbin LLC<br>321 N. Clark Street<br>Chicago, IL  60654 |
| *Counsel to the Debtors* | *Counsel to Oliver Parties* |
| David W. Carickhoff, Esq.<br>Blank Rome LLP<br>1201 Market Street<br>Suite 800<br>Wilmington, DE  19801 | Matthew Lunn, Esq.<br>Young Conaway Stargatt<br> & Taylor, LLP<br>1000 N. King Street<br>Wilmington, DE  19801 |
| and | and |
| Scott L. Alberino, Esq.<br>Akin Gump Strauss<br> Hauer & Feld LLP<br>1333 New Hampshire Ave., N.W.<br>Washington, DC  20036-1564 | Kristopher Hansen, Esq.<br>Stroock & Stroock & Lavan<br>180 Maiden Lane<br>New York, NY  10038 |
| *Counsel to the Ad Hoc Second*<br> *Lien Committee* | *Counsel to Fortress Investment*<br> *Group LLC* |

---

[1]        The Debtors in these jointly administered Chapter 11 cases are Indianapolis Downs, LLC and Indiana Downs Capital Corp.

# MEMORANDUM OPINION[2]

Before the Court is the request of Indianapolis Downs, LLC and Indiana Capital Corp. (collectively, the "Debtors") for confirmation of their Modified Second Amended Joint Plan of Reorganization (the "Plan") [Docket No. 1480]. Confirmation is opposed by the Oliver Parties,[3] who include senior management and holders of equity and debt instruments of the Debtors, and by the United States Trustee. In addition, the Restructuring Support Parties (as defined and identified *infra*), while strongly supporting confirmation of the Plan, object to certain releases contained in the Plan.

As a threshold matter, also before the Court is the Oliver Parties' motion to designate (the "Motion to Designate") [Docket No. 1286] and thus disregard the votes of any creditors that executed a post-petition (but pre-disclosure statement) restructuring support agreement with the Debtors. For the reasons that follow, the Court will deny the Oliver Parties' Motion to Designate, overrule the remaining objections to the Plan, and confirm the Plan.

## I. BACKGROUND

The Debtors operate a combined horse racing track and casino—a "racino"—in Shelbyville, Indiana. They employ over 1,000 people and provide patrons a wealth of wagering and entertainment options. In addition to betting on horse racing, visitors to the racino can try their luck at roughly 2,000 electronic wagering games, including slot machines.

On April 7, 2011 (the "Petition Date"), the Debtors filed voluntary Chapter 11 petitions in this Court. The Debtors are operating and managing their business as debtors-in-possession pursuant to Bank-

---

[2]    This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[3]    The Oliver Parties consist of Ross J. Mangano, both individually and as the trustee of the Jane C. Warriner Trust dated February 26, 1971, the J. Oliver Cunningham Trust dated February 26, 1971, and the Anne C. McClure Trust dated February 26, 1971, Troon & Co., John C. Warriner, Oliver Estate, LLC ("OE") and Oliver Racing, LLC.

ruptcy Code §§ 1107 and 1108. No official committee has been appointed in these cases.

The Debtors entered bankruptcy with substantial secured indebtedness. The Debtors' filings reflect outstanding first priority secured indebtedness (as of the Petition Date) in excess of $98 million. Second lien debt, secured and junior only to the first lien debt, was in the amount of $375 million, plus accrued interest and fees. A group of holders of the second lien debt (the "Ad Hoc Second Lien Committee") was organized and participated actively in this matter, both before and after the Petition Date. Finally, the Debtors also issued third lien debt, with approximately $78 million (plus accrued interest) of such obligations outstanding as of the Petition Date. The Court is advised that Fortress Investment Group, LLC ("Fortress") holds a substantial portion of the third lien debt (and second lien debt as well), and has actively participated in these proceedings both pre- and post-petition. The second and third lien obligations are guaranteed by all of the Debtors and are secured by substantially all of the Debtors' assets.

The record reflects that the Debtors struggled to service their debt obligations described above, and in late 2010 the Debtors failed to make a required interest payment due to holders of the second lien debt. The record further reflects that Fortress, the Ad Hoc Second Lien Committee and the Debtors' equity owners made formal and informal restructuring proposals to resolve the Debtors' financial distress. None of these pre-bankruptcy negotiations succeeded in resolving the Debtors' looming crisis. Faced with the impending expiration of a forbearance period, the Debtors commenced these cases in hopes of brokering a comprehensive financial restructuring under the protection of Chapter 11.

**The Restructuring Support Agreement**

Following months of negotiations and occasional litigation, the Debtors, Fortress and the Ad Hoc Second Lien Committee ultimately achieved consensus on a process that provided for a "parallel path" approach to the Debtors' reorganization. The parties agreed on a plan that contemplated that the Debtors would test the market to determine

whether bids would be made for their assets at a sufficiently high level that their major creditor constituents would support a sale.  As an alternative simultaneous approach, these parties agreed that if the marketing effort failed to produce adequate offers, then the plan would permit the Debtors to proceed with a recapitalization.  This "parallel path" approach was embodied in a Restructuring Support Agreement dated April 25, 2012 (the "RSA") [Docket No. 976].

The RSA provides for (i) specific terms of the dual track plan of reorganization described above, including the financial terms of, and creditor treatment under, a potential sale or in the recapitalization transaction; (ii) the requirement that the Debtors propose a plan of reorganization within a time frame set in the RSA; (iii) a prohibition upon any party to the RSA proposing, supporting or voting for a competing plan of reorganization, and (iv) the requirement (enforceable by an order of specific performance) that parties to the RSA vote "yes" for a plan that complies with the RSA.  Under its terms, the RSA was binding upon execution by its non-Debtor signatories (basically Fortress and the members of the Ad Hoc Second Lien Committee).  The RSA would become binding upon the Debtors only upon approval by the Court of a disclosure statement.

