IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**ID Liquidation One, LLC,** *et al*.<br>Debtors. | Chapter 11<br><br>Case No. 11-11046 (BLS)<br><br>(Jointly Administered)<br><br>Related to Docket Nos. 1740, 1849, & 1871 |

| | |
|---|---|
| Dennis A. Meloro, Esq.<br>Greenberg Traurig<br>The Nemours Building<br>1007 N. Orange Street<br>Wilmington, DE 19801<br><br>and<br><br>Nancy A. Mitchell, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>New York, NY 10166<br><br>*Counsel to the Debtors*<br><br>David W. Carickhoff, Esq.<br>Blank Rome LLP<br>1201 Market Street<br>Wilmington, DE 19801<br><br>and<br><br>Scott L. Alberino, Esq.<br>Akin Gump Strauss Hauer & Feld LLP<br>1333 New Hampshire Ave., NW<br>Washington, DC 20036<br><br>*Counsel to the Ad Hoc Second Lien Committee* | Thomas M. Horan, Esq.<br>Womble Carlyle Sandridge & Rice, LLP<br>222 Delaware Avenue<br>Wilmington, DE 19801<br><br>and<br><br>Brian L. Shaw, Esq.<br>Shaw Gussis Fishman Glantz Wolfson & Towbin LLC<br>321 N. Clark Street<br>Chicago, IL 60654<br><br>*Counsel to the Oliver Parties*<br><br>Matthew B. Lunn, Esq.<br>Young Conaway Stargatt & Taylor, LLP<br>1000 N. King Street<br>Wilmington, DE 19801<br><br>and<br><br>Kristopher M. Hansen, Esq.<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038<br><br>*Counsel to Fortress Credit Opportunities Advisors LLC* |

# OPINION[1]

Before the Court is the motion of the Oliver Parties[2] to allow and compel payment of an administrative expense (the "Motion") [Docket No. 1849]. The post-confirmation debtors in this case are ID Liquidation One, LLC (f/k/a Indianapolis Downs, LLC) and ID Liquidation Two, Inc. (f/k/a Indiana Downs Capital Corp.)[3] (collectively referred to hereinafter as the "Debtors" or "Indianapolis Downs"). The Oliver Parties seek allowance and payment of an administrative expense in the amount of $3.85 million on account of post-petition management services, principally provided by Ross J. Mangano in his role as CEO of Indianapolis Downs, pursuant to the terms of the 2010 Consulting and Credit Enhancement Agreement (the "2010 Agreement").[4] Fortress Credit Opportunities Advisors LLC and the Ad Hoc Second Lien Committee (collectively, the "Objectors") oppose the Motion.

The Objectors argue that the payment terms of the 2010 Agreement should not govern because the contract was not fairly negotiated but rather was an insider agreement signed solely by Mangano for both sides. The Objectors also argue that the contract rate under the 2010 Agreement is not rationally related to the actual value of the services provided, and that Mangano's role was limited to that of a non-executive chairman. For the reasons that follow, the Court will grant the Motion. The Court finds that the Oliver Parties provided valuable post-petition management services, namely the contributions of Mangano as CEO. However, the Court also finds that the compensation rate provided in the 2010 Agreement does not govern determination and allowance of the Oliver Parties' administrative expense claim. The

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] The Oliver Parties consist of Ross J. Mangano, as the trustee of the Jane C. Warriner Trust dated February 26, 1971; the J. Oliver Cunningham Trust dated February 26, 1971; and the Anne C. McClure Trust dated February 26, 1971; and Troon & Co.

[3] Indiana Downs Capital Corp. was formed solely to serve as co-issuer and guarantor of Indianapolis Downs' securities.

[4] Oliver Parties' Ex. 6; Objectors' Ex. 3.

Court will allow an administrative expense claim in favor of the Oliver Parties in the amount of $3.04 million.[5]

## I. BACKGROUND

### A. General Background

The Debtors filed voluntary Chapter 11 petitions on April 7, 2011 (the "Petition Date"). Prior to bankruptcy and up until the sale of their assets on February 20, 2013, the Debtors operated a "racino," a combined horse racing track and casino, in Shelbyville, Indiana. The racino employed over 1,000 people and provided patrons a variety of wagering and entertainment options. The track opened in December 2002 and offered live racing seven months out of the year. The casino opened in 2008 and offered roughly 2,000 electronic wagering games, including slot machines.

The Debtors' business was subject to extensive regulation by the State of Indiana. Both the Indiana Gaming Commission and the Indiana Horse Racing Commission (collectively, the "Commissions") had regulatory authority over the racino, including licensing power. The electronic wagering games were available at Indianapolis Downs thanks to a 2007 Indiana law (as codified at Ind. Code. § 4-35-1-1 *et seq.* (2013)) that extended the privilege of operating slot machines beyond riverboat casinos to the state's horse racing tracks. Under the statute, two tracks may be licensed to run racinos, and up until the sale of its assets, Indianapolis Downs was one of them.