The RSA was filed with the Court on April 25, 2012, immediately after it was executed [Docket No. 976].  The Debtors also filed a proposed Disclosure Statement and accompanying Plan on April 25, 2012 [Docket Nos. 974 and 975].  The RSA was described at length in the Debtors' proposed Disclosure Statement.

After a hearing held on June 21, 2012, the Court approved the Debtors' Disclosure Statement over the objection of the Oliver Parties. The Debtors' marketing effort ultimately proved successful, culminating in a bid from Centaur LLC ("Centaur") for the purchase of substantially all of the Debtors' assets for a price of $500,000,001.  No superior competing bids were received, and the Debtors proceeded forward with a combined hearing to request approval of the sale to Centaur, and confirmation of the Plan which is predicated upon that sale.

The Court held that combined hearing on October 19 and 22, 2012.  At the confirmation hearing, the Court heard and considered tes-

timony from six live witnesses, and collectively admitted into evidence over 200 exhibits from the Debtors and the Oliver Parties.

By Order dated October 31, 2012 [Docket No. 1546], the Court approved the sale of substantially all of the Debtors' assets to Centaur and overruled the Oliver Parties' objections relating to the sale. The Court's understanding is that the sale transaction is proceeding forward to closing, subject to receipt of various regulatory approvals needed by Centaur from the State of Indiana.

With the approval of the sale, the parties await a decision regarding confirmation of the Plan and the pending objections. This is the Court's ruling.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Motion to Designate constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O). Consideration of the request for confirmation of the Plan constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## III.    DISCUSSION

### A.    The Motion to Designate

#### 1.    The Parties' Positions

The Oliver Parties contend that the RSA constituted a wrongful post-petition solicitation of votes on a plan prior to Court approval of a disclosure statement. As a remedy, the Oliver Parties request that the ballots of the parties to the RSA not be counted pursuant to Bankruptcy Code §§ 1125(g) and 1126(e). The result of such designation would be that the Debtors would lack sufficient votes to win confirmation of their Plan.

The Debtors and the Restructuring Support Parties, by contrast, dispute that developing and executing the RSA is a "solicitation" within the meaning of §§ 1125 and 1126. These parties point the Court to case law narrowly defining what constitutes solicitation. They also note that the RSA itself explicitly states that it is not intended to be a

solicitation of a plan.  RSA at § 6.  Further, the Restructuring Support Parties argue that designation of votes is a rare and extreme sanction, which here would have the effect of disregarding ballots cast by the overwhelming majority of these Debtors' creditors in support of the Plan.

###    2.    Analysis

The Court starts as always with applicable provisions of the Bankruptcy Code and Rules.  The structure and timeline for the Chapter 11 plan process is well known:  a debtor enjoys a limited exclusive period to develop and formulate a plan of reorganization.  11 U.S.C. § 1121(b).  When that plan is filed with the Court, it is accompanied by a disclosure statement that is intended to provide stakeholders with "adequate information" to permit a creditor them an informed decision to vote for or against a proposed plan.  The statutory scheme for solicitation is laid out in detail in Bankruptcy Code §§ 1125 and 1126:

> (b)  An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).  Section 1126 goes on to articulate a potential consequence of failing to comply with § 1125(b), or a sanction for conduct found to be in bad faith:

> (e)  On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or re-

> jection of such plan was not in good faith, or
> was not solicited or procured in good faith
> or *in accordance with the provisions of this title.*

11 U.S.C. § 1126(e) (emphasis added).  It is the Court's understanding that the Oliver Parties are not contending that the Restructuring Support Parties have acted in bad faith.  Rather, the Motion to Designate is premised on the final prong of § 1125(e), and the Oliver Parties' contention that the votes of the Restructuring Support Parties were not obtained "in accordance with the provisions of" Title 11.

The seminal case is this Circuit construing solicitation and the designation of votes is *In re Century Glove*, 860 F.2d 94 (3d Cir. 1988).  In that case, the debtor filed a plan and disclosure statement; one of its major creditors, First American Bank ("FAB"), presented an alternative plan to the creditors' committee in hopes of garnering that body's support.  *Id.* at 95.  The committee decided to support the debtor's plan, and the bankruptcy court later approved the debtor's disclosure statement and permitted solicitation of votes on the plan.

Shortly thereafter, counsel for FAB directly contacted several large creditors "to find out what these creditors thought of the proposed reorganization, and to convince them to vote against the plan." *Id.*  FAB later shared a copy of its proposed competing plan, marked "draft."  *Id.* Ultimately, FAB and several of the creditors it contacted voted to reject the debtor's plan; the debtor sought to designate their votes, arguing that "FAB has acted in bad faith in procuring these rejections."  *Id.* at 96.

The bankruptcy court granted the motion to designate, finding that FAB had violated Bankruptcy Code § 1125(b) when it circulated materials (*viz.*, its draft plan) that were not part of the court-approved disclosure and solicitation package.  The district court reversed the bankruptcy court's designation of ballots, on the dual grounds that (i) FAB's circulation of the draft plan did not constitute bad faith and (ii) FAB's actions were more accurately characterized as "negotiations" rather than as a "solicitation" of votes.  *Id.* at 97.

The Third Circuit affirmed the district court's ruling, holding that "solicitation must be read narrowly.  A broad reading of § 1125 can seriously inhibit free creditor negotiations."  *Id.* at 101.  The court also rejected the debtor's contention that only court-approved statements could or should be communicated to creditors.  *Id.* 100-101.