### B. The Oliver Parties, the Debtors, and Mangano

A brief overview of the connections among the Oliver Parties, the Debtors, and Mangano may be helpful. The Oliver Parties consist of various entities created to manage the wealth of the Oliver family.[6] The family money is invested in a variety of different investments, active and passive.[7] Mangano testified that most of the investments are pas-

---

[5] As discussed below, this amount is derived from an annualized compensation rate of $1.62 million.
[6] 9/11/2013 Tr. at 40. Citations to "[date] Tr. at [page]" are to the hearing transcripts.
[7] 9/11/2013 Tr. at 47-48.

~ 3 ~

sive and Indianapolis Downs was the only active investment.[8] Mangano himself has worked for the family since 1971.[9]

As listed above, the Oliver Parties for purposes of this opinion are the Jane C. Warriner Trust dated February 26, 1971; the J. Oliver Cunningham Trust dated February 26, 1971; and the Anne C. McClure Trust dated February 26, 1971 (collectively, the "Trusts"); and Troon & Co. ("Troon"). Troon is an Indiana partnership formed by the Trusts, and the primary purpose of Troon is to serve as a nominee to enable the Trusts to conduct business as a single entity. Mangano serves as co-trustee for each of the Trusts, and is also a partner of Troon.

Together, the Trusts held majority ownership of the Debtors. Oliver Racing, LLC ("Oliver Racing") is a limited liability company whose principal members are the Trusts. Prior to the asset sale, Oliver Racing held a 95.39% interest in Indianapolis Downs. The remaining interests were held by John S. Warriner (3.07%) and Mangano (1.54%). Mangano served as a manager of Oliver Racing.

Another related entity is Oliver Estate, Inc. ("Oliver Estate"), an Indiana corporation whose shareholders are the Trusts. Oliver Estate manages the business interests owned by the Trusts and the Oliver family. Mangano is the president of Oliver Estate. Oliver Estate has three full-time employees: an administrative assistant, a business advisor, and an accountant.

While retaining his title as Chairman of the Board of Managers and CEO of Indianapolis Downs during the bankruptcy, Mangano also continued to work on behalf of the Oliver Parties' equity interests. A Special Committee of the Board of Managers of Indianapolis Downs was formed in September 2011 to handle conflicts of interest between the Debtors and the Oliver Parties, and Mangano was not a member of that Special Committee.

**C. History of Payments to the Oliver Parties**

Since the race track opened its doors in 2002, the Oliver Parties have provided both services and financial accommodations to support the business. At one point, the Trusts had a financing agreement with

---

[8] 9/11/2013 Tr. at 48.
[9] 9/11/2013 Tr. at 43.

Indianapolis Downs that provided for an annual credit enhancement fee equal to 3% of the value of securities pledged as collateral by the Trusts on behalf of the Indianapolis Downs. Due to repayment of the underlying debt in August 2007, the credit enhancement fee arrangement expired at that time.

However, the Debtors' annual report for the period ending December 31, 2008[10] reflected that a credit enhancement fee of $250,000 was paid that year to the Oliver Parties even though the financing agreement no longer provided for it. In 2009, Troon loaned the Debtors additional funds. Indianapolis Downs issued four (4) demand promissory notes to Troon (the "Troon Notes")[11] in the first half of 2009: (1) an April 30, 2009, note for $4,200,000; (2) a May 15, 2009, note for $11,350,000; (3) a June 25, 2009, note for $9,700,000; and (4) a June 29, 2009, note for $3,100,000. Each of the Troon Notes carried an 8% interest rate. Under indentures with senior secured lenders, dated October 30, 2007 (the "Indentures"),[12] however, no payment of principal or interest could be made on the Troon Notes while the senior notes were outstanding.

In 2009, a number of payments were made to Troon by the Debtors, totaling $1.8 million: 1) $200,000 on June 29; 2) $184,701.36 on June 30; 3) $634,378.09 on September 25; and 4) $780,920.55 on December 17.[13] After the first three payments were made but before the fourth one, a Consulting and Credit Enhancement Agreement was executed on December 3, 2009 (the "2009 Agreement").[14] The 2009 Agreement provided that the Debtors would compensate the Oliver Parties $1.8 million annually for consulting and credit enhancement services for a period of five years. Mangano signed the 2009 Agreement on behalf of both the Oliver Parties and Indianapolis Downs. The $1.8 million in payments was disclosed in the Debtors' annual report as a credit enhancement fee.[15]

---

[10] Objectors' Ex. 7.
[11] Objectors' Ex. 14.
[12] Objectors' Ex. 11, 12.
[13] *See* Objectors' Ex. 5; 9/11/13 Tr. at 186-88.
[14] Oliver Parties' Ex. 4; Objectors' Ex. 1.
[15] *See* Objectors' Ex. 8 at 29.