The Debtors and the Restructuring Support Parties rely on Chief Judge Houser's comprehensive opinion *In re Heritage Organization, L.L.C.*, 376 B.R. 783 (Bankr. N.D. Tex. 2007).  In that case, "after years of litigation," a Chapter 11 trustee and certain major creditors entered into a term sheet embodying key economic terms of a plan; the conforming plan was thereafter filed, and objecting creditors moved to designate the votes of the parties to the term sheet.  *Id.* at 787.  Citing to *Century Glove*, the court found that the term "solicitation" should be construed very narrowly, in deference to a clear legislative policy encouraging negotiations among creditors and stakeholders in Chapter 11 cases.  *Id.* at 792-93.

The court in *Heritage* placed special emphasis on the fact that the creditors who signed the term sheet ultimately were co-proponents of the plan:

> [I]f a creditor believes that it has sufficient information about the case and the available alternatives to jointly propose Chapter 11 plan with another entity (whether than co-proponent is another creditor, the debtor, or a trustee (who also believes that it has sufficient information)), it is absurd to think that the signing of a term sheet by those parties (that contains the material terms of their to-be-filed joint plan and states that the co-proponent creditor(s) will vote for their agreed upon joint plan) is an improper solicitation of votes in accordance with § 1125(b).

*Id.* at 791.    While the Restructuring Support Parties are not co-proponents of the Debtors' Plan, given their significant respective stakes in the Debtors and the Court's own observation of these parties' involvement in these proceedings, precisely the same considerations pertain here as those found persuasive by the court in *Heritage*.

The Oliver Parties place significant weight on a pair of orders entered by this Court a decade ago in the context of two pre-packaged bankruptcy cases. *See In re Stations Holdings Co., Inc.*, Case No. 02-10882 (MFW) (Bankr. D. Del. 2002) (Order dated September 30, 2002) [Docket No. 177]; *In re NII Holdings., Inc.*, Case No.  02-11505 (Bankr. D. Del. 2002) (Order dated October 25, 2002) [Docket No. 367].  In these two cases, it appears that the Court designated votes of creditors that were received by the debtor after the filing of the bankruptcy petition.  Noting first that (as far as the Court can tell) these two pre-packaged cases present a markedly different factual and procedural context than the case at bar,[4] the Court further observes that the two-page orders entered in those cases do not contain any legal analysis and, consistent with this Court's practice, are of only the most limited (if any) precedential value.

The Court finds the analysis and reasoning in *Heritage* dispositive.  Congress intended that creditors have the opportunity to negotiate with debtors and amongst each other; to the extent that those negotiations bear fruit, a narrow construction of "solicitation" affords these parties the opportunity to memorialize their agreements in a way that allows a Chapter 11 case to move forward.

Designation of votes in this case would be demonstrably inconsistent with the purposes of the Bankruptcy Code for at least two reasons.  First, creditor suffrage is a bedrock component of Chapter 11; it would indeed be anomalous, in the absence of a showing of bad faith or wrongful conduct, to discount or ignore the votes of the overwhelming majority of the creditors and stakeholders, and thereby deny confirmation of a Plan that has been laboriously (and expensively) developed and has won broad support.

---

[4]       At a minimum, there was no question in those cases that the act in question was a "solicitation" of a specific ballot relating to a filed plan.

Second, and perhaps more to the point, the interests that § 1125 and the disclosure requirements are intended to protect are not at material risk in this case. The Code's robust disclosure requirements were designed to end the "undesirable practice . . . of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests." *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999) (internal quotation marks omitted). The Restructuring Support Parties, by contrast, are all sophisticated financial players and have been represented by able and experienced professionals throughout these proceedings. It would grossly elevate form over substance to contend that § 1125(b) requires designation of their votes because they should have been afforded the chance to review a court-approved disclosure statement prior to making or supporting a deal with the Debtor. *Accord Heritage*, 376 B.R. at 794 ("[T]he entities whose votes are targeted . . . cannot seriously be characterized as too ill-informed to act capably in their own interests."); *In re Gilbert*, 104 B.R. 206, 215 (Bankr. W.D. Mo. 1989) (declining to designate vote of sophisticated creditor).

Courts have consistently held that the right of creditors to vote on a plan is a critical feature of Chapter 11, and the party seeking to disallow a vote bears a heavy burden. *In re Kovalchick*, 175 B.R. 863, 875 (Bankr. E.D. Pa. 1994); *see also,* 7 Collier on Bankruptcy ¶ 1126.06 (16th ed. 2009). Judge Gerber succinctly captured the standard:

> A right to vote on a plan is a fundamental right of creditors under Chapter 11. Designation of a creditor's vote is a drastic remedy, and, as a result, designation of votes is the exception, not the rule. The party seeking to have a vote disallowed has a heavy burden of proof.

*In re Adelphia Communications Corp.,* 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006).

The decision whether to designate a creditor's ballot is within the sound discretion of the Court, and requires a factual inquiry on a case-by-case basis.  *See Heritage*, 376 B.R. at 794-95; *Adelphia*, 359 B.R. at 60, 63.  In situations where creditors have acted with the apparent goal of furthering their own self-interest and maximizing their recoveries, courts have been extremely reluctant to penalize such parties through designation.  *Id.* at 63 (Creditors' activities, "while distasteful and heavy handed, are . . . sufficiently tied to maximizing creditor recoveries, that I should not disenfranchise creditors from their statutory rights."); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 844-45 (Bankr. S.D.N.Y. 1995).