In November 2010, the 2010 Agreement replaced the 2009 Agreement. It provided that the Debtors would compensate the Oliver Parties $2.2 million annually for a period of five years. Mangano again signed the 2010 Agreement on behalf of both the Oliver Parties and Indianapolis Downs. The $2.2 million paid by the Debtors to Troon in 2010 was disclosed in the Debtors' annual report as a consulting and credit enhancement fee.[16]

The day before the Debtors filed bankruptcy, the Oliver Parties executed a letter to Indianapolis Downs (the "Compensation Notice")[17] indicating that the Oliver Parties would continue to provide services in the year 2011. The Compensation Notice stated that these services would include the executive management functions of Mangano and that the Oliver Parties would continue to be compensated at the rate of $2.2 million. Mangano signed the Compensation Notice on behalf of both the Oliver Parties and Indianapolis Downs.

**D. The Objectors' Suit and Subsequent Stipulation**

Early in the bankruptcy process, on July 22, 2011, the Objectors filed a complaint against Indianapolis Downs and the Oliver Parties. [Adv. Proc. No. 11-52758, Adv. Docket No. 1]. They sought a declaration that payment of the credit enhancement fees by the Debtors violated section 363(b)(1) of the Bankruptcy Code and requested an order enjoining, on a permanent basis, Indianapolis Downs from making any payments to Troon or the Oliver Parties for consulting, credit enhancement, or other services. Before trial, the parties to the suit entered into a stipulation to preserve the status quo and remove the need for continued litigation during the Chapter 11 case. Specifically, the parties agreed to stay the adversary proceeding, and further agreed that no payment would be made under either the 2010 Agreement or the Compensation Notice until twenty (20) days following confirmation of a plan of reorganization.

The Court entered the Stipulation and Order Staying Adversary Proceeding No. 11-52758 on October 31, 2011. [Adv. Docket No. 59]. The Order indicated that it did not operate as an assumption or rejec-

---

[16] *See* Objectors' Ex. 9 at 30.
[17] Oliver Parties' Ex. 10; Objectors' Ex. 4.

tion of the 2010 Agreement, and as noted, the parties reserved their rights with respect thereto. The practical effect of the stipulation was to provide that Mangano and the Oliver Parties would continue to provide services to the Debtors (including Mangano continuing to serve as CEO) without current payment or compensation. Mangano and the Oliver Parties reserved their rights to seek payment in full for such services, and the Debtors and the Objectors reserved their rights to contest such a request.

### E. Sale of Assets to Centaur

The Debtors filed a proposed Disclosure Statement and accompanying Plan on April 25, 2012. [Docket Nos. 974 and 975]. After a hearing held on June 21, 2012, the Court approved the Debtors' Disclosure Statement over the objection of the Oliver Parties. The Plan proposed a sale of assets, and the Debtors' marketing efforts culminated in a bid from Centaur for the purchase of substantially all of the Debtors' assets for a price of $500,000,001. No superior competing bids were received, and the Debtors proceeded forward with a combined hearing to request approval of the sale to Centaur, as well as confirmation of the Plan which was predicated upon that sale.

The Court held the combined hearing on October 19 and 22, 2012. By order dated October 31, 2012 [Docket No. 1546], the Court approved the sale of substantially all of the Debtors' assets to Centaur and overruled the Oliver Parties' objections relating to the sale. The Court entered an opinion on confirmation on January 31, 2013, *In re Indianapolis Downs, LLC*, No. 11-11046 [Docket No. 1687], 486 B.R. 286 (Bankr. D. Del. 2013), and the asset sale was consummated on February 20, 2013 (the "Sale Date"). The Court entered an order approving a stipulation regarding the sale on February 22, 2013 [Docket No. 1721], and entered an order confirming the plan on March 20, 2013 [Docket No. 1767].

## II.    THE PARTIES' POSITIONS

### A. The Oliver Parties' Position

The Oliver Parties seek payment of an administrative claim in the amount of $3.85 million. They contend that they are due this sum under the 2010 Agreement, which set a contract rate of $2.2 million per

year. The Oliver Parties argue that this contract rate is entitled to a presumption of reasonableness.  They allege that they provided executive management services from the Petition Date through the Sale Date, pursuant to the 2010 Agreement. The bulk of these services were in the form of Mangano serving in the role of CEO of Indianapolis Downs.

**B. The Objectors' Position**

The Objectors argue that the services provided by the Oliver Parties were minimal; specifically, the Objectors allege that Mangano did not serve in a "hands-on" executive capacity, but instead functioned merely as a non-executive chairman. They seek therefore to rebut the presumption that the contract rate was reasonable first by contending that the contract was signed only by Mangano (for both sides) and lacks any indication that the terms were the product of a fair negotiation. Second, the Objectors contend that the contract rate of $2.2 million per year bore no relation to the actual value of the services provided but instead was calculated to cover interest due on the Troon Notes (and which interest could not be paid due to restrictions in the senior notes indentures). Finally, the Objectors contend that the $2.2 million annual payment is well in excess of an appropriate market rate for the services provided.