Applying these principles, the record clearly reflects that the Restructuring Support Parties were acting at all times to maximize their own recoveries and to advance the Debtors' reorganization process to facilitate a prompt and substantial return on their respective claims.  Designation of their votes is neither required nor warranted under these circumstances.

The Oliver Parties place special emphasis upon §§ 3 and 13 of the RSA, which require the Restructuring Support Parties to vote in favor of a conforming plan, and provide for the remedy of specific performance.  The Court finds that these provisions of the RSA are not dispositive of the question of designation.  As noted, the record reflects that sophisticated parties negotiated a deal and memorialized that deal in the RSA; predictably, it contained a commitment to vote for a plan that embodied that deal.  In the absence of such a provision, it does not appear that the parties would have had a deal.  Negotiation and formulation of a plan in a large, complex Chapter 11 case such as this one is not a hypothetical exercise.  Each party to the RSA wanted, and needed, to know that their agreement would be memorialized in a plan that enjoyed substantial creditor support.  In the event the Debtors' proposed Plan differed materially from what was contemplated by the Restructuring Support Parties, obviously they would not be obliged to vote for it.  But if the Plan as filed conformed to the heavily-negotiated RSA, the parties were entitled to demand and rely upon assurances that accepting votes would be cast by the parties thereto.

The Court finds that this case presents circumstances similar to those in *In re Kellogg Square Partnership*, 160 B.R. 336 (Bankr. D. Minn. 1993). In that case, the debtor entered into an agreement (prior to filing of a plan or approval of a disclosure statement) that provided for treatment of a creditor's claim and a commitment by the creditor to vote for a plan that was consistent with the agreement. *Id.* at 339. The court in *Kellogg* declined to designate the creditor's vote, finding that "the act by which the Debtor solicited [the vote] must be deemed to have taken place after the Court approved the amended disclosure statement, and only when the Debtor's plan and disclosure statement and ballot were actually presented." *Id.* at 340 (internal quotation mark omitted). Likewise in this case, the Restructuring Support Parties' commitment to vote was limited to a plan conforming to the RSA, after Court approval of an appropriate and conforming disclosure statement.

In summary, the Court observes that the filing of a Chapter 11 petition is an invitation to negotiate. Congress has carefully calibrated the Chapter 11 process—using the automatic stay, exclusivity, the right of secured creditors to adequate protection and a host of other statutory provisions—to provide stakeholders with leverage or bargaining chips to advance their respective agendas. The purpose, at bottom, is to permit parties to have a voice and to make their own economic decisions. Each case requires an analysis into its particular facts and circumstances to permit a court to determine whether there is material risk to the important interests sought to be protected by the Bankruptcy Code's disclosure requirements. But consistent with the holding in *Century Glove*, courts must be chary of construing those disclosure and solicitation provisions in a way that chills or hamstrings the negotiation process that is at the heart of Chapter 11. When a deal is negotiated in good faith between a debtor and sophisticated parties, and that arrangement is memorialized a written commitment and promptly disclosed, § 1126 will not automatically require designation of the votes of the participants. The Motion to Designate is denied.

**B.      Confirmation Objections**

In addition to the issues relating to the RSA discussed in detail above, the Oliver Parties and the United States Trustee have raised certain substantive objections to confirmation of the Plan.  The parties have briefed these objections, and presented testimony, exhibits and argument on these points at the Confirmation Hearing.  As is the often the case, in the lead-up to the Confirmation Hearing, the Debtors provided technical modifications to the Plan, or offered clarifications in their other submissions, that were responsive to some objections.  The record reflects that the remaining objections of consequence relate to (i) feasibility; (ii) payment of the fees and expenses of professionals engaged by parties to the RSA; (iii) the administrative claims cap; (iv) whether the Debtors have the requisite corporate authority to propose the Plan; and (v) the scope and appropriateness of releases and exculpations contained in the Plan.[5]  The Court will address each of the objections in turn.

**1.      Feasibility**

The Oliver Parties contend that the Plan is not feasible because transactions contemplated under the Plan are conditioned upon receipt of regulatory approvals and licensing by the Indiana Gaming Commission and the Indiana Horse Racing Commission.  As discussed above, the Plan is built around the sale of the Debtors' business to Centaur.  If the necessary approvals are not obtained, that transaction will fail and the Plan will likewise fail.  The uncertainty of receipt of those approvals dooms the Plan, according to the Oliver Parties.

Pursuant to § 1129(a)(11) of the Bankruptcy Code, a court may confirm a plan of reorganization if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).    As discussed in detail below, however, § 1129(a)(11) does not require a guarantee of the plan's success; rather the

---

[5]      In addition to the objections of the Oliver Parties and the United States Trustee, the Restructuring Support Parties filed a limited objection to the Plan to the extent that the Debtors are providing releases to the Oliver Parties.

proper standard is whether the plan offers a "reasonable assurance" of success.  *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (holding that a plan may be feasible although its success is not guaranteed); *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 476 (Bankr. S.D. Ohio 1994) (to establish feasibility, "a [plan] proponent must demonstrate that its plan offers a reasonable prospect of success and is workable") (internal quotation marks omitted).

The purpose of the feasibility test is to protect against visionary or speculative plans.  Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure will not defeat feasibility.  The first, best indicator of feasibility is the position of the creditors whose economic interests are at stake.  The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the Court than any expert report or accountant's projections.  Courts have identified a number of other factors relevant to evaluating the feasibility of a proposed plan of reorganization, including (a) the prospective earnings or earning power of the debtor's business; (b) the soundness and adequacy of the capital structure and working capital for the debtor's post-confirmation business; (c) the debtor's ability to meet its capital expenditure requirements; (d) economic conditions; (e) the ability of management and the likelihood that current management will continue; and (f) any other material factors that would affect the successful implementation of the plan.  *See, e.g., In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988).