### III.   JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

### IV.   LEGAL ANALYSIS

**A. Standard of Review**

    **1. Administrative Expense Priority**

Section 503 of the Bankruptcy Code accords administrative expense priority to "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Such costs and expenses include "wages, salaries, and commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A)(i). "'For a claim in

its entirety to be entitled to . . . priority under § 503(b)(1)(A)[i], the debt must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business.'" *In re Bernard Technologies, Inc.*, 342 B.R. 174, 177 (Bankr. D. Del. 2006) (quoting *Calpine Corp. v. O'Brien Envt'l Energy, Inc. (In re O'Brien Envt'l Energy, Inc.),* 181 F.3d 527, 532–33 (3d Cir. 1999)).

In order to "hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed." *Bernard Technologies*, 342 B.R. at 177 (citing *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 706 (9th Cir. 1988)). "As such, the applicant seeking compensation or reimbursement under section 503(b)(1)(A)(i) carries a 'heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets.'" *Bernard Technologies, Inc.*, 342 B.R. at 177 (quoting *Calpine,* 181 F.3d at 533 (internal citation omitted)). Generally, a claimant must prove his entitlement to requested compensation and expense reimbursement by a preponderance of the evidence. *Bernard Technologies*, 342 B.R. at 177 (citing *In re TransAmerican Natural Gas Corp.,* 978 F.2d 1409, 1416 (5th Cir. 1992)).

### 2. Presumption that Contract Rate is Reasonable

The parties do not dispute that the 2010 Agreement was an executory contract.[18] Courts in this district have consistently held that administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending assumption or rejection. *In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741 (Bankr. D. Del. 2010) (citing *In re Goody's Family Clothing, Inc.*, 392 B.R. 604, 607 (Bankr. D. Del. 2008); *In re Continental Airlines, Inc.*, 146 B.R. 520, 526–27 (Bankr. D. Del. 1992)). Pending assumption or rejection, a debtor must pay the "reasonable value of the services received." *Smurfit-Stone*, 425 B.R. at

---

[18] The parties signed the Stipulation and Order Staying Adversary Proceeding No. 11-52758, [Adv. Proc. No. 11-52758, Docket No. 59], which stated that it did not act as an assumption or rejection of the Credit Enhancement and Consulting Agreement (*i.e.*, the 2010 Agreement). By implication, the parties acknowledged that the contract was executory and therefore could be assumed or rejected.

741 (citing *NLRB v. Bildisco*, 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Continental Airlines*, 146 B.R. at 526–27).

Under the *Bildisco* "reasonable value of services" standard, there is a presumption that the contract terms and rate represent the reasonable value of the services or goods provided under the contract. *Smurfit-Stone*, 425 B.R. at 741 (citing *In re Bethlehem Steel Corp.*, 291 B.R. 260, 264 (Bankr. S.D.N.Y. 2003) ("There is an initial assumption that, where a contract exists, the contractual rate is the reasonable value of the goods or services provided to the estate.")). This presumption can be overcome if the objecting party provides "'convincing evidence to the contrary.'" *Smurfit-Stone*, 425 B.R. at 741 (quoting *In re Washington–St. Tammany Electric Cooperative, Inc.*, 111 B.R. 555, 559 (Bankr. E.D. La. 1989)); *but see Bernard Technologies,* 342 B.R. at 177-78 (holding that the terms of an employment contract are not entitled to presumptive reasonableness where the contract was ultimately rejected).

**B.     Analysis of Motion**

    **1. Objectors Overcame the Presumption**

While the presumption of reasonableness may not be lightly overcome, the Objectors in this case have presented sufficient evidence to defeat that presumption. First, the record reflects that the Oliver Parties were insiders of the Debtors, and that the agreement was executed solely by Mangano for both Indianapolis Downs and the Oliver Parties. Case law teaches that insiders of a debtor "may be entitled to claims in bankruptcy but the claims should be subject to intense scrutiny by the Court." *In re Delta Air Lines, Inc.*, No. 05-17923, 2010 WL 423279 at *5 (Bankr. S.D.N.Y. Feb. 3, 2010) (citing *In re Russell Cave Co.*, 253 B.R. 815 (Bankr. E.D. Ky. 2000)). Such scrutiny is intended to prevent insiders from "extracting inflated amounts for their services." *In re Allegheny Int'l, Inc.*, 158 B.R. 332, 339 (Bankr. W.D. Pa. 1992); *see also, Delta*, 2010 WL 423279 at *5.  "An insider has been defined as any entity or person with a 'sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms' length with the debtor.'" *Allegheny*, 158 B.R. at 339 (quoting *In re Acme–Dunham, Inc.*, 50 B.R. 734, 739 (D. Me. 1985)); *see also, Delta*, 2010 WL 423279 at *5. In the present case, the Oliver Parties' close financial and equity rela-

tionship with the Debtors, coupled with a history of deep involvement in the management of the Debtors, militates that the Court closely scrutinize the asserted basis for their administrative claim request—which, in this case, is a contract signed by one individual for all sides. The Objectors' Exhibit 1 is a copy of the 2009 Agreement signed by Mangano for both sides. The Objectors' Exhibit 2 is a copy of an addendum to the 2009 Agreement signed by Mangano for both sides. The Objectors' Exhibit 3 is a copy of the 2010 Agreement signed by Mangano for both sides. Finally, the Objectors' Exhibit 4 is a copy of the Compensation Notice signed by Mangano for both sides. Testimony regarding the 2009 and 2010 Agreements does not indicate that the terms of those agreements were the subject of serious negotiation between Mangano and any other party.[19]