As noted, the Oliver Parties contend that the closing of the sale to Centaur, which is the centerpiece of the Plan and provides a half-billion dollars of proceeds, is uncertain due to the need for regulatory approvals.  If those approvals are not obtained, the sale will fall through and the Plan cannot be consummated.

It is not at all unusual for consummation of a Chapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals. *See, e.g., In re Tribune*, 464 B.R. 126,

185 (Bankr. D. Del. 2011).  Rather, the plan proponent bears the burden of demonstrating that achieving the necessary approvals is not subject to "material hurdles" or readily anticipated, significant obstacles.  *Id.* at 185 (finding plan feasible notwithstanding FCC licensing conditions); *In re TCI 2 Holdings, LLC,* 428 B.R. 117 (Bankr. D.N.J. 2010) (overruling feasibility objection relating to prospect of issuance of gaming license in casino case).

In the present case, the Court finds that the Debtors have carried their burden regarding feasibility.  The entity requiring regulatory approvals in this case is Centaur; the record reflects that Centaur already operates the only other racino in Indiana and has been duly licensed to do so.  Further, in approving the sale to Centaur, the Court has already made necessary findings regarding Centaur's ability to close the transaction, which is similarly predicated upon regulatory approvals.  *See* Sale Order dated October 31, 2012 [Docket No.  1546].  But beyond the evidence presented in the sale hearing—which  was adequate for its purpose—there  are also readily apparent and practical considerations that give the Court confidence that there is a reasonable assurance of success:  Centaur is already in this business in the State of Indiana, and has thus already successfully gone through the licensing process.  It has committed half a billion dollars to this deal.  Absent compelling evidence to the contrary, it is almost inconceivable that Centaur, the Debtors and the other stakeholders in these cases would have headed down this path unless they were confident that the necessary licenses and approvals would be obtained.

The Debtors have demonstrated that the Plan is feasible, that the necessary approvals are reasonably likely to be obtained, and that the Plan is not likely to be followed by the need for further financial reorganization.  The objection on grounds of feasibility is overruled.

### 2.    Administrative Claims Cap and Priority Tax Cap

The United States Trustee and the Oliver Parties object to the Plan provisions that they contend operate to "cap" the Debtors' obligations on account of administrative claims and priority tax claims.  Specifically, Article IX of the Plan provides that, as conditions precedent to

confirmation and the Effective Date of the Plan, the estimated Allowed Administrative Claims and the estimated Allowed Priority Tax Claims shall not exceed the Administrative Claims Cap and the Priority Tax Claim Cap, respectively.   Subject to certain conditions, the Plan provides that Administrative Claims Cap means "(i) $12.0 million if a Sale Transaction is consummated and (ii) $9.5 million otherwise . . . ." Plan § 1.8.  The Priority Tax Claim Cap means $6.5 million.  *Id.* § 1.33.  Out of a fair concern that these Plan provisions could be read to limit or reduce the statutory rights of priority claimants to payment, the United States and the Oliver Parties have argued that these sections are at odds with the Bankruptcy Code and render the Plan unconfirmable.

Pursuant to § 1129(a)(9)(A) of the Bankruptcy Code, a plan must provide holders of administrative expense claims with "cash equal to the allowed amount of such claim."  11 U.S.C. § 1129(a)(9)(A).  Similarly, the holders of priority tax claims must receive cash totaling the allowed amount of their claim either on the effective date of the plan or over a period of five years from the petition date.   11 U.S.C. § 1129(a)(9)(C)(i)-(ii).  The Plan appears to provide for treatment consistent with these statutory requirements:  pursuant to § 3.01(a) of the Plan, each Holder of an Allowed Administrative Claim "shall receive, in full and complete settlement, release and discharge of such Claim, payment in full in Cash . . . ."  Plan § 3.01(a).  Likewise, § 3.01(b) of the Plan provides that each Holder of an Allowed Priority Tax Claim shall receive "Cash in the amount equal to such Allowed Priority Tax Claim . . . ."  *Id.* § 3.01(b).

The record developed at trial makes it clear that these "caps" do not serve to limit priority claimants' rights to payment or to relieve the Debtors' obligation to pay.  These "caps"—perhaps  an unfortunate and inaccurate term in this context—are   conditions to confirmation and represent a post-confirmation budgeting and financial projection exercise by the Debtors and their stakeholders.  As the Debtors acknowledged in their submissions and at the Confirmation Hearing, if claims exceed these caps, the Plan cannot become effective absent either a waiver or proper treatment of holders of Administrative Claims and Allowed Priority Tax Claims consistent with their statutory rights.

Thus, these provisions do not adversely affect priority claimants, and objections on these grounds are overruled.

     **3.**      **Payment of Advisors to the Restructuring Support Parties**

     The Plan provides for payment of the legal and professional fees of the Restructuring Support Parties, including Fortress.  Specifically, the Plan provides as follows:

> On the Effective Date, in full and complete settlement, release and discharge of their Allowed Administrative Claims pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, the Debtors or the Reorganized Debtors shall promptly indefeasibly pay in full in Cash (pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise) all reasonable and documented fees, out-of-pocket costs, expenses, disbursements and charges incurred by the Restructuring Support Advisors in connection with the Chapter 11 Cases up to and including the Effective Date that have not previously been paid
> . . . .