Second, the evidence shows that the rate provided in the contract was not predicated upon an assessment of the value of the services provided. Out of the $1.8 million paid to Troon in 2009, representations from multiple sources within Indianapolis Downs indicate that only $300,000 was paid as a credit enhancement fee and the rest was contemplated as payment of interest on the Troon Notes. Out of the four payments made, the $200,000 payment was paid as a credit enhancement fee; the $184,701.36 was paid as interest on the Troon Notes; the $634,378.09 was comprised of a $100,000 credit enhancement fee and a $534,378.09 interest payment; and the $780,000 was calculated as an interest payment.

The 2009 Agreement recharacterized the entire amount as a consulting and credit enhancement fee. While the Oliver Parties were certainly providing executive management services to the Debtors at that time, and deserved to be compensated for such services, the calculation of the $1.8 million fee in the 2009 Agreement appears to have been primarily based on the 8% interest rate on the Troon Notes and was not a valuation of the executive management services provided. Regarding the 2010 Agreement and payments made in that year, Mangano admitted that by October 2010, $2.2 million had been paid to the Oliver Par-

---

[19] 9/11/13 Tr. at 178-82.

ties.[20] In November 2010, the 2010 Agreement was executed and the contract rate was raised to $2.2 million.[21] Therefore, it is not clear that the change in the contract rate from 2009 to 2010 solved the issue of how the rate was calculated.

All of these payments were disclosed in the annual reports, and the question before the Court does not concern whether the Indentures were violated by payments of interest to the Oliver Parties. The inquiry before the Court is whether the Oliver Parties should be paid an administrative claim for providing post-petition executive management services to the Debtors. The Court finds that the Objectors have successfully rebutted the presumption that the contract rate represented the reasonable value of the services provided, and therefore the burden shifts to the Oliver Parties to prove their entitlement to the requested compensation.

**2. Services Provided**

The Court finds that the Oliver Parties did provide executive management services through the efforts of Mangano as CEO. The Oliver Parties proved by a preponderance of the evidence that Mangano was a hands-on executive officer.[22] The Oliver Parties adduced unrebutted testimony by Mangano that the Debtors' business is heavily regulated,[23] essentially at the mercy of the Commissions, and that he was the primary contact between Indianapolis Downs and the Commissions.[24] Separately, Mangano testified at length and without material contradiction that he was the driving force in pursuing favorable resolution of the double taxation issue,[25] which was of considerable value

---

[20] 9/11/2013 Tr. at 191.

[21] The 2010 Agreement is dated December 3, 2009, but the date is incorrect. The 2010 Agreement was actually executed in November 2010. 9/11/2013 Tr. at 191.

[22] At the close of trial, five exhibits remained outstanding: the Oliver Parties' Exhibits 11, 12, 13, 14, and 15. These exhibits were declarations of five individuals. The five individuals did not testify in court, but a designated deposition of each individual was admitted separately into evidence. In light of this, Exhibits 11, 12, 13, 14, and 15 are denied admission into evidence.

[23] 9/11/2013 Tr. at 60, 68.

[24] 9/11/2013 Tr. at 79-80.

[25] Under Indiana law, a racino is required to set aside 15% of its slot-machine adjusted gross receipts ("AGR") and make a monthly distribution of such funds (the "Set-Aside Funds") to various third parties. Ind. Code § 4-35-7-12(b). A racino is also re-

to the estate. Mangano also testified that he was involved in the hiring and firing of management, including four (4) general managers during the post-petition period.[26] Mangano held Level One licenses from both the Indiana Gaming Commission and the Indiana Horse Racing Commission, which he maintained in good standing during the post-petition period.[27] When the Debtors attempted to replace Mangano as CEO at one point, the prospective replacement was unable to obtain the necessary licensing.[28] Mangano therefore provided value simply by filling the position and maintaining his license. This is further reflected in the fact that despite obvious tensions and open hostility between Mangano and important stakeholders, Mangano was retained in his position throughout the entire course of the Chapter 11 case.