Plan § 12.02

     The Oliver Parties object to payment of these fees and expenses on several grounds.  First, they contend that the Restructuring Support Parties, as holders of Second Lien and Third Lien debt, are under-secured and thus not statutorily entitled to payment of fees and expenses under Bankruptcy Code 506(b).  Second, the Oliver Parties challenge the Debtors' contention that the professional fees are permissible under Bankruptcy Code § 503(b).  Finally, they contend that the Plan provides for payments in derogation of Bankruptcy Code

§ 1123(a)(4)'s requirement that each member of the same class receive the "same treatment".

In response, the Debtors note that the payment of professional fees proposed here is not to be made under Code § 506(b), and thus, there is no requirement of a showing that the recipients are over-secured. Further, the Debtors contend that the Restructuring Support Parties have made a "substantial contribution" to these cases, such that the fees and expenses are entitled to priority treatment and payment under § 503(b). The Debtors next contend that the final financing order has already been approved by this Court. Finally, as discussed in detail below, the Debtors submit that the payment of fees and expenses at issue here is not being made on account of the Restructuring Support Parties' claim, but are independent of those claims, so that there is no disparate treatment of Class members.

The Court finds as a threshold proposition that the payments contemplated hereby have been previously authorized under the Final DIP financing order (the "Final DIP Order") [Docket No. 139] entered at the onset of these cases. Payment of these fees and costs was authorized under ¶ 19(d) of the Final DIP Order, and the record reflects that monthly invoices have been submitted and paid pursuant to that Order.

Equally important, the Court finds that the fees and expenses are allowable pursuant to Bankruptcy Code § 503(b). Section 503(b)(1)(A) provides that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A). In determining whether a claim is entitled to administrative status, courts generally apply a two-part test: "(1) the expense must have arisen from a post-petition transaction between the creditor and the debtor, and (2) the expense must have been 'actual and necessary' to preserve the estate." *In re New Century TRS Holdings, Inc.*, 446 B.R. 656, 661 (Bankr. D. Del. 2011) (citing *In re Unidigital, Inc.*, 262 B.R. 283, 288 (Bankr. D. Del. 2001) and *In re DBSI, Inc.*, 407 B.R. 159, 165 (Bankr. D. Del. 2009)).

In the present case, the Debtors note that the consent of the Restructuring Support Parties at the onset of these cases made possible the use of cash collateral and post-petition financing.  Further, in the absence of an official committee appointed in these cases, the Debtors contend that the Restructuring Support Parties performed a central role in the formulation of the confirmable Plan and to otherwise keep these proceedings moving forward.  Allowance of the fees and expenses under § 503(b) is supported by the record in these proceedings and by the Court's own observations that, in the absence of the laboriously negotiated resolution built into the RSA and the Plan, these cases would either have either dragged on (expensively) for many more months or devolved (much more expensively) into ferocious litigation between and among the Debtors and their stakeholders.  Accordingly, the Court finds that the Debtors have carried their burden to demonstrate that payment of the professional fees and expenses of the Restructuring Support Parties is permissible pursuant to Bankruptcy Code § 503(b).

The Oliver Parties' further opposition, on grounds of disparate treatment of Class 4 claims, fails upon close examination.  Both Fortress and the Oliver Parties hold claims in Class 4.  The Plan provides, at § 3.03, for treatment of Class 4 claims; whatever Fortress gets on account of its Class 4 claims, the Oliver Parties will likewise receive.  However, the Court does not accept the Oliver Parties' contention that payment of Fortress' professional fees and expenses – admittedly a substantial sum – represents an enhanced distribution on account of Fortress' Class 4 claim.  Rather, as discussed above, all Class 4 claimants will get what they get for their respect Class 4 claims under the Plan.  These payments will occur under the imprimatur of the Final DIP Order and § 503; there is therefore no violation of § 1123(a)(4), and the Oliver Parties' objection to payment of these professional fees and expenses is overruled.

### 4.    Corporate Authority

The Oliver Parties complain that the Debtors have excluded them from the formulation and proposal of the Plan.  Given that certain

of the Oliver Parties are, *inter alia*, holders of the Debtors' equity interests and occupy a substantial management role, they contend that such exclusion means the Plan has been proposed without proper corporate authority.  As discussed in detail below, the Court finds the Debtors have demonstrated that, in fact, they did and do possess appropriate authorization to file and prosecute the Plan.

It is axiomatic that the commencement of a Chapter 11 case does not suspend or displace non-bankruptcy law and contractual rights regarding corporate governance.  *See Manville Corp. v. Equity Holders Comm. (In re Johns-Manville Corp.), (*2d Cir. 1986) (stating that shareholders' right to govern their corporation is "a prerogative ordinarily uncompromised by reorganization").  The record developed in these cases reflects that the Special Committee of Indianapolis Downs (the "Special Committee") was formed pursuant to the First Amendment to the Fourth Amended and Restated Operating Agreement of Indianapolis Downs, LLC, dated September 9, 2011 (the "First Amendment"), which was duly executed by certain of the Oliver Parties.  As set forth in the First Amendment, the Special Committee was tasked with:

> (i) the exclusive power and authority to investigate, analyze and/or deliberate upon, all COI Matters; and (ii) the exclusive power and authority to make such determinations and take such actions, or cause the Company to take such actions, as the Special Committee deems necessary, appropriate, desirable or advisable with respect to all COI Matters.

As used in the First Amendment, "COI Matters" means:

> actions, transactions, determinations or decisions relating to or to be addressed by the Company that give rise to, or are reasonably

likely to give rise to a conflict of interest between the Company, its other members and its creditors, on the one hand, and any Member owning at least 50% Common Percentage Interest, and/or such Member's respective Affiliates, on the other hand, including . . .