The Objectors offer two main arguments to show that Mangano did not function as an executive officer but merely as a non-executive chairman. First, they point to the fact that Mangano worked primarily out of the Oliver Parties' office in South Bend, Indiana, rather than on site at the racino in Indianapolis. Second, they provided the testimony

---

quired to pay a graduated tax ("Graduated Tax") on slot-machine AGR. Id. § 4-35-8-1(a). Mangano testified that he championed the argument that Indianapolis Downs should not have to pay the Graduated Tax on the Set-Aside Funds. In an opinion and order entered October 26, 2011, this Court agreed and held that Indianapolis Downs did not need to include the Set-Aside Funds in its calculation of the Graduated Tax. *In re Indianapolis Downs, LLC*, No. 11-11046 [Docket No. 526], 462 B.R. 104 (Bankr. D. Del. 2011); Order Granting the Tax Motion, Docket No. 527. The result of the ruling was a dramatic increase in available revenue for the Debtors. The Indiana Department of State Revenue (the "Department") promptly appealed that order directly to the Third Circuit Court of Appeals. While the appeal was pending, the Department, the Debtors, and Centaur Acquisition, LLC ("Centaur") entered into settlement negotiations that culminated in a consensual resolution of the dispute. As part of the settlement, this Court's earlier order on the double taxation issue was vacated. [Docket No. 1939]. Centaur was the expected purchaser of the Debtors' assets at that time, and Centaur and the Department agreed that going forward, for purposes of the Graduated Tax, one half of the Set-Aside Funds would be considered AGR. Centaur also agreed not to seek a refund of the Graduated Tax on Set-Aside Funds which Indianapolis Downs had already paid, and the Department agreed not to seek payment of the Graduated Tax on Set-Aside Funds for the period November 1, 2011 – June 30, 2013 (during which time Indianapolis Downs had stopped paying the Graduated Tax on the Set-Aside Funds).

[26] 9/11/2013 Tr. at 80, 82-84.
[27] 9/11/2013 Tr. at 63, 80.
[28] 9/11/2013 Tr. at 80-81.

of William Hardie III, senior managing director at Houlihan Lokey Capital, Inc. ("Houlihan"), who served as Fortress' financial advisor during the bankruptcy. Hardie testified that he personally had no interaction with Mangano during the course of the Chapter 11 process.

With regard to the Objectors' first argument, the Oliver Parties presented sufficient evidence that Mangano was able to and did perform CEO duties for Indianapolis Downs while based out of the South Bend office. Mangano testified that he personally approved payment of every bill;[29] that operating personnel, including the general manager of the casino, the chief financial officer of the casino, the equine manager for the racetrack, and the accountant for the racetrack, reported directly to him;[30] and that he was the primary contact at Indianapolis Downs for the Commissions.[31] Many of these properly executive functions could be performed remotely. Mangano also testified that he was on site at Indianapolis Downs at least once per week,[32] during which visits he would meet with the operating personnel, attorneys, and representatives from the Commissions, and address any matters that needed to be dealt with in person.[33] The South Bend office was located approximately one-hundred sixty (160) miles from the site of Indianapolis Downs, so Mangano would have been less than a three-hour car ride away if his presence was required.[34]

---

[29] 9/11/2013 Tr. at 77.
[30] 9/11/2013 Tr. at 60, 66, 71-72; *see also* Dingman Dep. 41:20-21, July 25, 2013 (stating that Dingman, as COO and general manager of Indianapolis Downs, emailed daily operating reports and surveillance reports to Mangano); *id.* 42:2-14 (stating that Dingman sent internal audit reports and surveillance reports to Mangano, which they would discuss); Regan Dep. 37:11-17, Sept. 14, 2012 (stating that Regan, as CFO of Indianapolis Downs, provided daily and monthly financial statements to Mangano).
[31] 9/11/2013 Tr. at 79-80.
[32] 9/11/2013 Tr. at 70; Dingman Dep. 25:14-22, July 25, 2013 (stating that Mangano "routinely visited the property virtually every week"); Regan Dep. 15:3-4, July 19, 2013 (stating that on average Mangano visited the site weekly).
[33] 9/11/2013 Tr. at 71; *see also* Dingman Dep. 27:16–29:2, July 25, 2013 (stating that Dingman took Mangano on walk-throughs of the property during the weekly visits, Mangano was engaged in the process, and Mangano was particularly interested in maintaining a high level of friendliness and cleanliness at the casino); Regan Dep. 51:15–55:4, July 19, 2013 (stating that Regan would also accompany Mangano on walk-throughs of the property).
[34] *See* Dingman Dep. 29:19–30:3, July 25, 2013 (stating that Mangano was "always reachable through his office or via his . . . cell phone").