> (iii) actions, transactions, determinations or decisions regarding a chapter 11 plan process, to the extent that any Member owning at least a 50% Common Percentage Interest, and any Member owning at least a 50% Preferred Percentage Interest, and/or such Member's respective Affiliates make any plan or similar proposal in such plan process.

Where members, officers or directors may have a personal stake in transactions contemplated by a corporation, sound practice encourages the recusal of those parties from the corporation's deliberations. The record reflects that, consistent with their fiduciary duties and principles of good stewardship, certain of the Oliver Parties executed the First Amendment to create the Special Committee with broad powers to deliberate and to act in matters where a Member (as defined in the First Amendment and which includes some of the Oliver Parties) was likely to "make any plan or similar proposal in such plan process."

As noted, the Plan contemplated a "parallel path" that would have permitted a sale in the first instance and a restructuring if no adequate offers were received.  The record reflects that some or all of the Oliver Parties were expected to participate in the bidding process and

thus, they properly handed their decision-making authority in respect of that sale process to the Special Committee.

The Court finds that the Debtors have complied with the applicable corporate governance requirements under their animating agreements. The Plan has been properly filed and prosecuted to confirmation, and the Oliver Parties' objection in this regard is overruled.

### 5.   Releases and Exculpations

The Oliver Parties, the United States Trustee, and the Restructuring Support Parties have objected to the release provisions contained in XI of the Plan. The United States Trustee, the Oliver Parties and the Restructuring Support Parties have each opposed the releases by the Debtors (the "Debtors' Releases"), the Releases by the Holders of Claim and Interests (the "Third Party Releases", and together with the Debtors' Releases, the "Releases"), and the exculpation provision (the "Exculpation") set forth in § XI of the Plan. The U.S. Trustee argues that the Third-Party Releases are too expansive because they apply to certain parties that could not be released under applicable law. The Restructuring Support Parties claim that the Oliver Parties should not be released under the Debtors' Releases. The Oliver Parties argue that the Third-Party Releases are improper because they are non-consensual and thus impermissible under applicable law.

### A.   The Debtors' Releases

The Restructuring Support Parties have objected to those Releases to the extent they cover and benefit the Oliver Parties. The Court's analysis will focus first on the appropriateness of the Debtors' proposed release of the Oliver Parties. With respect to the Debtors' Releases, courts in this district have applied a five-factor test:

> 1. An identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

2. Substantial contribution by the non-debtor of assets to the reorganization;

3. The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

4. An agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class of classes "overwhelmingly" votes to accept the plan; and

5. A provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999) (quoting *In re Master Mortgage Inv. Fund Inc.*, 168 B.R. at 930, 937 (Bankr. W.D. Mo. 1994)).  These factors are neither exclusive nor are they a list of conjunctive requirements.  *See, e.g., Washington Mut. Inc.,* 442 B.R. 314, 346 (Bankr. D. Del. 2011).  Instead, they are helpful in weighing the equities of the particular case after a fact-specific review.  *Master Mortgage,* 168 B.R. at 935.

The first *Zenith* factor requires "an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." *In re Spansion, Inc.,* 426 B.R. 114, n. 47 (Bankr. D. Del. 2010) (citing I*n re Zenith Elecs. Corp.,* 241 B.R. at 110).  An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release.  *See In re Washington Mut., Inc.,* 442 B.R. at 347 (recognizing that indemnification may create an identity of interest thereby satisfying the first factor of *Zenith*).  The record reflects that the Debtors' organizational documents require the Debtors to indemnify the Oliver Releasees and each of the Oliver Releasees has asserted indemnification claims against the Debtors' estates.  Therefore, the first *Zenith* factor is satisfied with respect to the Oliver Releases.

Likewise, the second *Zenith* factor, which examines whether the non-debtor party benefitting from the release has made a substantial contribution to the debtor's reorganization, is also satisfied.  *In re Con-*

~ 23 ~

*goleum Corp.*, 362 B.R. 167, 193 (Bankr. D.N.J. 2007). The record reflects that Mr. Mangano has continued performing services for the Debtors post-petition without receiving compensation. The record further reflects that the remaining Oliver Releasees have contributed materially by allowing Mr. Mangano to continue performing such services for the Debtors.

The third and fifth *Zenith* factors are not met here, but the record does reflect overwhelming creditor voting in support of the Plan overall, thereby satisfying the fourth prong. Weighing each of these facts in the context of these cases, the Court finds the Debtors have carried their burden and the Oliver Releases will be approved.

### B.    The Third Party Releases are Consensual

The Oliver Parties contend that the Plan contains a non-consensual third party release provision that violates section 524(e) of the Bankruptcy Code and renders the Plan unconfirmable. *See* Oliver Parties Objection, ¶¶ 21-22. The United States Trustee similarly argues that the third party release provision in the Plan is "overbroad, over-inclusive, and impermissible" under applicable law. *See* UST Objection, ¶ 19.9. The Debtors respond that the third party release provision is consensual and entirely appropriate under a contract theory. *See, e.g., In re Washington Mut. Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (To be enforceable, "any such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan).") (citation omitted).

As a threshold matter, the Court finds that the Oliver Parties lack the requisite standing to object to the third party release provision in the Plan. In the context of a confirmation hearing, creditors "have standing *only* to challenge those parts of a reorganization plan that affect their direct interests." *In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989) (emphasis added) (citation omitted) (noting that certain limited parties of a debtor who objected to plan confirmation on various grounds, including a voluntary release provision contained in the plan, were not adversely affected by the provision since the objecting partners had not tendered the voluntary releases*); In re*

*Johns-Manville Corp.*, 68 B.R. 618, 623 (S.D.N.Y. 1986) ("[N]o party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation.").