With regard to the Objectors' second argument, Hardie testified that in his experience, CEOs are deeply involved in the bankruptcy process and plan negotiation, and that he would have expected direct involvement by Mangano as a CEO. Hardie further testified that he was surprised, as the financial advisor of one of the Debtors' major stakeholders, to have had absolutely no contact with Mangano during the course of these cases. As a general proposition, this Court agrees with Hardie's testimony and experience regarding typical interaction of senior management of a debtor with major creditors. However, Mangano's unchallenged testimony was that he was directly instructed by the Debtors' bankruptcy counsel to keep out of the bankruptcy proceedings,[35] and that was likely prudent instruction. The hostility toward Mangano from creditors was clear from the outset of this case, and divorcing his role in running the business from any negotiations with creditors likely improved the progress of those negotiations. Mangano did continue to work on behalf of the Oliver Parties and their equity interests, in addition to his role as CEO of Indianapolis Downs, but that conflict was amply disclosed and then cured by creation of the Special Committee of the Board of Managers to relieve those potential conflicts of interest. The Objectors' arguments and evidence about what Mangano did not do during the case are therefore insufficient to undermine the evidence about what he did accomplish.

The Oliver Parties also alleged that valuable additional services were provided by the three Oliver Estate employees working out of the South Bend office. Specifically, Mangano testified that James Hart (investment analyst for Oliver Estate), Lorrie Nunemaker (secretary), and Donald Riggs (treasurer) regularly assisted him in serving as CEO of Indianapolis Downs. There is no dispute that the employees served as full-time employees of Oliver Estate.[36] The Court determines, however, that the Oliver Parties did not carry their burden with respect to demonstrating that these employees provided actual and necessary services. The employees may have facilitated Mangano's ability to func-

---

[35] 9/11/2013 Tr. at 108-110.
[36] *See* Hart Dep. 13:7–15:7, July 31, 2013 (stating that he was a full-time employee); Nunemaker Dep. 9:20–10:9, July 31, 2013 (stating that she was a full-time employee); Riggs Dep. 13:25–15:21, July 31, 2013 (stating that he was a full-time employee).

tion remotely,[37] but it is not clear that any tasks performed by the three Oliver Estate employees directly benefited Indianapolis Downs in a measurable or quantifiable way. Therefore, while the Oliver Parties proved that Mangano provided compensable services to the Debtors, they did not carry their burden to prove that the three employees also did so.

### 3. Value of the Services

Each side presented an expert witness regarding the appropriate level of compensation for Mangano. The Oliver Parties' expert had considerable experience working at the executive level in the casino industry, and the Objectors' expert had numerous years of experience in the restructuring industry. Despite careful analyses presented by both experts, neither was able to provide a robust analysis of total compensation of chief executive officers at comparable companies.

The Oliver Parties elicited the expert testimony of Hector Mon of Hector Mon Consulting. Mon worked in the casino industry for thirty-three (33) years, and now runs a consulting agency. He worked his way up in the industry and then held a variety of managerial and executive roles.[38] Mon testified that this was his first time performing this type of compensation analysis.[39]

Mon's expert report was admitted into evidence as the Oliver Parties' Exhibit 72. Mon evaluated possible compensation rates under three different methods: 1) what a third party management company would charge; 2) what other companies pay for corporate expenses as a percentage of revenue; and 3) comparative executive compensation. Under the first method, Mon determined that a third party management company likely would charge between 4-7% of revenue.[40] The Debtors' former management company charged 4.5% of revenue, plus

---

[37] *See* Hart Dep. 27:17–30:9 (stating that he compiled financial spreadsheets and assisted Mangano in preparing for a presentation to a committee of the Indiana legislature); Nunemaker Dep. 15:2-16 (stating that she provided clerical support to Mangano); Riggs Dep. 20:20–21:14 (stating that he managed the purse accounts for the race track).
[38] Oliver Parties' Ex. 72 at 2.
[39] 9/12/2013 Tr. at 51.
[40] Oliver Parties' Ex. 72 at 15.

1% of profit.[41] This amounted to $10 million per year during their engagement.[42] Mon concluded that this would not be a reasonable rate of compensation because the scope of services provided by the Oliver Parties was much narrower than the scope of services provided by a third party management company.[43] Under the second method, Mon used a sample of five other companies in the gaming industry and calculated what percentage of revenue was being spent on corporate expenses.[44] The average was 2.1%.[45] In this case, that would translate to $4.7 million per year.[46] Mon concluded that this figure was still too high. His report states that, "Based on my study of the circumstances and in my opinion, it would not be reasonable to say that Mr. Mangano and the Oliver Parties deserved to be paid those amounts [the $10 million or $4.7 million per year figures]. Yet those figures do serve as a legitimate point of reference." [47]

Therefore, Mon turned to yet a third method to inform his estimate of the value of the services being provided by the Oliver Parties. Under the third method, Mon used five sample companies as data points—he explicitly stated that they were not presented as comparables—to examine the base rate, incentive bonus, and equity participation of gaming industry executives.[48] Mon assigned $500,000 as a base salary value; $550,000 for an incentive bonus; $625,000 for equity participation; and $465,000 for services performed by the South Bend office.[49] Even with the three methods, however, Mon testified that, "This is not really a clean-cut [case] of any one of the three, so I did the best I could to come up with a reasonable estimate using three different methods . . . ."[50]

---

[41] Oliver Parties' Ex. 72 at 15.
[42] Oliver Parties' Ex. 72 at 15.
[43] Oliver Parties' Ex. 72 at 15.
[44] Oliver Parties' Ex. 72 at 15-16.
[45] Oliver Parties' Ex. 72 at 16, Ex. 2.
[46] Oliver Parties' Ex. 72 at 17.
[47] Oliver Parties' Ex. 72 at 17.
[48] 9/12/2013 Tr. at 121.
[49] Oliver Parties' Ex. 72 at 17-19.
[50] 9/12/2013 Tr. at 131.