Here, each of the Oliver Parties has (1) been deemed to reject the Plan by virtue of its status as an out-of-the-money creditor not receiving a distribution (*see* 11 U.S.C. § 1126(g)) and is therefore not subject to the release provisions, or (2) voted to reject the Plan and indicated that it will not grant the third party releases by marking the appropriate box in its Ballot, thereby affirmatively opting-out of the release provision. Accordingly, the third party release does not affect any of the Oliver Parties' direct interests, given that they are not releasing any Released Parties. As a result, the Oliver Parties lack standing to object to the third party releases and their objection in this regard is overruled.

Turning to the objection of the United States Trustee, careful review of the Plan reflects that the third party release provisions apply to holders of Claims who (i) affirmatively vote to accept or reject the Plan and do not opt out of granting the releases, (ii) are unimpaired pursuant to the Plan and therefore deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (iii) abstain from voting on the Plan and who do not otherwise submit a Ballot indicating their desire to opt out of the releases. *See* Plan § 11.01(c). As set forth above, the third party release provision does not apply to any party that is deemed to reject the Plan or any party who opts out of granting the releases by checking the appropriate box on the Ballots.

Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected. *See In re Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of plan); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010)) (recognizing that "[c]ourts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan").

The United States Trustee offers the *Washington Mutual* decision as support for the proposition that a third party release is unenforceable absent affirmative consent. In *Washington Mutual*, the plan as origi-

nally drafted contained a release of all "Released Parties" by non-
debtor third parties who were creditors or shareholders. *In re Washing-
ton Mut. Inc.*, 442 B.R. at 351. That provision allowed third parties (who
were entitled to vote on the plan) to opt out of granting that release by
checking a box on their ballot. *Id.* Notwithstanding that option, how-
ever, the plan provided that because the releases were essential to the
Global Settlement, even parties who thought they were opting out of
the releases by checking the box on their ballot would be bound by the
releases and would receive whatever distributions the Plan afforded
their class. *Id.* The court held that "the original language in the Plan
that would mandate third party releases even in the place of an indica-
tion on the ballot that the party did not wish to grant the release would
not pass muster." *Id.* at 352 (citation omitted). Subsequent changes to
the Plan intended to remedy these defects were rejected by the Court as
internally inconsistent with other Plan provisions. *Id.*

As noted, the Plan here provides that those who fail to opt out,
or to vote, are "deemed" to consent to the Third Party Release. The
United States Trustee contends that the Third Party Release is unenfor-
ceable without affirmative consent. Nevertheless, case law teaches that
no such hard and fast rule applies. For example, the court in *Spansion*
held that returning a ballot is not essential to demonstrating consent to
a release. *See In re Spansion, Inc.*, 426 B.R. at 144 (finding that a release
was not overreaching to the extent it bound unimpaired classes deemed
to accept the plan since those creditors were being paid in full and had
received adequate consideration of the release). That court also noted
that no creditor or interest holder whose rights were affected by the
"deemed" acceptance language objected to the plan, and that "the si-
lence of the unimpaired classes on this issue is persuasive." *Id.*

Courts in other jurisdictions have similarly taken a more flexible
approach in evaluating whether a third party release was consensual,
finding that even impaired creditors who abstained from voting on a
plan and did not otherwise opt out were nevertheless bound. *See In re
DBSD N. Am., Inc.*, 419 B.R. 179, at 218-19 (S.D.N.Y. 2009) (determining
that adequate notice of the proposed release was given to impaired
creditors, and the ballots set forth the effect of abstaining without opt-

ing out of the release);  *see also In re Conseco, Inc.*, 301 B.R. 525, 528
(Bankr. N.D. Ill. 2003) (finding a release provision binding impaired
creditors who abstained from voting on the plan and did not otherwise
opt out to be consensual).

In this case, the third party releases in question bind certain un-
impaired creditors who are deemed to accept the Plan:  these creditors
are being paid in full and have therefore received consideration for the
releases.  As for those impaired creditors who abstained from voting on
the Plan, or who voted to reject the Plan and did not otherwise opt out
of the releases, the record reflects these parties were provided detailed
instructions on how to opt out, and had the opportunity to do so by
marking their ballots.  Under these circumstances, the Third Party Re-
leases may be properly characterized as consensual and will be ap-
proved.

### C.    The Exculpations are Appropriate

The Exculpations under the Plan as modified and filed with the
Court are limited so as to apply only to estate fiduciaries.  The Third
Circuit has held that "a creditors' committee, its members, and estate
professionals may be exculpated under a plan for their actions in the
bankruptcy case except for willful misconduct or gross negligence."  *In
re Washington Mut., Inc.,* 442 B.R. at 350 (citing *In re PWS Holding Corp.,*
228 F.3d 224, 246 (3d Cir. 2000)).  The *Washington Mutual* court deter-
mined that exculpation clauses should be limited to fiduciaries who
have served during the chapter 11 proceedings:  estate professionals,
committees and their members, and the debtors' directors and officers.
*Id.* at 350-51.  The Plan's exculpation provisions are consistent with ap-
plicable law and will be approved.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies the Oliver Parties' Motion to Designate.  The Court overrules the remaining objections[6] and will confirm the Plan.  Counsel shall confer and promptly submit a confirmation order consistent with the Court's ruling.

BY THE COURT:

Dated: January 31, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[6]    Those objections  not expressly addressed by the Court in this Opinion are hereby overruled.