The Objectors' expert was William Hardie III of Houlihan, mentioned above. As a senior managing director in Houlihan's restructuring practice, he has managed numerous debtor and creditor side restructuring assignments, including businesses in the gaming industry. Hardie stated that he has not previously testified as an expert in the valuation of executive services.[51]

Hardie's expert report was admitted into evidence as the Objectors' Exhibit 68. Hardie assessed Mangano's functions to be most like a non-executive chairman, and on rare occasion a chief executive officer, of a one-property casino and gaming operation.[52] Since the Court has determined that Mangano provided the services of a chief executive officer, the compensation analysis for non-executive chairmen is not relevant here. Hardie did also compile information for chief executive officers of one-property casino and gaming operations.[53]

For 2012, Hardie provides a sample of five (5) comparable companies.[54] Hardie's analysis explains that several other companies were excluded because information on executive compensation was not publicly available. However, even for the companies that did make it into the sample, the report lacks information on equity compensation for four out of those five companies. Additionally, one of the executives was paid only for time served as CEO from October 22, 2012, through the end of the year, and it is not clear from the report whether the pay rate was prorated and if this was factored into the calculation.

While the expert reports may be probative of the range of standard compensation, they do not provide reliable comparable compensation rates. Mon's report provides a comparative analysis of data points, which offer a frame of reference, but the compensation calculation is far from exact. Meanwhile, Hardie's report offers a valuable summary of comparative base salaries, but lacking equity compensation information, does not reliably reflect total compensation of those executives.

---

[51] 9/12/2013 Tr. at 232.
[52] 9/12/2013 Tr. at 228.
[53] Objectors' Ex. 68 at Ex. F.
[54] Objectors' Ex. 68 at Ex. F.

The record developed at trial reflects that the Debtors intended to replace Mangano with Gregory Rayburn.[55] Specifically, both Hardie and Mon testified that the Debtors and stakeholders initially intended that Rayburn would serve as CEO of the Debtors and negotiated the terms of his engagement with that position in mind.[56] The compensation for Rayburn to serve as CEO was $135,000 per month, for an annual rate of $1.62 million per year.[57]

As noted earlier, Rayburn was unable to obtain the necessary licensing or approval from the Commissions that would have enabled him to serve as CEO of Indianapolis Downs.[58] Consequently, Rayburn was engaged as CRO, at the same $135,000 per month referenced above.

In attempting to determine an appropriate compensation level for the services provided by Mangano, the Court finds that the rate agreed to for Rayburn is most indicative of a fair market value. The record reflects that Rayburn's contract was negotiated between and among Rayburn, the Debtors, and the major creditor constituencies—all sophisticated, experienced parties enjoying the assistance of able professionals in the process. Further, while the annual salary is significant, the Court is also mindful that Mangano was and had been running an enterprise that ultimately obtained a sale value of over half a billion dollars.

The purpose of this exercise has been to determine the reasonable market value of Mangano's services to Indianapolis Downs. The compensation terms negotiated for his proposed replacement are clearly probative. The Court acknowledges that there is a practical difference between a long-term executive such as Mangano, and a crisis manager such as Rayburn. Experience teaches that a CRO may at times be compensated at a high rate, given the typically short duration and intense pressures and challenges that crisis managers face. Nevertheless, based upon the substantial record developed in this proceeding, the Court concludes that the compensation structure that was agreed to

---

[55] 9/12/2013 Tr. at 175, 245-46.
[56] 9/12/2013 Tr. at 175, 246.
[57] 9/12/2013 Tr. at 171, 175, 245-46.
[58] 9/12/2013 Tr. at 175, 246.

by the major stakeholders for Rayburn's proposed service as CEO is the best and most reliable measure of the appropriate value attributable to Mangano's service as CEO.[59] Accordingly, the Oliver Parties shall be compensated for the provision of executive management services at the rate of $1.62 million per year for the period of the Petition Date through the Sale Date. The Court will therefore allow and approve an administrative expense claim in the amount of $3.04 million. An appropriate Order follows.

### IV. CONCLUSION

For the foregoing reasons, the Court will enter an order allowing and compelling payment of the Oliver Parties' administrative claim in the amount of $3.04 million. An appropriate Order follows.

**BY THE COURT:**

Dated: November 5, 2013
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[59] As noted, Rayburn went on to serve as CRO under the same terms. While cognizant of the cumulative effect of Mangano's and Rayburn's compensation, the Court observes that CROs are commonly appointed in large Chapter 11 cases without removing other, highly compensated senior officers.